**No. 26-2568**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

BAGDASARIAN PRODUCTIONS, LLC,

*Plaintiff-Appellant*,

v.

PGS ENTERTAINMENT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2-25-cv-03240-CV (Ex)
The Honorable Cynthia Valenzuela

# OPENING BRIEF OF PLAINTIFF-APPELLANT BAGDASARIAN PRODUCTIONS, LLC

MaryAnn Almeida
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 757-8030
maryannalmeida@dwt.com

David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Haley B. Zoffer
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue
27th Floor
Los Angeles, CA 90071
(213) 633-6800
haleyzoffer@dwt.com

*Attorneys for Plaintiff-Appellant Bagdasarian Productions, LLC*

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... iv

STATEMENT REGARDING ORAL ARGUMENT ..... viii

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 3

STATEMENT OF ISSUES ..... 4

STATEMENT OF THE CASE ..... 5

A. The Underlying Dispute ..... 5

B. PGS Initiates Arbitration Proceedings. ..... 7

C. BP Initiates Arbitration Proceedings In Response To The Newly Discovered Information. ..... 9

D. The Arbitrator's Decision. ..... 11

1. Resolution of the First Arbitration claims. ..... 11

2. Resolution of the Second Arbitration claims. ..... 13

E. The Arbitrator's "Interpretation" And "Correction" Of The Initial Award. ..... 15

1. PGS requested a substantive change in the award, which the arbitrator allowed. ..... 15

2. Both parties requested clarification of the fee award, which the arbitrator never resolved. ..... 17

F. The District Court's Decision. ..... 18

SUMMARY OF ARGUMENT ..... 21

STANDARD OF REVIEW ..... 25

## TABLE OF CONTENTS (continued)

**Page**

ARGUMENT ........................................................................................ 26

I. The Arbitrator Exceeded His Powers By Increasing Damages For The Potential Nickelodeon Deal By Nearly $1.6 Million........ 27

A. *Functus officio* prohibits arbitrators from reconsidering the substance of their awards. ............................................. 28

B. As the district court found, the arbitrator went “outside the bounds” of what is allowed under *functus officio* by increasing the Nickelodeon damages.................................. 30

C. The Amended Award necessarily violates the ICDR-IFTA Rules because Article 37.1 codifies *functus officio* and its exceptions. .............................................................. 33

D. Article 37.1 cannot authorize what *functus officio* forbids. ...................................................................... 38

II. The Arbitrator Never Issued A Final Decision Regarding PGS’s Failure To Inform BP Of Third-Party Broadcast Deals. ......................................................................................... 41

A. The record shows that the arbitrator failed to address BP’s claim. ............................................................... 42

B. BP did not waive this argument, and there is no exhaustion requirement under the FAA. ............................. 45

III. The Arbitrator Exceeded His Authority By Failing To Fix Costs, Which The Rules Require. ................................................. 47

IV. The Arbitrator Exceeded His Authority By Awarding PGS Fees On The Second Arbitration.................................................. 50

CONCLUSION ..................................................................................... 55

CIRCUIT RULE 28-2.6 STATEMENT OF RELATED CASES ............ 57

## TABLE OF CONTENTS (continued)

**Page**

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ................58

CERTIFICATE OF SERVICE..............................................................59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerojet Rocketdyne, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 2017 WL 9500948 (C.D. Cal. Nov. 27, 2017) .......... 30

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162 (9th Cir. 2019) .......... 26

*Bell Aerospace Co. Div. of Textron, Inc. v. Loc. 516, Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 500 F.2d 921 (2d Cir. 1974) .......... 49

*Bosack v. Soward*, 586 F.3d 1096 (9th Cir. 2009) .......... 25–26, 33, 50

*Cardinal v. Lupo*, 2021 WL 4027803 (9th Cir. Sept. 3, 2021) .......... 54

*Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327 (3d Cir. 1991) .......... 28, 29, 30

*Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC*, 319 F.3d 1060 (8th Cir. 2003) .......... 49

*G.P.P., Inc. v. Guardian Prot. Prods., Inc.*, 126 F.4th 1367 (9th Cir. 2025) .......... 54

*HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232 (9th Cir. 2022) .......... 25, 26

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, Loc. 631 v. Silver State Disposal Serv., Inc.*, 109 F.3d 1409 (9th Cir. 1997) .......... 36–37, 41

*Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401 (9th Cir. 2011) .......... 25

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*La Vale Plaza, Inc. v. R. S. Noonan, Inc.*,
378 F.2d 569 (3d Cir. 1967) ........................................................ 29, 35

*McClatchy Newspapers v. Cent. Valley Typographical Union*,
686 F.2d 731 (9th Cir. 1982) ........................................... 29–30, 34, 35

*McKinney Restoration, Co. v. Ill. Dist. Council No. 1 of Int'l Union of Bricklayers & Allied Craftworkers*,
392 F.3d 867 (7th Cir. 2004) ............................................................ 44

*Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*,
44 F.3d 826 (9th Cir. 1995) .............................................................. 26

*Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*,
307 F.3d 1220 (9th Cir. 2002) ........................................................... 53

*Millmen Loc. 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells Exterior Trim*,
828 F.2d 1373 (9th Cir. 1987) ........................................................... 41

*Norfolk S. Ry. Co. v. Sprint Commc'ns Co. L.P.*,
883 F.3d 417 (4th Cir. 2018) ................................................. 41, 45, 46

*Preston v. Ferrer*,
552 U.S. 346 (2008) .......................................................................... 49

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*,
157 F.3d 174 (2d Cir. 1998) .............................................................. 41

*San Diego AFL-CIO Bus Drivers Loc. Div. 1309 of Amalgamated Transit Union v. San Diego Transit Corp.*,
972 F.2d 1342, 1992 WL 180221 (9th Cir. 1992) ......................... 28, 29

*Santisas v. Goodin*,
951 P.2d 399 (Cal. 1998) ................................................................... 54

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Steinmann v. ZTE Corp.*,
2015 WL 13546434 (C.D. Cal. Dec. 11, 2015) .................................... 48

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
592 F.3d 329 (2d Cir. 2010) .................................................. 21, 39, 40

*Teamsters Loc. 312 v. Matlack, Inc.*,
118 F.3d 985 (3d Cir. 1997) ........................................................ 30, 36

*Thomas Kinkade Co. v. Hazlewood*,
2007 WL 2088584 (N.D. Cal. July 18, 2007) ...................................... 54

*United States v. Park Place Assocs., Ltd.*,
563 F.3d 907 (9th Cir. 2009) ....................................................... 25, 35

*U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*,
591 F.3d 1167 (9th Cir. 2010) ........................................................... 28

*W. Emps. Ins. Co. v. Jefferies & Co.*,
958 F.2d 258 (9th Cir. 1992) ............................................................. 46

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1–16
§ 10 ............................................................................................ *passim*
§ 16 ................................................................................................... 4

9 U.S.C. § 203 ......................................................................................... 4

28 U.S.C. § 1291 ...................................................................................... 4

28 U.S.C.§ 1331 ....................................................................................... 4

28 U.S.C.§ 1332 ....................................................................................... 4

## TABLE OF AUTHORITIES (continued)

**Page(s)**

### Rules

ICDR® International Arbitration Rules For IFTA Arbitrations
Article 37.1 ........ *passim*
Article 38 ........ 47–48, 54

### Other Authorities

2 Martin Domke et al., *Domke on Com. Arb.* § 33:5 (Jan. 2025) ...... 43–44

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1), Plaintiff-Appellant Bagdasarian Productions, LLC requests oral argument to help clarify the important issues in this appeal.

## INTRODUCTION

This appeal turns on a basic tenet of arbitration: An arbitrator's authority is broad, but it is not boundless. Arbitrators must follow the law, and they must decide the issues presented to them. In a consolidated pair of arbitrations between Appellant Bagdasarian Productions (BP) and Appellee PGS Entertainment (PGS) over a contract for the distribution of a television series BP created in the "Alvin and the Chipmunks" entertainment franchise, an arbitrator from the International Center for Dispute Resolution (ICDR) failed on both fronts.

After issuing what was expressly characterized as a final award, the arbitrator improperly reconsidered evidence he had already rejected, reversed his own reasoning, and increased the damages awarded by nearly $1.6 million, from $138,713 to $1,716,000. He did so under the guise of correcting a "computational error" and an "oversight," even though the change altered both the factual basis for and the methodology of the award. This redetermination of the merits violated both the common-law doctrine of *functus officio* and the arbitration rule that codifies it.

Nor was that the arbitrator's only dispositive error. He also (1) failed to decide one of BP's primary claims; (2) awarded fees and costs without fixing their amount or committing to resolve them in arbitration, even though the governing rules required him to do so; and (3) awarded undefined attorneys' fees to PGS based on BP's initiation of the second of the two consolidated arbitrations, even though he ruled for BP on a central claim in that proceeding. Each of these errors independently exceeded the arbitrator's authority.

The district court recognized much of this—yet affirmed anyway. The district court correctly concluded that the arbitrator's post-award damages revision exceeded the narrow limits of *functus officio* by changing both the methodology and the magnitude of the remedy based on facts outside the face of the decision. That should have ended the matter. Instead, the court supplied a rescue theory no party had advanced—that Article 37.1 of the ICDR-IFTA Rules authorizes what *functus officio* forbids, and that the court was obliged to defer to the arbitrator's characterization of a merits revision as a computational correction. But deference is not abdication, and an arbitrator's label

cannot expand his authority. Once the district court concluded the amendment was substantive, confirmation was no longer permissible.

The Federal Arbitration Act, 9 U.S.C. §§ 1–16, does not permit courts to rubber-stamp arbitration awards. Although judicial review of arbitration awards is deferential, the arbitrator's decision here was so fundamentally flawed that it defeated the parties' expectations in agreeing to arbitration. When an arbitrator's decision improperly redetermines the merits, leaves submitted claims unresolved, fails to complete the award he was required to issue, and imposes fees without a lawful basis, the Act requires vacatur. Because the arbitrator repeatedly exceeded his authority, and the district court compounded those errors by treating them as grounds for deference rather than vacatur, this Court should reverse the district court's judgment, vacate the award, and remand under the Federal Arbitration Act.

## JURISDICTIONAL STATEMENT

The district court denied BP's motion to vacate and granted in part and denied in part PGS's motion to confirm on March 31, 2026. *See* ER-3–25. BP filed a timely notice of appeal on April 16, 2026. ER-145–49.

The district court properly exercised jurisdiction under 9 U.S.C. § 203 and 28 U.S.C. § 1331 because the arbitral award is between BP, a U.S. entity, and PGS, a French entity, and is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. It also properly exercised jurisdiction under 28 U.S.C. § 1332(a)(2) because this civil action is between a citizen of California (BP) and a citizen of France (PGS), and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(D).

## STATEMENT OF ISSUES

1. Whether the arbitrator exceeded his powers under the common-law doctrine of *functus officio* and the arbitration rule implementing that doctrine when he reconsidered evidence and changed the methodology used to calculate damages to increase the award from $138,713 to $1,716,000.

2. Whether the arbitrator failed to issue a final decision regarding PGS's concealment of third-party broadcast deals.

3. Whether the arbitrator exceeded his authority under the parties' arbitration agreement by failing to fix attorneys' fees and costs.

4. Whether the arbitrator expressed a manifest disregard for the law by awarding PGS attorneys' fees on the second arbitration.

## STATEMENT OF THE CASE

### A. The Underlying Dispute.

Alvin and the Chipmunks is an icon in children's entertainment, a 68-year-old franchise that includes successful albums, television series, merchandise, and motion pictures. It was created by Ross Bagdasarian Sr. and has been owned and operated for the last 46 years by BP—a family-run business led by Ross Bagdasarian Jr. and his wife Janice Karman. BP contracts with distributors, sales agents, and other third parties to deliver Chipmunks content to viewers around the world.

In 2012, after having produced three blockbuster movies featuring Alvin and the Chipmunks, BP conceived of and co-produced a new Chipmunks television series entitled *Alvinnn!!! and the Chipmunks* (the Series). The following year, BP and PGS contracted for PGS to serve as BP's international sales agent—its "exclusive agent regarding the representation, distribution and exploitation" of the Series worldwide, except in France and the United States (the Agreement). ER-84. The

Series premiered in 2015, and in the years that followed, BP produced, wrote, directed, and voiced five seasons totaling 260 episodes.

Building on the success of the first five seasons, the parties contracted in 2019 for PGS to sell the Series' sixth and seventh seasons. ER-121. Unfortunately, the COVID-19 pandemic disrupted BP's efforts to develop these new seasons between 2020 and 2022. Of particular importance, issues with BP's India-based co-producer and animator, Technicolor Animation Productions (TAP), delayed production. TAP lacked the infrastructure necessary to support efficient remote work after shutdown orders went into effect, and tragically, one of the Series' senior animators at TAP died from COVID during production. *Id.*

BP informed PGS in April 2021 that it had decided to suspend production of the sixth and seventh seasons, due to these production challenges and lower-than-expected sales. *Id.* But following the parties' failed attempt at mediating those issues in June 2021, BP decided to move forward with production. *Id.* BP provided PGS with a revised delivery schedule in August 2021 to account for the delays experienced to date. *Id.* BP asked PGS to relay those dates to broadcasters and to confirm the broadcasters' receipt of the revised schedule to ensure

broadcasters did not expect episodes based on the original schedule. Unbeknownst to BP, however, "PGS d[id] not provide this [updated] delivery schedule" as BP had requested. *Id.* PGS also failed to provide broadcasters with a second revision to the schedule in January 2022. ER-122.

After further pandemic-related difficulties, on April 21, 2022, TAP's president recommended postponing production of the Series entirely. *Id.* BP immediately reached out to PGS and asked to renegotiate the Agreement under French Civil Code Article 1195, which allows renegotiation of a contract due to unforeseen changes in circumstances. *Id.* PGS never responded.

### B. PGS Initiates Arbitration Proceedings.

Rather than accepting BP's offer to renegotiate, PGS filed a Notice of Arbitration on May 27, 2022 (the First Arbitration). *Id.* Per the parties' Agreement, the proceedings were conducted by the ICDR in Los Angeles, California under the ICDR® International Arbitration Rules For IFTA Arbitrations (ICDR-IFTA Rules).[1] ER-143. The Agreement also provided

---

[1] *See* https://icdr.org/sites/default/files/ICDR_IFTA_Rules.pdf (Jan. 1, 2022) (last visited July 16, 2026). IFTA stands for the Independent Film and Television Alliance.

that "French law controls validity, construction, and performance [of this] agreement." ER-120.

PGS's statement of claim alleged that BP breached the Agreement by failing to perform its contractual obligations in good faith, advancing three theories of liability. ER-123, ER-124. Only one of those theories is relevant to this appeal—that BP acted in bad faith by unreasonably rejecting four offers PGS obtained in 2021 for distribution of Seasons 6 and 7, notwithstanding the Agreement's grant to BP of sole approval over any potential deal.

The ICDR assigned PGS's arbitration to Michael C. Donaldson, who began arbitration hearings on September 21, 2022. On November 3, 2022, after eight days of hearings, PGS revealed to BP for the first time that it had received a letter with "threats from RTL," a European media conglomerate, "related to the non-delivery of S6." ER-122. PGS hid RTL's October 14, 2022 letter from BP for almost three weeks. The letter also stated that RTL had been expecting the initial Season 6 episodes on August 1, 2022. *See* ER-78. But August 1, 2022 was the ***original*** date in the outdated schedule; the ***revised*** schedule that BP instructed PGS to

distribute in August 2021 set August 1, ***2023*** as the delivery date. ER-77–78.

Naturally, this came as a shock to BP. BP immediately asked why RTL would expect episodes based on a long-ago-supplanted schedule, but PGS delayed another three weeks before responding. Then, on November 29, 2022—during BP's own testimony in the final few days of arbitration hearings—PGS finally confirmed that it ***never communicated*** the schedule changes to broadcasters, and indeed ***never had any intention of doing so***. ER-78, ER-123. PGS not only failed to fulfill its contractual obligations to provide this key information to broadcasters; instead, it concealed its inaction from BP. More troubling still, PGS's correspondence with RTL and another broadcaster, Globo, revealed that PGS's only communications with those broadcasters sought to undermine BP's relationships with them: PGS disclosed information about the confidential arbitral proceedings and disparaged BP. ER-122–23.

### C. BP Initiates Arbitration Proceedings In Response To The Newly Discovered Information.

After learning that PGS had intentionally withheld the updated production schedule from broadcasters, BP promptly filed its own Notice of Arbitration on December 16, 2022 (the Second Arbitration). ER-123.

BP asserted two claims against PGS for breach of the Agreement because PGS: (1) failed to communicate the updated delivery schedule to broadcasters and concealed that failure from BP; and (2) wrongfully disclosed confidential information to broadcasters. *Id.* The ICDR then consolidated the Second Arbitration with the First Arbitration and instructed Arbitrator Donaldson to hear both arbitrations together.

During discovery in the Second Arbitration, BP uncovered evidence that PGS had committed an ***additional*** breach of the Agreement: PGS had a contractual obligation to promptly present all potential deals to BP, but it concealed over $7 million in potential new or renewed deals for the Series proposed by various broadcasters. *Id.* Those deals included offers from the Series' biggest broadcaster, Nickelodeon. Indeed, PGS hid that in August and October of 2021, Nickelodeon had offered $1 million for additional rights to Season 5, and in September 2023 had offered $3.5 million for renewal rights to Seasons 1–5. ER-121–23; *see also* ER-123 (describing "nearly ten proposals" that PGS "did not disclose to BP in 2023" alone).

Following this revelation, BP amended its notice of arbitration on February 2, 2024, to add a third claim for bad faith, alleging that PGS

breached the Agreement by concealing these potential deals from BP. ER-123. PGS asserted a counterclaim in response, alleging BP improperly disclosed PGS's confidential information by uploading to a data room documents containing deal information about the *Alvinnn!!!* television series that BP created and owned. *Id.*

### D. The Arbitrator's Decision.

The arbitrator issued his award (the Initial Award) on November 21, 2024, following an additional ten days of hearings on the Second Arbitration and post-hearing briefing on both Arbitrations. *See* ER-120–32. Titled "FINAL AWARD," the Initial Award addressed claims from both of the consolidated Arbitrations.

#### 1. Resolution of the First Arbitration claims.

As to the First Arbitration, the arbitrator sided with PGS on two of the claims and with BP on the other. As to PGS's claim that BP acted in bad faith by unreasonably rejecting ***four*** deals that PGS proposed in 2021, the arbitrator agreed those rejections were in bad faith, but he concluded BP had "rejected" only "***three contracts*** in bad faith" that year. ER-125 (emphasis added). The decision distinguished three concrete offers for broadcast contracts—with Disney, Discovery, and

Tele-Quebec, *id.*—from the fourth potential opportunity—Nickelodeon's 2021 "expressed interest" in the Series—which never amounted to a contractual offer, ER-125, ER-129. Instead, Nickelodeon and BP ended discussions about that opportunity when BP declined "to make certain creative changes," ER-125—essentially, to create a completely new spin-off—that Nickelodeon had requested in order to even consider making an offer. ER-122.

The arbitrator awarded damages to PGS based on the rejection of the three contract offers and the potential deal with Nickelodeon. For the three firm offers, the arbitrator awarded PGS the amount it would have received under the Agreement had the contracts gone forward—27.5% of projected revenue. ER-129. This included $123,750 from the Disney deal, $196,625 from the Discovery deal, and $95,766.45 from Tele-Quebec. *Id.* The damages from these three contract offers totaled roughly $416,000. The arbitrator calculated damages arising from the potential Nickelodeon deal differently because, he explained, Nickelodeon's 2021 "proposal … ***was never formalized***." *Id.* (emphasis added). The arbitrator thus concluded that, due to the nascent character of the discussions, "there [wa]s no proposed licensee fee on which to base [the

damages] calculations." *Id.* Accordingly, he "averaged the proposed license fees of the three other deals found to be in bad faith," awarding PGS $138,713.81 for not moving forward after Nickelodeon's inchoate expression of interest. *Id.* The "total damages on account of the four deals" came to $554,855.26. *Id.*[2]

### 2. Resolution of the Second Arbitration claims.

With respect to BP's three claims for damages based on PGS's bad faith and PGS's confidential disclosure counterclaim in the Second Arbitration, the arbitrator agreed that PGS had acted in bad faith by failing to provide the revised schedule to broadcasters. ER-126. According to the arbitrator, PGS acted "in self-serving ways by … withholding information [from broadcasters]." *Id.* This "qualifie[d] as an act of bad faith under French law." *Id.* The arbitrator disagreed with BP on its claim for damages based on PGS's disclosure of the arbitral proceedings to broadcasters. *Id.* He also concluded PGS was not entitled to recover any damages for its counterclaim, finding that although BP's disclosures constituted bad faith under French law, *id.*, there was "no evidence

[2] The arbitrator also awarded $75,000 in additional damages, ER-129, that are not at issue here.

presented by PGS that any actual reputational damages occurred," ER-129.

But the arbitrator never fully resolved BP's third claim—whether PGS acted in bad faith by concealing from BP several high-value proposed deals totaling over $7 million. Undoubtedly, the arbitrator was aware of this claim—the Initial Award makes that clear. In summarizing the disputes, for example, the arbitrator explained that "PGS failed to inform BP of third-party broadcast proposal deals, 'despite being contractually and legally obligated to do so.'" ER-123. He even made express factual findings that PGS concealed at least twelve deals from BP. *See, e.g.*, ER-121 (describing Nickelodeon offer for S5 "that PGS rejects without informing BP"); ER-123. But the arbitrator ***never*** determined PGS's liability for the concealment he found.

Finally, the arbitrator concluded that PGS was not entitled to recover attorneys' fees and costs for the claims it prevailed on in the First Arbitration. But he shockingly penalized BP by awarding PGS fees and costs for the entire ***Second Arbitration***, despite finding ***in BP's favor*** that PGS acted in bad faith by failing to disclose the revised delivery schedule, and despite finding facts suggesting that PGS violated the

Agreement by concealing at least twelve deals from BP. ER-130 (awarding fees and costs "starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022"). The Initial Award also lacked any detail or specificity about the ***amount*** of fees he was awarding—it noted only that PGS could not seek reimbursement for its travel to and from France to Los Angeles or its food and lodging costs. *Id.*

### E. The Arbitrator's "Interpretation" And "Correction" Of The Initial Award.

Under Article 37.1 of the ICDR-IFTA Rules, parties in arbitration may not seek substantive reconsideration of an arbitral award, but may "request the arbitrator to interpret the award or correct any clerical, typographical, or computational errors" in the award. Both parties filed post-award briefing under Article 37.1 and agree that it applied.

#### 1. PGS requested a substantive change in the award, which the arbitrator allowed.

Despite the narrow scope of clarification permissible under Article 37.1 of the ICDR-IFTA Rules, PGS requested that the arbitrator reverse his substantive finding that "there [wa]s no proposed licensee fee on which to base [the damages] calculations" for the potential Nickelodeon

interest in 2021. ER-129. PGS claimed that the arbitrator "overlooked" a ***different*** offer Nickelodeon made in 2020, and that he should have based the damages award on that separate offer. ER-60. But the Initial Award shows otherwise—the arbitrator expressly addressed the 2020 offer, noting that "both parties [had] agree[d] to reject" it. ER-121.

According to PGS, its request that the arbitrator reverse his factual findings was merely "a request to correct a computational error." ER-60. But implicitly recognizing how strained that claim was, PGS offered in the next sentence to "withdraw this request" if the arbitrator believed it was improper under Article 37.1. *Id.* And to be clear, PGS's request required the arbitrator to reverse course with respect to multiple factual findings:

- that both parties had agreed to reject the 2020 offer;
- that there was no proposed license fee on which to base a calculation for the 2021 expression of interest; and
- that the averaging methodology should be changed

—all to increase the damages award by nearly $1.6 million.

The arbitrator fell for PGS's trap. *See* ER-115–18. Although he had already explicitly addressed the evidence PGS raised in its Request for

Correction—Nickelodeon's separate 2020 offer, which BP and PGS jointly rejected— and had stated in the Initial Award that the 2021 proposal "was never formalized," meaning there was "no proposed licensee fee on which to base" the calculations of PGS's lost revenue, ER-129, the arbitrator's Amended Award reversed course. It asserted that these factual findings were "inaccurate," that PGS was "correct that Nickelodeon's licensing offer contained in Exhibit 62 was inadvertently overlooked," and that the "oversight" could be "categorized as a computational error." ER-117. Relying on Nickelodeon's 2020 offer instead of averaging the other three 2021 offers increased the damages award from $138,713 to $1,716,000.

**2. Both parties requested clarification of the fee award, which the arbitrator never resolved.**

Both parties also sought clarification under Article 37.1 of the ICDR-IFTA Rules of the indefinite award of fees and costs. ER-116–17. BP also sought clarification of the arbitrator's fee award because it purported to award fees to PGS for the Second Arbitration despite finding that PGS had acted in bad faith by failing to disclose the revised delivery schedule to broadcasters. ER-74. Abiding by Article 37.1's narrow scope of permissible correction requests, BP did not challenge the arbitrator's

decision on any grounds that would have required the substantive reassessment of evidence—which would be improper.

The arbitrator addressed the request for clarification of his decision regarding attorneys' fees—but here, too, the Amended Award was inconsistent with the ICDR-IFTA Rules. Instead of fixing an award—and doing so based only on the claims on which PGS prevailed—the arbitrator ordered the parties to "meet and confer to mutually determine the proper amount of attorneys' fees and costs." ER-117. He acknowledged the likelihood that this alleged solution was no solution at all. If the parties were unable to "reach an agreement" after meeting and conferring, the arbitrator left resolution contingent on "other avenues" of resolving the dispute "such as mediation or a collection action in traditional litigation mode." *Id.*

Finally, the arbitrator rejected BP's request for correction of the award of attorneys' fees to PGS on the ground that it was outside "the ambit of Article 37." ER-116.

### F. The District Court's Decision.

BP timely challenged the arbitrator's award in the district court. On April 11, 2025, it filed a Petition to Vacate and Remand under the

Federal Arbitration Act, 9 U.S.C. §§ 1–16, ER-173–78, *Bagdasarian Prods., LLC v. PGS Ent.*, No. 2:25-cv-03240-CV-E (C.D. Cal. Apr. 11, 2025), Dkt. No. 1, and thereafter filed a supporting Motion, *id.*, Dkt. No. 20.

BP sought vacatur on four independent grounds. *First*, the arbitrator exceeded his authority under the common-law *functus officio* doctrine and Article 37.1, which codifies *functus officio*, by reversing factual findings, changing the methodology used to calculate damages, and dramatically increasing the magnitude of the award under the guise of correcting a computational error. *Second*, at least one part of the award was not final because the arbitrator failed to decide BP's concealment claim. *Third*, the arbitrator improperly failed to fix fees and costs to a sum certain. *Finally*, the arbitrator exceeded his authority by awarding PGS attorneys' fees tied to the Second Arbitration.

PGS also filed a Cross-Petition and Motion to Confirm. Those arguments largely duplicated PGS's opposition to BP's Petition and Motion to Vacate.

On March 31, 2026, the district court denied BP's Petition to Vacate and confirmed the Amended Award. *See* ER-3–25. Critically, the court

***agreed*** with BP's core objection to the arbitrator's post-award revision of the Nickelodeon damages calculation, concluding that "the arbitrator's amendment likely went beyond the narrow exceptions to the *functus officio* doctrine." *See* ER-12–16. The court deemed BP's *functus officio* argument "persuasive," and found that the arbitrator "abandoned the averaging approach" used in the original award, "changed the methodology used to measure damages," and had violated the *functus officio* doctrine by improperly increasing the Nickelodeon award from $138,713.81 to $1,716,000 based on a "2020 offer, which both BP and PGS rejected." ER-11 n.6, ER-12–16.

Nevertheless, the district court held that it was required to defer to the arbitrator's apparent belief that Article 37.1 differed from the underlying *functus officio* doctrine and authorized his factual and methodological reversals—even if those changes violated *functus officio*—as a correction of a computational error. ER-17–18. Importantly, PGS never argued that Article 37.1 did anything other than codify *functus officio*, and it never asked the district court to defer to the arbitrator's interpretation of the Rule. But the district court *sua sponte* adopted the view that there was daylight between Article 37.1 and

*functus officio*—which ***no party*** argued, and which this Court has never held. In so holding, the district court relied on non-binding authority from the Second Circuit, *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329 (2d Cir. 2010)—that PGS never cited—for the proposition that "an amendment may fall outside the narrow common-law category of 'clerical mistakes or obvious errors in arithmetic computation,' yet still be permissible under the parties' chosen arbitral rule containing the same language." ER-17 (quoting *T.Co*, 592 F.3d at 342–43, 345–47).

Regarding BP's other grounds for vacatur, the court held that BP had waived its arguments that the arbitrator omitted BP's concealment claim and erred by failing to fix attorneys' fees and costs; rejected BP's challenge to the fee award on the merits; and confirmed the Initial and Amended Awards. ER-18–21. BP timely filed its notice of appeal on April 16, 2026. ER-145–49.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's judgment and vacate the arbitration award.

I. The Amended Award must be vacated because the arbitrator did exactly what *functus officio* forbids: He revisited the merits of a final

award, reversed prior factual findings, adopted a new damages methodology, and increased the Nickelodeon award from roughly $138,000 to $1.716 million. Neither the common law nor the ICDR-IFTA Rule permits that result. *Functus officio* allows only narrow post-award adjustments—clerical mistakes, facially obvious arithmetic errors, completion of an omitted issue, or clarification of ambiguity. Article 37.1 mirrors those same limits. It does not create a freestanding power to reopen the merits whenever arbitrators later decide they "overlooked" evidence in the record.

The district court was right to recognize that the amended ruling changed both the methodology and the magnitude of the remedy based on material outside the face of the Initial Award. Once that much was established, the analysis should have ended—if the amendment was substantive, it violated both *functus officio* and Article 37.1 and must be vacated. Even the arbitrator believed that Article 37.1 does not permit a "substantive request to reverse a decision." ER-116. Because the Amended Award rests on an impermissible redetermination of the merits dressed up as a "computational error," it must be vacated.

II. The award also must be vacated because it is not "final and definite" under the FAA. 9 U.S.C. § 10(a)(4). BP presented a distinct claim that PGS concealed third-party broadcast proposals worth millions of dollars. The arbitrator expressly identified that claim as one of BP's three theories, and he found facts consistent with it, including undisclosed Nickelodeon and other broadcast proposals. But when he turned to the merits analysis, that claim disappeared. He never resolved the concealed-deals claim, never said whether BP prevailed or lost on it, and never explained whether damages were available. The arbitrator's failure to decide one of BP's claims leaves the award incomplete and requires vacatur.

BP did not waive this defect by failing to seek an additional ruling under Article 37.1, because the FAA imposes no exhaustion requirement and Article 37.1 itself is permissive—a party may request an additional award on an omitted claim, but need not do so to preserve vacatur.

III. Vacatur is also required because the arbitrator never fixed the costs of arbitration, even though Article 38 says he "shall" do so in the award. The Initial Award granted PGS fees and costs from a specified point in time, but it never determined the amount. When the parties

sought clarification, the arbitrator admitted the computation remained unresolved, yet he still refused to decide it. Instead, he suggested mediation or a separate collections action if the parties could not agree. But the parties bargained to arbitrate their dispute to completion, and the Rules required the arbitrator to fix costs as part of that process. By leaving the amount open and sending the parties elsewhere to finish the job, the arbitrator failed to issue a complete and final award in violation of the Rules.

IV. Finally, the fee award for the Second Arbitration cannot stand because PGS did not prevail in that proceeding, such that the arbitrator had no legitimate basis to award PGS fees. The arbitrator initially tied the fee ruling to a factual premise—the timing of when BP learned of PGS's wrongdoing—that he later acknowledged was incorrect. He then reaffirmed the fee award anyway, despite having held that PGS breached the Agreement and acted in bad faith by failing to inform broadcasters of the revised delivery schedule, which was the core of BP's Second Arbitration claim. The Amended Award suggests the arbitrator instead used fees to punish BP for filing the Second Arbitration when it did, despite acknowledging that BP did so promptly upon learning of PGS's

concealed bad-faith conduct. That makes no sense. Because the fee award lacks a valid prevailing-party basis, it exceeds the arbitrator's authority and must be vacated.

## STANDARD OF REVIEW

This Court reviews "a district court's decision to confirm or vacate an arbitration award de novo." *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1238 (9th Cir. 2022) (citing *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 918 (9th Cir. 2009)). Federal courts review awards governed by the Convention under the Federal Arbitration Act, 9 U.S.C. § 10. *See HayDay Farms*, 55 F.4th at 1240.

Although a federal court's review under the FAA is deferential, it is not a "rubber stamp." *Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 409 (9th Cir. 2011). The FAA authorizes courts to vacate awards for several reasons, including because the arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4); *see Johnson*, 635 F.3d at 412. "Arbitrators exceed their powers when they express a manifest disregard of law, or when they issue an award that is

completely irrational." *Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) (internal quotation marks & citation omitted).

An arbitrator manifestly disregards the law when they "recognize[] the applicable law and then ignore[] it." *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995). And a decision is completely irrational when it fails to "'draw[] its essence from'" the parties' contract by "ignor[ing] controlling terms." *HayDay Farms*, 55 F.4th at 1241 (quoting *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019)).

## ARGUMENT

The award should be vacated for four independent reasons. *First*, the arbitrator exceeded his authority by substantively revising the Initial Award to increase the Nickelodeon-related damages by nearly $1.6 million, in violation of *functus officio* and Article 37.1 of the ICDR-IFTA Rules. *Second*, the arbitrator failed to resolve BP's separate claim that PGS concealed from BP several high-value third-party broadcast deals. *Third*, the arbitrator failed to fix costs as required by the governing rules, leaving the award incomplete. *Fourth*, the arbitrator exceeded his

authority by awarding PGS attorneys' fees for the Second Arbitration even though PGS did not prevail in that arbitration.

## I. The Arbitrator Exceeded His Powers By Increasing Damages For The Potential Nickelodeon Deal By Nearly $1.6 Million.

The Amended Award should be vacated because the arbitrator acknowledged the impropriety of substantive requests for correction, yet (a) accepted PGS's substantive request to reconsider evidence that he had already rejected, and (b) relied on that purported evidence to increase the damages award for BP's rejection of the potential Nickelodeon deal from $138,713.81 to $1,716,000. The arbitrator thus "exceeded [his] powers," 9 U.S.C. § 10(a)(4), ***both*** under the common-law doctrine of *functus officio* ***and*** under Article 37.1 of the ICDR-IFTA Rules.

Far from merely correcting a "computational error," the arbitrator reversed several of his own factual findings underpinning the damages award and used an entirely new methodology to measure those damages. ER-117. The arbitrator thus violated settled principles governing the finality of arbitration decisions. A decision that manifestly disregards the law and is completely irrational cannot stand under the FAA.

### A. *Functus officio* prohibits arbitrators from reconsidering the substance of their awards.

The arbitrator's work on damages from lost deals was complete after he determined in the Initial Award that the damages from rejecting Nickelodeon's interest in Season 6 should be estimated based on the average of the three other written offers from other broadcasters. The arbitrator exceeded his powers by reversing factual findings and modifying the method of calculating those damages in the Amended Award.

The common-law doctrine of *functus officio* provides that arbitrators are generally "without authority to reconsider an issue once [they have] issued a final decision on that issue." *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1177 n.11 (9th Cir. 2010). Courts accordingly reject arbitral decisions that reexamine substantive determinations after an award has been issued. *See, e.g.*, *San Diego AFL-CIO Bus Drivers Loc. Div. 1309 of Amalgamated Transit Union v. San Diego Transit Corp.*, 972 F.2d 1342, 1992 WL 180221, at *2 (9th Cir. 1992); *Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 332–33 (3d Cir. 1991).

This rule makes sense as a practical matter. *Functus officio* expresses the law's "unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which he has already rendered, because of the potential evil of … unilateral influence which might affect a new conclusion." *McClatchy Newspapers v. Cent. Valley Typographical Union*, 686 F.2d 731, 734 (9th Cir. 1982) (quoting *La Vale Plaza, Inc. v. R. S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967)). Courts thus have held that it constitutes "legal error … to confirm" a corrected arbitration award "entered in derogation of the *functus officio* doctrine." *See, e.g.*, *Colonial Penn*, 943 F.2d at 333. When an arbitrator "overstep[s] its authority" by issuing a correction that "redetermin[es] issues that had already been decided," the proper response is to "vacate[] the corrected award." *San Diego AFL-CIO*, 972 F.2d 1342, 1992 WL 180221, at *2.

Although there are exceptions to the *functus officio* doctrine, none apply here. Arbitrators may revisit final decisions on specific issues in limited circumstances—to (1) "correct a mistake which is apparent on the face of [the] award"; (2) "complete an arbitration if the award is not complete"; and (3) "clarify an ambiguity in the award." *McClatchy*, 686

F.2d at 734 n.1. But mistakes "apparent on the face" of an award are "clerical mistakes or obvious errors in arithmetic computation." *Colonial Penn*, 943 F.2d at 332; *see also Aerojet Rocketdyne, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 2017 WL 9500948, at *5 (C.D. Cal. Nov. 27, 2017). They do not encompass "alleged mistakes where extraneous facts must be considered." *Teamsters Loc. 312 v. Matlack, Inc.*, 118 F.3d 985, 992 (3d Cir. 1997) (citing *Colonial Penn*, 943 F.2d at 332).

### B. As the district court found, the arbitrator went "outside the bounds" of what is allowed under *functus officio* by increasing the Nickelodeon damages.

As the district court correctly concluded, the arbitrator violated the *functus officio* doctrine here by reconsidering the factual basis for PGS's damages and using that reassessment to increase the Nickelodeon damages award ***by more than 1,000%***.[3] Just as the arbitrator would have violated *functus officio* by reconsidering his conclusion that BP was

[3] The district court stopped short of a formal holding, but found "[t]he recalculation … here ***appears*** outside the bounds of what is typically permitted under the common law *functus officio* doctrine," and believed "the arbitrator's amendment ***likely*** went beyond the narrow exceptions to the *functus officio* doctrine." ER-15, ER-16 (emphases added).

liable at all,[4] so too did his reconsideration of the basis for calculating damages—it "exceeded [the arbitrator's] powers," 9 U.S.C. § 10(a)(4), by substantively revisiting his decision.

As the district court explained, the *functus officio* doctrine does not allow an arbitrator, after issuing a final damages decision, to reconsider facts outside the award to make a "significant change to the magnitude" of the remedy or the "methodology used to measure" it. ER-13 n.8, ER-15–16. Yet that is exactly what the arbitrator did: Under the guise of correcting "a computational error" because "an incorrect number was used in the calculations," ER-117, he reversed the Initial Award's conclusion that "there was 'no proposed licensee fee on which to base' a calculation for the [2021] Nickelodeon opportunity because [that] proposal had never been formalized," ER-15 (quoting ER-129).

Nor does the arbitrator's rationale in expanding the damages award through this changed methodology make any sense. As the district court explained, it "was not apparent from the face of the award" that

---

[4] BP firmly believes that the liability finding was incorrect, but it did not challenge that determination because doing so would have exceeded the proper scope of a correction request under Article 37.1 and the scope of a federal court's review under the FAA, and BP chose to abide by those limits.

Nickelodeon's separate, 2020 offer—made in different circumstances and jointly rejected by BP and PGS—provided a valid measure of damages for BP's alleged bad-faith rejection of Nickelodeon's interest ***in 2021***. ER-16. To the contrary—the "asserted 'mistake' … only became visible after the arbitrator returned to the record and decided that an exhibit should have been used," contradicting the Initial Award's conclusion that the exhibit was "not [a] sufficient evidentiary basis." *Id.* The district court also correctly found that this recalculation was not "a simple arithmetic correction" or a change to "an input used in the calculation," but a change to "the methodology used to measure damages" resulting in a "significant change to the magnitude of the remedy." ER-14, ER-15–16.

Simply put, the arbitrator's Initial Award expressly acknowledged the existence of the 2020 offer, stated that both parties rejected it, and declined to use it as a basis for awarding damages. PGS's request for correction sought another bite at the apple by repackaging irrelevant evidence the arbitrator had already considered. Yet the arbitrator allowed this so-called "correction" and awarded nearly $1.6 million in additional damages based on evidence he had previously rejected. The

Amended Award therefore improperly reversed the Initial Award's substantive reasoning in violation of *functus officio*.

That requires vacatur.

### C. The Amended Award necessarily violates the ICDR-IFTA Rules because Article 37.1 codifies *functus officio* and its exceptions.

Because the arbitrator's modified decision violates *functus officio*, it also violates the ICDR-IFTA Rules.

The district court held that the parties' Agreement "to arbitrate under rules that expressly authorize a limited form of post-award correction" somehow made *functus officio* inapplicable. ER-16. Nonsense. This Court has expressly held that a similar rule authorizing the same post-award corrections "essentially codifies the common-law doctrine of *functus officio*" by limiting an arbitrator's power to "redetermine the merits" of an award after it has been rendered. *Bosack*, 586 F.3d at 1103–04 (describing similar language of former AAA Commercial Arbitration Rule 46 (now Rule 52)). Article 37.1 is no different. It plainly mirrors the narrow *functus officio* exceptions that allow an arbitrator to (1) "correct a mistake which is apparent on the face of [the] award"—that is, a clerical error or obvious arithmetic miscalculation—just as the rule permits

arbitrators to "correct any clerical, typographical, or computational errors"; (2) "complete an arbitration if the award is not complete," like the rule's directive that arbitrators may "make an additional award as to claims … presented but omitted from the award"; and (3) "clarify an ambiguity in the award," like the rule enabling arbitrators to "interpret the award." *McClatchy*, 686 F.2d at 734 n.1 & ICDR-IFTA Rules Art. 37.1. The clear implication of Article 37.1, therefore, is that it permits only those changes that the common law would likewise allow.

PGS has never contended that Article 37.1 is anything but coextensive with *functus officio*. ER-43 (arguing the *McClatchy functus officio* exceptions are "the basis upon which the arbitrator" "made [his] respective corrections"); ER-47 (accepting BP's contention that "Article 37.1 of the ICDR-IFTA Rules codifies the common-law doctrine of *functus officio*"). Quite the opposite—PGS argued that BP's *functus officio* and Article 37.1 arguments ***must*** rise and fall together "[b]y necessity." ER-47.

So too, the arbitrator's own interpretation of Article 37.1 confirms that it prohibits the amendment he allowed. He held that the rule does not authorize a "substantive request to reverse a decision," and instead

permits only the "correction of a 'clerical, typographical, or computation error.'" ER-116 (quoting Art. 37.1). But despite acknowledging Article 37.1's limit on substantive changes, he nonetheless overhauled the Initial Award's substantive reasoning based on a claim that he "inadvertently overlooked" the 2020 offer—despite having explicitly rejected it as a basis for determining damages. ER-117. In other words, the arbitrator "recognized the applicable law and then ignored it." *Park Place*, 563 F.3d at 920. There could be no clearer manifest disregard of the law.

The arbitrator's alleged belief that he committed a "computational error" by "inadvertently overlook[ing]" Nickelodeon's 2020 offer cannot be a basis to avoid *functus officio* as embodied in Article 37.1. ER-117. For starters, even had the arbitrator "overlooked" such a contract, that "oversight" is not a ***computational*** error under any plausible interpretation of that phrase, *id.*, but is instead a result of the one-sided, "unilateral influence which might affect a new conclusion" animating this Court's view that *functus officio* prohibits substantive reconsideration, *McClatchy*, 686 F.2d at 734 (quoting *La Vale Plaza*, 378 F.2d at 572). BP objected to the arbitrator even considering PGS's reconsideration

argument,[5] but specifically asked that, should the arbitrator nonetheless choose to entertain PGS's substantive attack, BP be given an opportunity to respond. *See* ER-27. The arbitrator compounded his error by denying BP that opportunity. *See Teamsters Loc. 312*, 118 F.3d at 996 ("[R]esolution of the merits" without opposing party's "argument on the issue severely impeded [that party's] right to notice and opportunity to be heard").

Beyond that, the claim that the arbitrator "overlooked" the 2020 Nickelodeon offer is belied by the Initial Award, which expressly addressed that offer and rejected using it as a basis to compute damages. The Initial Award's discussion of this information is compelling "evidence … refut[ing] the arbitrator's" post-hoc "explanation of [his] state of mind." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, Loc. 631 v. Silver State Disposal Serv., Inc.*,

[5] That PGS attached evidence to its Request for Correction only underscores the fact that it was not a request to correct a computational error. *See* ER-60. The Rules forbade PGS from submitting evidence because a permissible correction must be evident on the face of the award, rather than based on facts outside it. ER-27. That PGS submitted evidence anyway demonstrates that it sought precisely the type of substantive reexamination Article 37.1 forbids.

109 F.3d 1409, 1411 (9th Cir. 1997). In the Initial Award the arbitrator found that:

- In early 2020, Nickelodeon made an "offer for S6 and S7 of *Alvinnn!!!*, ***which both parties agree[d] to reject***." ER-121 (emphasis added).

- In September 2021, "Viacom/Nickelodeon tells PGS that it is ***interested*** in making ***another offer*** for S6 and S7 but wants changes to the creative direction of the series." ER-121–22 (emphasis added).

- "BP claims that the changes would amount to a spinoff of *Alvinnn!!!*" and "declines to proceed." ER-122.

- BP's "outright refusal" in September 2021 to "entertain a conversation" about the creative changes accompanying Nickelodeon's "express[ion of] interest" was "in bad faith." ER-125.

- BP "rejected ***three contracts*** in bad faith" during 2021—not four. *Id.* (emphasis added)

These specific discussions of what was and was not available as a basis for calculating damages show the arbitrator's prior, thoughtful consideration of exactly the issue PGS raised as a "correction." And sealing the deal, the arbitrator held that "there [wa]s ***no proposed licensee fee on which to base [damages] calculations***" from BP's rejection of the potential Nickelodeon deal in 2021 because Nickelodeon's "proposal … was never formalized." ER-129 (emphasis added).

### D. Article 37.1 cannot authorize what *functus officio* forbids.

The district court's analysis cannot be squared with itself. Having concluded that the Amended Award fell outside the narrow bounds of *functus officio*, the district court could not then uphold the Amended Award under Article 37.1 as an "overlooked computational input." ER-18. Article 37.1 does not create a free-floating power to revisit the merits. It authorizes only limited post-award corrections mirroring the narrow common-law exceptions.

If *functus officio* barred the amendment, then Article 37.1 did too. Reading "computational error" so broadly as to reach any alleged oversight would swallow the rule's limits entirely. Under the district court's approach, an arbitrator could recast substantive reconsideration as a permissible correction simply by labeling the issue computational. An arbitrator's say-so cannot itself expand the rule. If that were the case, Article 37.1 would impose no meaningful backstop against an arbitrator's post-award reconsideration of the merits.

Nor is deference the answer. *See* ER-17–18. For one, PGS never argued that the arbitrator's interpretation of the rules was entitled to any deference. And second, deference presupposes the arbitrator actually

interpreted the scope of his authority under the rule. But the arbitrator never interpreted Article 37.1 as displacing the common-law limits or authorizing broader relief than what *functus officio* permits. To the contrary, he recognized that Article 37.1 does not permit a "substantive request to reverse a decision" and is limited to correction of a "clerical, typographical, or computation error." ER-116. Once the district court agreed that the amendment was substantive for *functus officio* purposes, its analysis should have ended.

The district court's exclusive reliance, ER-16–17, on *T.Co Metals*, was misplaced. In *T.Co*, the Second Circuit held that an arbitrator amending his award "did not exceed his powers" because the revision was "***consistent with his interpretation*** of his reconsideration authority." 592 F.3d at 347 (emphasis added). Here, by contrast, the arbitrator expressly concluded that Article 37.1 does not authorize a "substantive request to reverse a decision," but then did exactly that, contrary to his own interpretation of his authority. ER-116. Put differently, the question is whether—given the arbitrator's own stated view that the rule prohibited substantive requests to reverse a decision—the decision to change the Initial Award's factual findings, reasoning, and method of

calculating damages manifestly disregarded the law or was completely irrational. *See* 9 U.S.C. § 10(a)(4). *T.Co* does not answer that question, nor can it, because nothing suggests that the arbitrator there believed the governing rule prohibited substantive reconsideration. In fact, the arbitrator in *T.Co* believed precisely the opposite. *See* 592 F.3d at 337 (arbitrator explaining he understood the Rule as "empower[ing] [him] to change conclusions … where such correction … entails an exercise of judgment").

*T.Co* is distinguishable for other reasons as well. Where BP disputes the arbitrator's application of his own interpretation of Article 37.1 as showing manifest disregard of the law, the appellant in *T.Co* "did not invoke the manifest disregard doctrine before the district court" or "on appeal"—forfeiting the kind of argument BP makes here. *Id.* at 346 n.10. In addition, the nature of the arbitrator's reconsideration is far more obvious here than in *T.Co*. There, "the way each particular bit of evidence entered the arbitrator's calculation was not expressly articulated" in the original award, so the revisions involved only changes to numerical inputs, not the award's stated reasoning. *Id.* at 337. Here, however, the district court acknowledged that the arbitrator reversed his

own factual findings and "changed the methodology used to measure damages … not just an input used in the calculation." ER-15–16. For these reasons, the Amended Award should be vacated.

## II. The Arbitrator Never Issued A Final Decision Regarding PGS's Failure To Inform BP Of Third-Party Broadcast Deals.

The award should also be vacated because the arbitrator failed to issue a "final and definite award" on BP's claim that PGS improperly concealed from BP proposed broadcast deals worth more than $7 million. *See* 9 U.S.C. § 10(a)(4).

"An award is not 'final' under the FAA if it fails to resolve an issue presented by the parties to the arbitrator[]." *Norfolk S. Ry. Co. v. Sprint Commc'ns Co. L.P.*, 883 F.3d 417, 422 (4th Cir. 2018) (citing *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 177 (2d Cir. 1998)); *see also Int'l Bhd. of Teamsters*, 109 F.3d at 1411–12 (award incomplete where it "failed to resolve [a] question" presented to the arbitrator). Both the merits and "the issue of damages [must] be resolved in order for an award to be considered final." *Millmen Loc. 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells Exterior Trim*, 828 F.2d 1373, 1376 (9th Cir. 1987).

### A. The record shows that the arbitrator failed to address BP's claim.

Here, the arbitrator recognized that BP's third-party deals claim constituted a separate and independent argument for why PGS had breached the parties' Agreement. He summarized "BP['s] Claims" as follows: (1) "PGS' failure or refusal to provide BP's revised delivery schedule for S6 and S7 to broadcasters," which PGS "purposefully concealed … from BP"; (2) "PGS wrongfully disclosed confidential litigation information to its broadcasters"; and (3) that—"[a]dditionally"—"***PGS failed to inform BP of third-party broadcast proposal deals***, 'despite being contractually and legally obligated to do so.'" ER-123 (emphasis added).

The arbitrator also found facts consistent with BP's position that PGS had improperly concealed several deals:

- "Nickelodeon ma[de] an offer for S5 of *Alvinnn!!!* that PGS reject[ed] without informing BP." ER-121.
- "Viacom/Nickelodeon propose[d] a renewal deal for Seasons 1-5 of *Alvinnn!!!* PGS d[id] not disclose this proposal to BP." ER-123.
- In January 2024, "PGS inform[ed] BP of nearly ten proposals that it did not disclose to BP in 2023." *Id.*

But even after finding these facts, the arbitrator inexplicably never addressed BP's claim again.[6] His statement of "ISSUES," which outlined his decision on the merits, listed only two of BP's three claims under the heading "Did PGS breach the S6 and S7 Agreement or act in bad faith in performing the S6 and S7 Agreement?"—(1) PGS's "failure to provide BP's revised delivery schedule to broadcasters" and (2) PGS's "disclosure of the ongoing litigation proceedings." ER-124. There is no mention of BP's claim that PGS concealed third-party broadcast proposals in the issue outline, nor in the pages of substantive analysis that follow. The arbitrator failed in his duties by leaving one of BP's three theories of liability unaddressed and unresolved.

The district court relied on the Initial Award's boilerplate finality language to find that the arbitrator "adjudicated each of BP's claims." ER-19. But that shows only that the arbitrator ***believed*** his decision was final, not that the decision ***was*** sufficiently final in addressing all claims presented. *See* 9 U.S.C. § 10(a)(4). A "full-settlement clause does not

[6] The district court asserted that by reciting these facts, "BP concedes the arbitrator addressed the supposedly missing claim" in the Initial Award. ER-19. Far from it. The arbitrator noted these ***facts***, but he never addressed the ***legal claim***—and BP never conceded that he did so, as clearly he did not.

mean that the award cannot be challenged, as the party seeking vacatur may produce evidence which shows that the arbitrator did not, in fact, consider all the claims." 2 Martin Domke et al., *Domke on Com. Arb.* § 33:5 (Jan. 2025); *see also McKinney Restoration, Co. v. Ill. Dist. Council No. 1 of Int'l Union of Bricklayers & Allied Craftworkers*, 392 F.3d 867, 871 (7th Cir. 2004) ("[I]f the award was incomplete in that the arbitrators did not complete their assignment but believed they had … the court … may vacate it pursuant to § 10(a)(4) of the Federal Arbitration Act.").

And here, the text of the Initial Award is the best evidence that the arbitrator did not decide this claim. That is clear from the arbitrator's omission of this claim from the statement of issues. And when the arbitrator found that a party prevailed on the merits but did not want to award damages, he knew how to do so: Indeed, the arbitrator elsewhere found that PGS's "failure to provide broadcasters" with the revised schedule "was bad faith," but declined to award damages for it. *See* ER-126, ER-129–30. And on BP's other claim in the Second Arbitration, the arbitrator went even further: When he found that PGS's disclosure of ongoing litigation proceedings was not in bad faith, he still explained why

he declined to award damages. ER-126, ER-130. It is telling that the arbitrator explained ***neither*** for BP's claim about PGS concealing deals.

Arbitrators cannot altogether "fail[] to resolve an issue presented by the parties." *Norfolk*, 883 F.3d at 422. When an award is not a "'final' arbitration award under the FAA," courts have the power to vacate the decision. *Id.* at 424. The Court should accordingly vacate the arbitrator's "imperfectly executed" decision. 9 U.S.C. § 10(a)(4).

### B. BP did not waive this argument, and there is no exhaustion requirement under the FAA.

The district court found that BP had waived its challenge to the arbitrator's failure to rule on the third-party deals claim on two grounds: *First*, because BP's Request for Correction did not ask the arbitrator to address the omitted claim; and *second*, because BP supposedly "disclaimed any challenge to the arbitrator's merits determinations." ER-19. Neither finding is supported by the record or precedent.

The district court faulted BP's failure to "invoke [Article 37.1] to seek a ruling on any missing claims." *Id.* But BP indisputably raised its claim based on concealed deals in the arbitration, so this is an issue of exhaustion, not waiver. The FAA does not require a party to exhaust its options in arbitration before that party may invoke the statute's

protections. Indeed, neither the district court nor PGS cited any authority—binding or otherwise—holding that a party must move under Article 37.1 or any other rule before seeking vacatur under the FAA. That is unsurprising, because the FAA expressly authorizes vacatur where a "final … award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Courts do not hesitate to exercise this authority. *See, e.g.*, *Norfolk*, 883 F.3d at 422–23, 424. The district court wrongly read Article 37.1 to create an exhaustion requirement, contrary to the plain terms of the FAA and without so much as explaining why. *Cf. W. Emps. Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 260, 262 (9th Cir. 1992) (vacating arbitration award that failed to finally resolve all claims where petitioner did not first move before the arbitrator).

The ICDR-IFTA Rules further confirm the district court's error. Not only do the Rules lack any general exhaustion requirement, but Article 37.1 says only that a party "***may*** request the arbitrator to … make an additional award as to claims … presented but omitted from the award"—not that it ***must***. While the Rules thus permit a party to seek an additional award on claims "presented but omitted," they do not compel it to do so before accessing federal court review under the FAA.

Nor did BP "disclaim[] any challenge to the arbitrator's merits determinations," ER-19, by characterizing its Request for Correction as "not challeng[ing] the substance of the Arbitrator's decisions." ER-73. That statement cannot logically be read as intentionally relinquishing the right to seek vacatur under the FAA because the arbitrator never made a substantive determination on this issue. BP's point is that the arbitrator failed to decide the claim, not that his (non-existent) merits determination on this issue was wrong. In any event, the district court took the statement out of context. BP was explaining why its request for correction on a separate issue (the fee award) was consistent with Article 37.1's narrow scope. That is a far cry from surrendering challenges to the arbitrator's wholesale failure to decide a claim under the FAA.

## III. The Arbitrator Exceeded His Authority By Failing To Fix Costs, Which The Rules Require.

The award should also be vacated because the arbitrator never fully fixed the costs of arbitration, and then further erred by refusing to correct that error in the Amended Award. Article 38 of the ICDR-IFTA Rules requires that "[t]he arbitrator shall fix the costs of arbitration in its award(s)," including allocating costs "if it determines that allocation is reasonable, taking into account the circumstances of the case." ICDR-

IFTA Rules, Art. 38. The costs to be allocated include "the reasonable legal and other costs incurred by the parties." *Id.* This requirement to fix costs is mandatory, and it is also necessary for an award to be final. *See Steinmann v. ZTE Corp.*, 2015 WL 13546434, at *3 (C.D. Cal. Dec. 11, 2015) (arbitration award was not final where "the arbitrator did not 'fix the costs of arbitration in'" that award pursuant to the ICDR rules), *aff'd*, 692 F. App'x 493 (9th Cir. 2017).

The Initial Award awarded PGS "fees and costs starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022"—without ever saying the amount of the allocated fees and costs. ER-130. Both BP and PGS sought clarity on this award, which the arbitrator construed as requests for interpretation under Article 37.1. But despite recognizing that "the final computation of PGS' attorney fees and costs is yet to be determined," in purporting to address these requests in the Amended Award, the arbitrator again failed to fix the costs. ER-116. Instead, he ordered the parties to "meet and confer to mutually determine the proper amount of attorneys' fees and costs." ER-117. And if they could not agree, the arbitrator refused to decide the issue even then, telling the parties that "other avenues are available to them

rather than running up further fees in this case, such as mediation or a collection action in traditional litigation mode." *Id.*

Rather than fulfilling the parties' contractual agreement to arbitrate their disputes, the arbitrator shirked his duties by failing to fix costs and instead leaving the parties to return to "traditional litigation mode" to further resolve their dispute. *Id.* Traditional litigation was precisely what the parties' agreement to arbitrate was designed to avoid. "The purpose of arbitration is to resolve disputes, not to create new ones," *Bell Aerospace Co. Div. of Textron, Inc. v. Loc. 516, Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW)*, 500 F.2d 921, 924 (2d Cir. 1974), and "to achieve 'streamlined proceedings and expeditious results,'" *Preston v. Ferrer*, 552 U.S. 346, 357–58 (2008). "An award which does not fulfill this purpose is unacceptable." *Bell Aerospace*, 500 F.2d at 924; *see also Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC*, 319 F.3d 1060, 1069 (8th Cir. 2003) (vacating award that "expressly le[ft]" issue "open for judicial determination"). The arbitrator's decision was not complete and must be vacated.

The district court compounded this error by holding that BP forfeited its ability to challenge the arbitrator's failure to fix fees. ER-19–20. Although BP's request for correction proposed a "post-award process" that would require PGS to share invoices and give BP the opportunity to object to PGS's fees, ER-19, BP never intended for anyone other than the arbitrator to resolve the amount of the fee award at the end of that process—much less for ***no one*** to resolve it. Yet that is the lay of the land following the district court's opinion: The amount of fees remains an open question, presumably in dispute, with no clear path to resolution—much less in arbitration, where fees should have been decided per the parties' agreement to arbitrate.

## IV. The Arbitrator Exceeded His Authority By Awarding PGS Fees On The Second Arbitration.

The arbitrator's award of costs also should be vacated because the arbitrator exceeded his authority and expressed a manifest disregard for the law in awarding PGS attorneys' fees for the Second Arbitration at all. 9 U.S.C. § 10(a)(4); *Bosack*, 586 F.3d at 1104.

In the Initial Award, the arbitrator awarded fees "starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022." ER-130. The arbitrator initially stated that the

"second arbitration … was triggered by testimony of Xavi Mas." *Id.* But Mas was not deposed during the First Arbitration; he was actually deposed during the Second Arbitration on December 15, 2023, nearly a year later. ER-116. BP asked the arbitrator to correct this error, and it noted that there could be no fee award for PGS on the Second Arbitration given that BP substantially prevailed in it. ER-73–74.

The arbitrator "corrected" the "factual, clerical error" of what triggered the Second Arbitration, amending the award to say that the Second Arbitration was actually "triggered by the correspondence from Super RTL" that led to BP learning that PGS had never disclosed the revised schedule to broadcasters. ER-116. But despite this correction, and despite having agreed with BP's claim in the Second Arbitration that PGS's failure to disclose the revised schedule to broadcasters violated the Agreement and was in bad faith, the arbitrator reaffirmed his decision to award fees to PGS with respect to the Second Arbitration. He did so based on his determination "weighing PGS' relatively minor bad faith against BP's much more costly and serious bad faith" and his "concern with [BP's] delayed initiation of a second arbitration premised upon information that either was or should have been known by BP at the time of the first

arbitration." *Id.* He never acknowledged that BP filed within two weeks of discovering that PGS had withheld this information from BP.

The arbitrator's award of fees to PGS based on the Second Arbitration has no plausible basis because BP substantially prevailed on its claims in that arbitration. The crux of BP's claims in that arbitration was that PGS failed to inform key broadcasters of the changes in the production schedule that delayed the delivery of Season 6, despite having a contractual obligation and clear directions to do so. *See* ER-79–80. The arbitrator ruled that PGS's failure to provide the revised schedule to broadcasters breached the Agreement and was "an act of bad faith under French law," ER-126, although he declined to award damages to BP on that basis, ER-130. And the arbitrator refused to award PGS damages for its counterclaim in the Second Arbitration, concluding that although BP acted in bad faith under French law in including PGS's confidential information in the data room, PGS presented "no evidence" that "any actual reputational damages occurred." ER-126, ER-129. In no sense can it be said that PGS prevailed in the Second Arbitration—either both parties prevailed, or neither did.

It seems likely, then, that the arbitrator improperly fashioned the fee award as punishment for what he viewed as BP's alleged "delayed initiation of" claims raised in the Second Arbitration. ER-116. But there is no conceivable justification to penalize BP for PGS's bad-faith concealment of the very conduct that the arbitrator found (in BP's favor) to be in bad faith in that Second Arbitration. Indeed—as the arbitrator himself noted, ER-122–23—BP was unaware of any of the facts underlying its claims in the Second Arbitration until PGS revealed RTL's threats in early November and confirmed in late November that it never disclosed the revised schedule to broadcasters. BP brought its claims at the earliest possible juncture, just two weeks after learning of PGS's misconduct. The district court never engaged with the arbitrator's clear admission that the dates underpinning his attorneys' fee award were incorrect. ER-20–21.

Any award of attorneys' fees is, of course, the exception under the American rule, and it requires a contractual or statutory basis. *Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*, 307 F.3d 1220, 1225 (9th Cir. 2002) (noting need for "an independent basis" for a fee award). But regardless of the nature of that basis, a party must

actually succeed in its claims to be eligible for an award of fees. Under California law, courts "compare the relief awarded" to a party's objectives to determine whether a party has prevailed by obtaining what it sought in litigation. *G.P.P., Inc. v. Guardian Prot. Prods., Inc.*, 126 F.4th 1367, 1374 (9th Cir. 2025). "[I]t is possible for no party to prevail on a claim" under this "'pragmatic definition'" of a prevailing party. *Cardinal v. Lupo*, 2021 WL 4027803, at *1 (9th Cir. Sept. 3, 2021) (quoting *Santisas v. Goodin*, 951 P.2d 399, 414 (Cal. 1998)).

The rules governing this arbitration cannot change this standard, as the district court improperly held. ER-20. While the ICDR-IFTA Rules permit the award of "the reasonable legal and other costs incurred by the parties," ICDR-IFTA Rules, Art. 38(d), broad authorizations like this incorporate general principles governing fee determinations. In *Thomas Kinkade Co. v. Hazlewood*, 2007 WL 2088584, at *17 (N.D. Cal. July 18, 2007), for instance, a court cited approvingly a AAA arbitral panel's incorporation of case law requiring that a party be a "prevailing party" to be eligible for an award of fees. In that case, the vacatur of the panel's merits decision required vacatur of the fee award, further demonstrating the requirement that a party must actually prevail to receive its fees. The

arbitrator here departed from that basic rule—imposing attorneys' fees against BP, who under ***no theory*** can be said to have lost the Second Arbitration—in manifest disregard for the applicable law and clearly exceeding his authority. The Court should vacate the award of fees on the Second Arbitration.

## CONCLUSION

For the foregoing reasons, BP respectfully requests that the Court reverse the district court's decision and vacate the arbitration award.

Respectfully submitted,

*/s/ David M. Gossett*
David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

MaryAnn Almeida
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 757-8030
maryannalmeida@dwt.com

Haley B. Zoffer
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue
27th Floor
Los Angeles, CA 90071
(213) 633-6800
haleyzoffer@dwt.com

*Attorneys for Plaintiff-Appellant Bagdasarian Productions, LLC*

Dated: July 20, 2026

## CIRCUIT RULE 28-2.6 STATEMENT OF RELATED CASES

I am unaware of any related cases currently pending in this Court.

/s/ *David M. Gossett*
David M. Gossett

July 20, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: https://www.ca9.uscourts.gov/filing/forms/form-8-certificate-of-compliance-briefs/*

**9th Cir. Case Number(s): 26-2568**

I am the attorney or self-represented party.

**This brief contains 10,681 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[●] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- [ ] it is a joint brief submitted by separately represented parties;
- [ ] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** /s/ *David M. Gossett* **Date:** July 20, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ *David M. Gossett*
David M. Gossett

July 20, 2026