**No. 26-2568**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

BAGDASARIAN PRODUCTIONS, LLC,
*Plaintiff-Appellant*,
v.
PGS ENTERTAINMENT,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2-25-cv-03240-CV (Ex)
The Honorable Cynthia Valenzuela

# PLAINTIFF-APPELLANT BAGDASARIAN PRODUCTIONS, LLC'S EXCERPTS OF RECORD

MaryAnn Almeida
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 757-8030
maryannalmeida@dwt.com

David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Haley B. Zoffer
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue
27th Floor
Los Angeles, CA 90071
(213) 633-6800
haleyzoffer@dwt.com

*Attorneys for Plaintiff-Appellant Bagdasarian Productions, LLC*

# INDEX TO EXCERPTS OF RECORD


| Dkt. No. | Filed Date | Description | ER Page |
|---|---|---|---|
| 39 | 3/31/26 | District Court Order Denying Petitioner Bagdasarian Productions, LLC's Motion to Vacate and Granting in Part, Denying in Part PGS Entertainment's Motion to Confirm Arbitration Award | ER3 |
| 30-13 | 6/23/25 | BP's Response to PGS's Request for Correction of Award—Exhibit M to Declaration of D. Lifschitz | ER26 |
| 29 | 6/23/25 | PGS's Opposition to BP's Motion to Vacate and Remand Arbitration Award | ER29 |
| 20-6 | 4/30/25 | PGS's Objection to and Request for Correction of Final Award—Exhibit E to Declaration of Haley B. Zoffer | ER56 |
| 20-5 | 4/30/25 | BP's Request for Correction of Award Pursuant to IFTA Article 37—Exhibit D to Declaration of Haley B. Zoffer | ER72 |
| 20-4 | 4/30/25 | Amended Award—Exhibit C to Declaration of Haley B. Zoffer | ER114 |
| 20-3 | 4/30/25 | Initial Award—Exhibit B to Declaration of Haley B. Zoffer | ER119 |
| 20-2 | 4/30/25 | Agreement Between Bagdasarian Productions and PGS Entertainment—Exhibit A to Declaration of Haley B. Zoffer | ER133 |
| 40 | 4/16/26 | 9th Circuit Notice of Appeal | ER145 |
| 40-1 | 4/16/26 | C.D. Cal. Notice of Appeal | ER149 |
| | | Docket | ER173 |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BAGDASARIAN PRODUCTIONS, LLC,

Petitioner,

v.

PGS ENTERTAINMENT,

Respondent.

Case No. 2-25-cv-03240-CV (Ex)

**ORDER DENYING PETITIONER BAGDASARIAN PRODUCTIONS, LLC'S MOTION TO VACATE AND GRANTING IN PART, DENYING IN PART PGS ENTERTAINMENT'S MOTION TO CONFIRM ARBITRATION AWARD**

**[DOC. ## 20, 28]**

This case involves a challenge to an arbitration award regarding the international distribution of an Alvin and the Chipmunks animated television series. Petitioner Bagdasarian Productions, LLC ("BP"), the owner of the franchise, had contracted with Respondent PGS Entertainment ("PGS"), a French animation distributor, to serve as BP's international sales agent for seven seasons of the series. When production of the sixth season was suspended in 2022, PGS commenced arbitration, alleging that BP had acted in bad faith to undermine the parties' agreement so it could sell the franchise to a third party. BP filed its own arbitration demand, asserting that PGS had failed to communicate

valuable broadcasting offers to BP and did not communicate scheduling changes required by the COVID-19 pandemic.

The parties' claims and counterclaims were consolidated into a single arbitration proceeding and resolved largely in PGS's favor. In the arbitrator's November 21, 2024 award, while BP prevailed on certain issues, the arbitrator declined to grant BP damages and instead determined that BP had rejected three proposed contracts and one potential deal for the television series in bad faith, awarding monetary damages and attorney fees to PGS. Both sides sought clarification under the arbitration rules. On January 24, 2025, the arbitrator issued an amendment that increased the damages awarded to PGS. BP then initiated this action.

Before the Court are the parties' competing motions regarding the arbitration award: BP's April 30, 2025 Motion to Vacate and Remand Arbitration Award ("Motion to Vacate"), Doc. # 20, and PGS's June 23, 2025 Motion to Confirm Arbitration Award Doc. # 28 ("Motion to Confirm," and with the Motion to Vacate, the "Motions"). Both Motions are fully briefed. Doc. ## 20, 28–30, 33, 35. Having reviewed the parties' submissions, the Court finds the Motions appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15; *Willis v. Pac. Mar. Ass'n*, 244 F.3d 675, 684 n.2 (9th Cir. 2001). For the following reasons, the Court **DENIES** BP's Motion to Vacate and **GRANTS IN PART** and **DENIES IN PART** PGS's Motion to Confirm.

## I. <u>INTRODUCTION</u>

On April 11, 2025, BP filed its Petition to Vacate and Remand Arbitration Award. Doc. # 1 ("Petition to Vacate"). BP seeks an order vacating the arbitration award, or, in the alternative, remand to the arbitrator for further proceedings consistent with the Court's opinion, and such other relief that the Court deems proper. *Id*. at Prayer for Relief ¶¶ 1–3.

On June 23, 2025, PGS filed its Petition to Confirm Arbitration Award. Doc. # 27 ("Petition to Confirm"). PGS asks the Court to (1) confirm the arbitration award; (2)

grant PGS all relief provided for in the Final Award; (3) award PGS pre-award, post-award/pre-judgment, and post-judgment interest as against BP; (4) award PGS costs accrued in bringing this action for confirmation and opposing BP's Petition to Vacate; (5) maintain jurisdiction over this matter until BP has fully complied with the arbitration award; and (6) to award any further relief to PGS as the Court deems proper and necessary in conformity with the arbitration award. Doc. # 27 at Prayer for Relief ¶¶ 1–6.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332. Doc. # 1 ¶¶ 6–7; Doc. # 27 ¶¶ 3–4.[1]

## II. FACTUAL BACKGROUND

### A. The Parties

BP is a limited liability company formed under the laws of California. Petition to Vacate ¶ 4. BP is a family-run business that has three members: Ross Bagdasarian, Jr.; Janice Karman; and Karman Ross Productions, Inc., a corporation incorporated in and with its principal place of business in California. *Id.* ¶¶ 4, 12. BP owns the rights to the Alvin and the Chipmunks franchise—an iconic name in children's entertainment that includes successful albums, television series, merchandise, and films. *Id.* ¶ 12. BP relies on distributors, sales agents, and other third parties to deliver its content to viewers around the world. *Id.* ¶ 13.

PGS Entertainment is a French S.A.S.[2] entity with its principal place of business in Paris, France. Petition to Confirm ¶ 1. PGS was founded by brothers Philippe and Guillaume Soutter to develop and distribute children's animation. *Id.* ¶ 9.

In or about 2011, after finding success in producing certain motion pictures, BP was introduced to PGS as a potential international sales agent. Petition to Vacate at ¶ 14; Petition to Confirm at ¶¶ 12–15. In 2013, PGS and BP contracted for PGS to fund and

---

[1] The parties agreed to forgo filing answers to the Petitions. *See* Doc. ## 23, 24.

[2] "'S.A.S.' is an acronym for 'société par actions simplifiée,' a type of French business entity. *See Siswanto v. Airbus Americas, Inc.*, No. 15-CV-5486, 2016 WL 7178459, at *1 (N.D. Ill. Dec. 9, 2016).

distribute the first five seasons of BP's new animated children's television show entitled *Alvinnn!!! And the Chipmunks* (the "Series"). *Id.*; Doc. # 30-1 at 2.[3]

**B. The International Distribution Agreement**

On or around November 31, 2019, BP and PGS entered into an agreement governing the international distribution of Seasons 6 and 7 of the Series (the "Agreement"). Doc. # 30-1 at 1. The Agreement requires disputes to be resolved by "binding, final, exclusive and non-appealable international arbitration" in Los Angeles under the International Arbitration Rules of Independent Film and Television Alliance ("IFTA") in effect as of the date of the request for arbitration before a sole arbitrator. *Id.* at 11.

After entering into the Agreement, the parties' relationship began to deteriorate. This culminated in April 2022, when BP suspended production on Seasons 6 and 7 of the Series. Petition to Vacate ¶ 18; Petition to Confirm ¶ 39. BP asserts that this was due to the COVID-19 pandemic and a changing entertainment landscape (Petition to Vacate ¶¶ 15–18), while PGS claims the suspension was the latest iteration of BP's efforts to renege on the Agreement so it could sell an unencumbered Alvin and the Chipmunks franchise to a third party (Petition to Confirm ¶¶ 22–39).

**C. The Arbitrations**

PGS initiated arbitration on May 27, 2022, asserting breach of the Agreement and bad faith (the "First Arbitration"). Doc. # 30-2. In the First Arbitration, PGS alleged that BP breached the Agreement by failing to perform its obligations in good faith, including by rejecting licensing proposals involving Disney, Nickelodeon, Amazon, Discovery and Tele-Quebec. *Id.* at 4–5. PGS sought approximately $33.8 million in lost profits from BP's refusal to commit to the production of Seasons 6 and 7, $6.7 million for harm to PGS's business relationships with existing distribution partners, $12.15 million for frustrating PGS's ability to produce additional properties in the future with affected

[3] Unless otherwise noted, citations to the record use CM/ECF pagination.

distributors working on the Series; and for the costs and attorney fees from the arbitration. *Id*. at 10. BP responded, seeking dismissal of PGS' claims. Doc. # 30-3.

The International Center for Dispute Resolution ("ICDR") appointed Michael C. Donaldson to oversee the arbitration. Petition to Vacate ¶¶ 1, 20.

On December 16, 2022, BP initiated a separate arbitration, asserting that PGS breached the Agreement and its good-faith obligations to BP under French law (the "Second Arbitration"). Doc. # 30-4 at 5. BP claimed that after BP revised the delivery schedule for the Series to account for COVD-19 related delays, PGS failed to provide BP's new delivery schedules to broadcasters and concealed this failure until broadcasters complained. *Id*. 2–5. BP characterized this as a deliberate effort by PGS to position itself for litigation against BP and sought monetary damages from the alleged economic and reputational harm of PGS's actions. *Id*. at 2, 6.

On February 1, 2023, PGS asserted a counterclaim against BP in the Second Arbitration for improperly disclosing PGS's confidential business information to PGS's business partners and direct competitors and sought monetary damages and costs as relief. Doc. # 30-5 at 7, 9.

On April 18, 2023, the ICDR granted PGS's request to consolidate the First Arbitration and the Second Arbitration before the arbitrator. Doc. # 30-6.

On February 2, 2024, BP amended its arbitration demand to include additional claims against PGS for breach of contract and for violation of PGS's duties under French law to perform its obligations in good faith and to perform its agency obligations. Doc. # 30-7 at 7. BP alleged that PGS disclosed confidential litigation information to broadcasters damaging BP's reputation and failed to inform BP of third-party broadcast proposals. *Id*. On February 14, 2026, PGS asserted its own counterclaim, alleging that BP had disclosed PGS's confidential information to business partners and direct competitors. Doc. # 30-8 at 11.

//

//

**D. The November 21, 2024 Award**

On November 21, 2024, the arbitrator issued a final award "in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding" (the "November 21, 2024 Award"). Doc. # 30-10 at 12. In sum, the arbitrator required BP to pay PGS $629,855.26 in damages and attorney fees and costs; BP was not awarded any monetary damages or attorney fees. *Id*. at 12.[4]

The arbitrator found that BP acted in bad faith under French law by rejecting four licensing opportunities involving Disney, Discovery, Tele-Quebec, and Nickelodeon.[5] *Id*. at 7. The arbitrator also found that BP acted in bad faith by (1) withholding from PGS BP's intention to sell their company and its intellectual property (*id*. at 6); (2) sharing various PGS contacts with third parties when exploring efforts to sell its company (*id*. at 8). The arbitrator also rejected BP's claim that PGS improperly disclosed the ongoing litigation proceedings to broadcasters and others. *Id*.

The arbitrator did not uniformly find in favor of PGS, however. For example, the arbitrator found that PGS acted in bad faith by failing to provide revised delivery schedules to broadcasters. *Id*. at 8. The arbitrator also found insufficient evidence that BP threatened to cancel seasons 6 and 7 of the Series to hinder PGS's ability to secure deals for these seasons. *Id*. at 7. And the arbitrator also found "there was mutual bad faith under French Law" and "[g]iven the palpable ill will between the parties" terminated the Agreement with specific requirements for certain continuing obligations under the Agreement. *Id*. at 10–11.

---

[4] The arbitrator also found that the arbitration costs totaling $154,127.58 should be borne equally by the parties and required BP to reimburse PGS $8,088.79 for the arbitration fees incurred by PGS in excess of the apportioned costs. Doc. # 30-10 at 12.

[5] The arbitrator did not find that BP rejected an earlier, 2020 Nickelodeon offer in bad faith. Although he did not state the reason for not considering that offer in his bad faith analysis, the arbitrator's failure to do so is understandable because both BP and PGS rejected the 2020 offer. *See* Petition to Confirm ¶ 37 ("Nickelodeon made a $6.5 million offer *that the parties initially passed on in 2020*, then PGS returned to in 2021 with the expectation to improve it through subsequent negotiations.") (emphasis added).

As noted above, the arbitrator awarded damages to PGS for "the course of conduct of BP." *Id.* at 11. For the rejected Disney, Discovery, and Tele-Quebec deals, the arbitrator awarded PGS 27.5% of the proposed license fee for each rejected contract: $123,750 for the Disney deal; $196,625 for the Discovery deal; and $95,766.45 for the Tele-Quebec deal. *Id.* at 11. As for the rejected Nickelodeon proposal, the arbitrator concluded that there was "no proposed licensee fee on which to base [the] calculations" because the proposal was never formalized. *Id.* He therefore averaged the proposed licensing fees from the three other rejected deals and awarded $138,713.81 for the rejected Nickelodeon opportunity. *Id.* The total damages awarded for the four lost opportunities were $554,855.26. *Id.* The arbitrator also awarded PGS $75,000 in separate damages for BP acting in bad faith under French law. *Id.*

The arbitrator did not award BP damages for "the course of conduct by PGS," finding that BP had failed to provide sufficient evidence supporting its damages claim. *Id.* at 11–12.

As for the parties' requests for attorney fees, the arbitrator found that since both parties had not fully complied with the French requirement to perform the Agreement in good faith and open communication, he would not award attorney fees and costs with regard to the First Arbitration brought by PGS against BP. *Id.* at 12. But he also found that PGS was entitled to attorney fees and costs "starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022" (the Second Arbitration) because BP's arbitration demand was triggered by testimony previously ignored by BP. *Id.* at 12.

**E. Requests for Correction**

Article 37 of the ICDR International Arbitration Rules ("Article 37") allowed the arbitrator to "correct any clerical, typographical, or computation errors" or "make an additional award as to claims, counterclaims, or setoffs presented by omitted from the award" upon the request of a party within 30 days or the final arbitration award. Doc. # 30-14 at 2–3.

On December 10, 2024 BP submitted a request for correction pursuant to Article 37 (the "BP Correction Request"). Doc. # 30-11. BP explicitly stated that it did "not challenge the substance" of the arbitrator's merits decisions. *Id.* at 1–2. Instead, BP sought correction of the arbitrator's assessment of what triggered the Second Arbitration—pointing out that the testimony identified by the arbitrator was given *after* the initiation of the Second Arbitration. *Id.* at 3. BP also requested that the arbitrator award BP its own fees and costs for the portions of the arbitration award for which BP had been successful and proposed a post-award process requiring PGS to produce invoices and proof of payment and allowing BP to lodge targeted objections on a mutually agreed schedule. *Id.*

On December 11, 2024 PGS submitted an objection to the BP Correction Request and its own request for correction pursuant to Article 37 (the "PGS Correction Request"). Doc. # 30-12. PGS objected to the BP Correction Request as exceeding the scope for corrections contemplated by Article 37. *Id.* at 2–4. PGS asked the arbitrator (1) to reduce the attorney fees and cost award to a sum certain and (2) to modify the Nickelodeon damages calculation to use a $6.24 million licensing valuation in the record rather than the average of the Disney, Discovery, and Tele-Quebec deals. *Id.* at 5

**F. January 24, 2025 Amendment**

On January 24, 2025, the arbitrator issued a written disposition granting in part and denying in part the parties' Article 37 requests (the "January 24, 2025 Amendment"). Doc. # 30-14 at 3, 5.

As to the BP Correction Request, the arbitrator modified certain language regarding circumstances that led to the Second Arbitration. *Id.* at 3. The arbitrator found that while BP was correct that the testimony cited in the November 21, 2024 Award as the impetus for the Second Arbitration was misdated, the Second Arbitration was still "premised upon information that either was or should have been known by BP at the time of the [First Arbitration]." *Id.*

As to the PGS Correction Request, the arbitrator concluded he had "inadvertently overlooked" a licensing valuation for the rejected Nickelodeon deal that was in the record[6] and replaced the averaged value used for the Nickelodeon opportunity ($138,713.81) with a number calculated based on the purportedly overlooked exhibit ($1,716,000). *Id*. As a result, the damages attributable to PGS's four lost opportunities increased from $554,855.26 to $2,132,141.45. *Id*.

With respect to attorney fees and costs, the arbitrator also declined BP's requests to either withdraw the attorney fees awarded to PGS or to award BP attorney fees. *Id*. The arbitrator found these requests did not fall within the ambit of Article 37, noting that his attorney fee decision was "thoughtfully made after weighing PGS's relatively minor bad faith against BP's much more costly and serious bad faith." *Id*.

The arbitrator also declined PGS's request to fix a sum certain and instead ordered the parties to meet and confer to determine the amount, directing that invoices and proof of payment be exchanged and that BP's objections to invoices be reasonable. *Id*.

## III. <u>DISCUSSION</u>

### A. BP's Motion to Vacate is Denied

The Federal Arbitration Act ("FAA") "gives federal courts only limited authority to review arbitration decisions." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.,* 363 F.3d 1010, 1012 (9th Cir. 2004) (citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.,* 341 F.3d 987, 998 (9th Cir. 2003) (en banc)). Under 9 U.S.C. § 9, a court "must grant" an order confirming an award, "unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10 or 11]."

The FAA limits the Court's power to vacate an arbitration award to certain circumstances, including where "the arbitrator[] exceeded [his or her] powers." 9 U.S.C.

---

[6] The arbitrator pointed to "Nickelodeon's licensing offer contained in Exhibit 62" as the licensing offer that was overlooked. Doc. # 30-14 at 3. Exhibit 62 concerns a Viacom/Nickelodeon 2020 offer, which both BP and PGS rejected. *See* Doc. # 30-15; Doc. # 1 at 49; Doc. # 27 at 64–65, 74.

§ 10(a)(4). The burden of establishing grounds for vacatur rests on the party seeking to vacate the award. *U.S. Life Ins. v. Super. Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010); *Emp'rs Ins. of Wausau v. Nat. Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1485 (9th Cir. 1991). The Court has "extremely limited authority to review arbitration awards." *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1239 (9th Cir. 2022). A district court will set aside an arbitrator's decision "only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). Courts resolve ambiguities in favor of the award's validity, even where its factual findings or legal conclusions are erroneous. *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1209 (9th Cir. 1989).

1. <u>The Court Declines to Vacate the Arbitrator's Decision to Amend His Damages Calculation Regarding the Nickelodeon Deal</u>

BP argues that the arbitrator exceeded his powers by increasing damages for BP's rejection of the potential Nickelodeon deal in the January 24, 2025 Amendment. Doc. # 20 at 16–21. BP invokes both the doctrine of *functus officio*[7] and Article 37 of the ICDR-IFTA Rules to challenge this amendment. *Id.* While BP's argument regarding the *functus officio* doctrine is persuasive, the Court finds that the arbitrator did not exceed his authority under Article 37.

//

//

//

//

//

[7] "*Functus officio*" is the Latin for "having performed his or her office." *See* FUNCTUS OFFICIO, Black's Law Dictionary (12th ed. 2024)

### *a. Functus Officio*[8]

The doctrine of *functus officio* provides that "once an arbitrator has made and published a final award his authority is exhausted and he can do nothing more in regard to the subject matter of the arbitration." *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir. 1982) (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967)). The doctrine serves an important but limited function: preserving finality and reducing the risk that, after an award issues, an arbitrator will be drawn back into the merits by renewed advocacy, outside influence, or second thoughts. *Id.*

The doctrine is subject to limitations. *Id.* at 734 n.1. An arbitrator may revisit a final award to (1) "correct a mistake which is apparent on the face of his award"; (2) "complete an arbitration if the award is not complete"; and (3) "clarify an ambiguity in the award." *Id.* Those exceptions do not permit a party to introduce new evidence to persuade the arbitrator that the original decision was wrong. *Id.* And the exception for mistakes apparent on the face of the award generally covers "clerical mistakes or obvious errors in arithmetic computation." *Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 332 (3d Cir. 1991); *see Local P-9, United Food & Com. Workers v. George A. Hormel & Co.*, 776 F.2d 1393, 1394 (8th Cir. 1985).

The parties have not identified, and the Court has not found, binding authority drawing a precise line between a permissible correction of a computational mistake and

---

[8] The Court rejects PGS's argument that the November 21, 2024 Award was nonfinal for purposes of analyzing the *functus officio* doctrine. Doc. # 29 at 14. The arbitrator stated that the award was "in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding." Doc. # 30-10 at 12. Similar language has been found sufficiently final for purposes of the *functus officio* doctrine, and the Court finds the same here. *See, e.g., BridgeLux, Inc. v. Ensure Enter., Inc.*, No. C 08-04218 JF, 2009 WL 10709801, at *4 (N.D. Cal. Mar. 31, 2009); *Aerojet Rocketdyne, Inc. v. Int'l Union, UAW*, No. 2:16-cv-1061, 2017 WL 9500948, at *4–5 (E.D. Cal. Apr. 19, 2017).

an impermissible reconsideration of a final arbitral award. The non-binding authorities suggest that the common-law exception is narrow.

In *Colonial Penn*, for example, the arbitrators' correction was found to fall outside this exception. The arbitrators first awarded $10 million and a release of claims to certain reserves, then later replaced that release with an additional cash payment after concluding they had misunderstood the parties' rights in those reserves. 943 F.2d at 329–33. The Third Circuit held that the second award could not stand because the asserted error was not apparent on the face of the award and became visible only by resort to facts outside the award itself. *Id.* at 332–33. *San Diego AFL-CIO* reached a similar result when an arbitration board later inserted the word "not" into one provision and added an effective date to another. *San Diego AFL-CIO Bus Drivers Local Div. 1309 v. San Diego Transit Corp.*, 972 F.2d 1342, 1992 WL 180221, at *2 (9th Cir. 1992). Those decisions reflect concern with post-award changes that alter the basis or effect of the award after the arbitrator returns to the matter.

Other cases show the narrow circumstances in which a later correction is allowed. For example, in *Laurin Tankers*, the court approved a remand to address a fuel-consumption miscalculation that was evident to "anyone familiar with the industry," because the fuel consumption number used by the arbitrators would have been physically impossible for the specific tanker vessel at issue. *See Laurin Tankers Am., Inc. v. Stolt Tankers, Inc.*, 36 F. Supp. 2d 645, 650–53 (S.D.N.Y. 1999). Accordingly, the permissible re-computation in *Laurin Tankers* involved a simple arithmetic correction to an obvious error, not a change to the methodology used to determine the remedy based on a reinterpretation of the evidence as in *Colonial Penn*.

In *BridgeLux*, the district court upheld a correction because it found the face of the original award revealed the problem: the arbitrator had expressly valued common stock based on "unrebutted testimony" concerning preferred stock. *BridgeLux, Inc. v. Ensure*

*Enter., Inc.*, No. C 08-04218 JF, 2009 WL 10709801, at *5–6 (N.D. Cal. Mar. 31, 2009).[9] The arbitrator then used a different valuation of the common stock by averaging the values of common stock previously provided by the parties. *Id.* at *5. To the extent *BridgeLux* reflects a broader application of the *functus officio* exception than *Colonial Penn*, the decisions remain reconcilable for two reasons: (1) the recalculation in *BridgeLux* resulted in only a *de minimis* change to the remedy (*id.*) while the recalculation in *Colonial Penn* resulted in an almost $9 million increase in award (*see Colonial Penn Ins. Co.*, 943 F.2d at 329–30); and (2) the district court in *BridgeLux* also relied on the arbitrator's authority under Article 30 of the ICDR rules—authority substantially similar to the Article 37 power invoked by the arbitrator here—while *Colonial Penn* did not address the arbitrator's authority under the arbitral rules. *See BridgeLux, Inc.*, 2009 WL 10709801, at *4–6.

The recalculation performed by the arbitrator here appears outside the bounds of what is typically permitted under the common law *functus officio* doctrine. In the November 21, 2024 Award, the arbitrator stated that there was "no proposed licensee fee on which to base" a calculation for the Nickelodeon opportunity because the proposal had never been formalized. Doc. # 30-10 at 11. He then used a different valuation method: averaging the proposed licensing fees from the Disney, Discovery, and Tele-Quebec deals, which yielded $138,713.81 for the rejected Nickelodeon opportunity. *Id.*

Then, in the January 24, 2025 Amendment, the arbitrator abandoned the averaging approach he previously used, referenced an exhibit in the record to approximate the value of the Nickelodeon opportunity, and replaced his earlier figure for damages for the Nickelodeon deal with $1,716,000. Doc. # 30-14 at 5. This increased the damages awarded to PGS. Doc. # 30-14 at 5. It also changed the methodology used to measure

---

[9] Relevant to the Court's analysis below, the affirmance of the arbitrator's correction was also based on the arbitrator's power under a substantially similar arbitral rule as Article 37 in this case. *BridgeLux, Inc.*, 2009 WL 10709801 at *4–6.

damages for the Nickelodeon deal, not just an input used in the calculation. Moreover, the asserted "mistake" was not apparent from the face of the award itself—it only became visible after the arbitrator returned to the record and decided that an exhibit should have been used when the November 21, 2024 award suggested the record did not supply sufficient evidentiary basis for such a calculation. Unlike *Laurin Tankers*, the corrected portion of the November 21, 2024 did not involve a physical impossibility evident from the face of the award, and unlike *BridgeLux*, the modification involved a significant change to the magnitude of the remedy. Accordingly, the arbitrator's amendment likely went beyond the narrow exceptions to the *functus officio* doctrine.

***b. Article 37***

The Court's *functus officio* analysis is not the end of the matter, however, because the parties did not proceed under the default common-law framework alone. They agreed to arbitrate under rules that expressly authorize a limited form of post-award correction. Article 37 permitted the arbitrator to "correct any clerical, typographical, or computation errors" and to "make an additional award as to claims, counterclaims, or setoffs presented by omitted from the award." Doc. # 30-14 at 2–3. "It is clear . . . that the parties and the arbitrator have full authority to establish the procedural rules of arbitration." *See Loc. P-9, United Food & Com. Workers Int'l Union, AFL-CIO*, 776 F.2d at 1394. The question, then, is how much deference the Court owes the arbitrator's understanding of Article 37 in these circumstances.

*T.Co Metals* provides guidance. There, the Second Circuit considered ICDR Article 30 (which uses similar language to Article 37) and held that the arbitrator did not exceed his powers by issuing an amended award under that rule. *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 336, 342–47 (2d Cir. 2010). The correction in *T.Co Metals* went beyond fixing a transposed number or recalculating an obvious arithmetic error. Indeed, the arbitrator explained that his corrections were "not a mere computational issue," and required renewed "appreciation of the evidence." *Id.* at 337.

Nonetheless, he concluded that Article 30 authorized him to "change conclusions based upon clerical errors in the body of an award, even where such correction process entails an exercise of judgment beyond rote computation." *Id.* He therefore modified his original calculation and reduced the damages from $420,537 to $340,587. *Id.*

The Second Circuit upheld the amendment and concluded that the district court had framed the issue too narrowly by looking only to the common-law *functus officio* doctrine rather than to the arbitrator's authority under Article 30 and the parties' adopted arbitral rules. *Id.* at 342–47. The court emphasized that the ICDR rules gave the arbitrator authority to interpret provisions relating to his powers and duties, and it therefore deferred to his understanding of Article 30's scope. *Id.* at 344–47. In that respect, *T.Co* recognized that an amendment may fall outside the narrow common-law category of "clerical mistakes or obvious errors in arithmetic computation," yet still be permissible under the parties' chosen arbitral rule containing the same language. *Id.* at 342–43, 345–47.

This reasoning applies here. The parties agreed to be bound by the decision of a single arbitrator acting under IFTA rules, which included Article 37. *See* Doc. # 30-1 at 11. The Second Circuit in *T.Co. Metals* found this kind of agreement provided a "clear and unmistakable" expression of intent to allocate to the arbitrator the task of interpreting the scope of his powers and duties under these rules. *See T.Co Metals, LLC*, 592 F.3d at 344–45. And here it is evident that the arbitrator grappled with the scope of his authority under Article 37 when the parties both submitted requests for correction pursuant to this rule. For example, he denied BP's request to alter the attorney fees ruling because that request challenged a decision he had "thoughtfully made after weighing" the parties' conduct and therefore fell outside his Article 37 authority. Doc. # 30-14 at 5. He treated the Nickelodeon issue differently because, in his view, the relevant licensing valuation had been "inadvertently overlooked." *Id.* The Court does not read that explanation lightly. To be sure, the Nickelodeon revision may have been more substantive than the

sort of correction ordinarily allowed under the common-law *functus officio* doctrine. But *T.Co Metals* shows that this does not end the analysis when the parties have adopted arbitral rules that give the arbitrator continuing corrective authority and the arbitrator has interpreted the authority conferred by that rule. 592 F.3d at 344–47; *see also*, *Veliz v. Cintas Corp.*, 273 F. App'x 608, 609 (9th Cir. 2008) (finding the district court erred by applying the doctrine of *functus officio* to find the arbitrator reconsidered his award without deferring to the arbitrator's interpretation of his authority); *BridgeLux, Inc.* 2009 WL 10709801 at *5–6.

This approach also aligns with the Ninth Circuit's directive that an "arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits." *See Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006).

On this record, the Court cannot say that the arbitrator exceeded the authority Article 37 conferred when he determined that the Nickelodeon issue involved an overlooked computational input that Article 37 empowered him to correct, rather than an improper request to revisit a "thoughtfully made" substantive decision. Accordingly, the Court finds that the arbitrator acted appropriately in revising the damages calculation regarding the Nickelodeon deal with the January 24, 2025 Amendment. On this issue, BP's Motion is DENIED and PGS's Motion is GRANTED.

2. <u>BP Waived Its Concealment Claim and the Arbitrator Addressed the Claim By Declining Damages Based on Insufficient Evidence</u>

BP argues that the arbitrator failed to rule on its claim that PGS failed to inform BP of third-party broadcast proposal deals (BP's "concealment claim") and therefore did not issue a "mutual, final, and definite award," rendering the November 21, 2024 Award subject to vacatur under § 10(a)(4). Mot. to Vacate at 21–23. The Court disagrees.

A party cannot assert challenges to confirmation of an arbitration award that were not raised during the arbitration. *Marino v. Writers Guild of America, East, Inc.,* 992 F.2d

1480, 1484 (9th Cir.1993); *Wellman v. Writers Guild of America, West., Inc.,* 146 F.3d 666, 673–74 (9th Cir.1998).

Here, BP waived its argument about the purportedly unaddressed concealment claim because it did not raise this alleged omission in the BP Request for Correction. *See* Doc. # 30-11 at 1–2. Article 37 expressly permits a party to seek "an additional award as to claims, counterclaims, or setoffs presented but omitted from the award." Doc. # 30-14 at 1. BP did not invoke that mechanism to seek a ruling on any missing claims. *See* Doc. # 30-11 at 1–2. Instead, BP affirmatively represented that it "does not challenge the substance of the arbitrator's decisions regarding the parties' claims and defenses." *Id*. Having failed to raise the alleged omission when expressly permitted to do so—and having disclaimed any challenge to the arbitrator's merits determinations—BP cannot now seek vacatur on the theory that the award was incomplete.

Even absent waiver, BP's argument fails on the merits. The arbitrator expressly stated that the November 21, 2024 Award was "in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding." Doc. # 30-10 at 12. And, as BP concedes, the arbitrator addressed the supposedly missing claim earlier in the November 21, 2024 Award. *Id*. at 10–11; Mot. to Vacate at 21–22. Accordingly, the Court finds that the arbitrator adjudicated each of BP's claims and denied relief. *Id*. at 11. The November 21, 2024 Award thus resolved this issue.

3. <u>BP Waived Its Argument that the Arbitrator Exceeded His Authority by Failing to Fix Costs</u>

BP also argues that the arbitrator exceeded his powers by failing to reduce the fee-and-cost award to a sum certain. Mot. to Vacate at 23–24. BP's argument is forfeited, however, and BP cannot complain of a procedure similar to the one it urged the arbitrator to adopt. In its request for correction, BP did not argue that the fee award was defective because it did not state a sum certain. Doc. # 30-11 at 2–3. Instead, BP proposed a post-award process under which PGS would produce invoices and proof of payment and BP could make targeted objections on an agreed schedule. *Id.* The arbitrator adopted a

similar invoice-based process in the January 24, 2025 Amended Award. Doc. # 30-14 at 4–5.

That sequence forecloses vacatur on the theory BP now advances. Courts reviewing arbitral awards have held that procedural objections are forfeited when they are not timely presented to the arbitrator. *See Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 692–93 (7th Cir. 2004) (holding that objections to the panel's compliance with arbitral timing rules were waived where "no one objected at the crucial time" and emphasizing that "the prejudiced party must make its objection known"). And the Ninth Circuit has long applied the related principle that a party "may not complain on review of errors below for which he is responsible." *Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1336 (9th Cir. 1985) (quoting *Hudson v. Wylie*, 242 F.2d 435, 448 (9th Cir. 1957)). Having asked the arbitrator to quantify fees through invoice production and party objections—rather than by fixing a sum certain in the award itself—BP cannot now seek vacatur because the arbitrator failed to reduce the attorney fees to a specific number. On this record, that objection supplies no basis for relief under 9 U.S.C. § 10(a)(4). *See Schoenduve Corp.*, 442 F.3d at 732–33.

4. The Arbitrator Did Not Exceed His Authority By Awarding PGS Attorney Fees

BP argues that the arbitrator exceeded his authority by awarding PGS Attorney Fees on the Second Arbitration. Mot. to Vacate at 24–27.

As BP concedes, the arbitral rules permitted the arbitrator to award "the reasonable legal and other costs incurred by the parties." *Id*. at 27. Indeed, both BP and PGS requested attorney fees as part of the proceedings. *See* Doc. # 30-10 at 12 ("Both parties have requested an award of attorneys' fees and costs."). The arbitrator fashioned a fee award for the consolidated proceedings pegged to attorney fees and costs stemming primarily from BP's Second Arbitration. *Id*. In the January 24, 2025 Amendment, the arbitrator rejected BP's request to revoke any attorney fees awarded to PGS, noting that he had made this decision "[t]houghtfully . . . after weighing PGS' relatively minor bad

faith against BP's must more costly and serious bad faith." Doc. # 30-14 at 3. The Court will not second guess this decision and finds that BP has not carried its burden to show that the award should be vacated on this basis. *See Stead Motors of Walnut Creek*, 886 F.2d at 1209.

***

Accordingly, BP's Motion to Vacate the Arbitration Award is DENIED**.**

**B. PGS's Request to Confirm the Arbitration Award is Granted**

Under the FAA, the Court must confirm an arbitration award unless a statutory ground for vacatur is established. 9 U.S.C. § 9. Accordingly, for the reasons discussed above, the Court GRANTS PGS's Motion to Confirm to the extent it seeks confirmation of the November 21, 2024 Award as it was amended by the January 24, 2025 Amendment.

**C. PGS's Request for Interest and Additional Attorney Fees is Granted in part, Denied in Part**

In addition to seeking confirmation of the arbitration award, PGS asks the Court to award it different categories of interest as well as attorney fees in connection with this action. Doc. # 28 at 23–26. As a threshold matter, the arbitrator's silence on awarding interest does not foreclose the Court from awarding interest upon confirmation of the arbitration award. *Lagstein v. Certain Underwriters at Lloyd's of London*, 725 F.3d 1050, 1055 (9th Cir. 2013) ("Courts do not lack authority to award interest where an arbitration award is silent."); *accord*, *Northrop Corp. v. Triad Int'l Mktg. S.A.,* 842 F.2d 1154, 1155 (9th Cir. 1988) (per curiam).

//

//

//

//

//

//

In diversity cases, state law governs the availability and rate of prejudgment interest. *Id*. Federal law governs requests for post-judgment interest. *Id*. at 1155–56.[10]

As detailed below, the Court GRANTS PGS's request for post-award, prejudgment interest and post-judgment interest and DENIES PGS's request for pre-award interest and additional attorney fees in connection with this action.

1. Pre-Award Interest is Denied

PGS seeks pre-award, prejudgment interest for the period before issuance of the November 21, 2024 Award pursuant to California Civil Code section 3287(a). Doc. # 28 at 24–25.

Under California Civil Code § 3287(a), prejudgment interest is mandatory only when damages are "certain, or capable of being made certain by calculation." Cal. Civ. Code § 3287(a); *Leff v. Gunter*, 33 Cal. 3d 508, 519–20 (1983). That standard is not met where the amount of damages depends on the trier of fact's resolution of disputed evidence or valuation issues. *Fireman's Fund Ins. Co. v. Allstate Ins. Co.*, 234 Cal. App. 3d 1154, 1173–74 (1991) ("The statute does not authorize prejudgment interest where the amount of damage . . . depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor.") (citation modified); *accord.*, *Duale v. Mercedes-Benz USA, LLC*, 148 Cal. App. 4th 718, 729 (2007); *Wisper Corp. v. Cal. Com. Bank*, 49 Cal. App. 4th 948, 962–63 (1996).

Here, the November 21, 2024 Award turned on the arbitrator's factual findings and valuation methodology regarding alleged lost licensing opportunities, including projected revenues and other disputed inputs. Because the amount owed was not fixed or

[10] Although the Agreement provides that French law should govern "the validity, construction and performance" of the Agreement, the question of the availability of pre- and post-judgment interest and attorney fees are a distinct remedial issue. *See Arno v. Club Med Boutique Inc.*, 134 F.3d 1424, 1426 (9th Cir. 1998) (finding that California law applied to an attorney fee request, despite French law applying to the underlying tort claim).

ascertainable before the arbitrator issued that award, PGS has not shown entitlement to mandatory prejudgment interest under § 3287(a). *See Warren v. Kia Motors Am., Inc.*, 30 Cal. App. 5th 24, 43–44 (2018).[11]

2. Post-Award, Prejudgment Interest is Granted

PGS also seeks post-award, prejudgment interest in the amount of 10% per annum for all liabilities first fixed by the January 24, 2025 amendment. Doc. # 28 at 25–26. The Court grants this request.

Under California Civil Code section 3289(a), post-award, prejudgment interest is mandatory from the date the arbitration panel renders its award, because the award itself fixes the amount owed and creates a new, certain liability. *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004); *Pierotti v. Torian*, 81 Cal. App. 4th 17, 27–28 (2000).

Here, the amount owed to PGS became certain and fixed with the January 24, 2025 amendment. The Court therefore awards PGS post-award, prejudgment interest at 10% per annum from January 24, 2025, through the day before entry of judgment.

3. Post-judgment Interest is Granted

PGS also requests post-judgment interest. Doc. # 28 at 26. The Court grants this request.

Post-judgment interest on a federal judgment is mandatory. 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *see Perkins v. Standard Oil Co.*, 487 F.2d 672, 674 (9th Cir. 1973). Post-judgment interest accrues on the entire amount of the judgment, including any

[11] To the extent PGS also seeks discretionary pre-award, pre-judgment interest on an unliquidated contract claim under section 3287(b), the Court declines to award it. The Court has "broad discretion" under that provision. *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1376–77 (9th Cir. 1987). In exercising that discretion, the Court notes that PGS has already obtained a substantial recovery. The Court also notes that PGS has not explained why it could not have sought pre-award interest from the arbitrator. Under these circumstances, the Court declines to award prejudgment interest under section 3287(b).

prejudgment interest awarded. *Air Separation, Inc. v. Underwriters at Lloyd's of London,* 45 F.3d 288, 291 (9th Cir. 1995). Accordingly, the Court finds that PGS is entitled to post-judgment interest at the rate provided by 28 U.S.C. § 1961 from the date judgment is entered until the date of payment.

4. <u>Additional Attorney Fees for this Action are Denied</u>

PGS also seeks attorney fees in addition to those awarded by the arbitrator for being forced to litigate the present action because of BP's bad faith actions. Doc. # 28 at 26–27. The Court denies this request.

Federal courts may award attorney fees under their inherent authority where the losing party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983). In the arbitration-confirmation context, an "unjustified refusal to abide by an arbitrator's award" may support a bad-faith fee award. *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.*, 84 F.3d 1186, 1192 (9th Cir. 1996).

Based on its review of the record, the Court finds that PGS has not carried its burden to show that BP's pursuit of vacatur amounted to bad faith or an unjustified refusal to comply with the award. Accordingly, the Court DENIES PGS's request for attorney fees.

## IV. **<u>CONCLUSION</u>**

For the foregoing reasons:

1. BP's Motion to Vacate is **DENIED**.
2. PGS's Motion to Confirm is **GRANTED IN PART and DENIED in PART.**
   a. The Court **CONFIRMS** the November 21, 2024 Award as it was amended by the January 24, 2025 Amendment.
   b. PGS is awarded post-award, prejudgment interest on the final arbitration award at a rate of 10% per annum from January 24, 2025, through the day before entry of judgment.

c. Post-judgment interest shall accrue pursuant to 28 U.S.C. § 1961 from the date judgment is entered until the date of payment.

d. PGS's request for attorney fees incurred in this confirmation and vacatur proceeding is **DENIED**.

3. All other pending matters are hereby **TERMINATED**.

**IT IS SO ORDERED**.

Dated: 3/31/26

Cynthia Valenzuela

HON. CYNTHIA VALENZUELA
UNITED STATES DISTRICT JUDGE

# Exhibit M

Davis Wright Tremaine LLP

5870 West Jefferson Boulevard
Suite H
Los Angeles, CA 90016

**Nicolas A. Jampol**
213.633.8651
nicolasjampol@dwt.com

December 13, 2024

**By Email**

Arbitrator Michael Donaldson
Independent Film & Television Alliance
5600 W. Adams Blvd., Suite 300
Los Angeles, CA 90016
mdonaldson@dcp.law

PGS Entertainment
c/o Neville L. Johnson
Johnson & Johnson, LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
njohnson@jjllplaw.com

Daniel Lifschitz
Gipson Hoffman & Pancione, APC
1901 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
dlifschitz@ghplaw.com

Re: **BP's Response to PGS's Request for Correction of Award**
*PGS Entertainment v. Bagdasarian Productions*, ICDR Case No. 01-22-0002-2640
*Bagdasarian Productions v. PGS Entertainment*, ICDR Case No. 01-22-0005-2712

Dear Arbitrator Donaldson:

BP submits this response to PGS's Request for Correction.

**First**, PGS does the very thing it claims is inappropriate by submitting a request for the Arbitrator to reconsider his decision and increase the underlying award by over one million dollars. Even worse, this request is based on an exhibit improperly attached to PGS's submission even though both parties received correspondence from IFTA on October 11, 2024 stating that no additional evidence was to be submitted, and to not transmit any further documentation to the tribunal. Doing so now, or requesting the Arbitrator reconsider his ruling on the merits, is directly contrary to the rules. The parties may not challenge the substance of the Arbitrator's Award. That said, given PGS's offer to withdraw this improper challenge to the Arbitrator's reasoning and decision in the Award, BP will not include a further response unless the Arbitrator so requests.

**Second**, contrary to PGS's letter, BP is not contending the Arbitrator made any error in judgment or discretion. BP expressly states it does **not** challenge the substance of the Arbitrator's decision on either party's claims or defenses. The issue BP raised is solely relating to the computation of attorneys' fees and costs, and is clearly a "computational error" under IFTA Article 37. Specifically, the Arbitrator stated BP filed a separate arbitration against PGS that was "triggered by testimony of Xavi Mas." But Mr. Mas's deposition testimony occurred on December 15, 2023, ***one year after*** BP filed its claims against PGS. Mr. Mas's deposition was taken as *part* of that action (and which resulted in an amended notice of arbitration filed on February 2, 2024). More importantly, BP ***prevailed*** on its primary claim in that second arbitration, that PGS acted in bad faith when it failed to disclose the revised delivery schedule to broadcasters (or tell BP that it was doing so).

It is well-established that a party is not entitled to attorneys' fees for a claim that it lost. ***PGS is thus not entitled to attorneys' fees for the second arbitration***. The fee award was predicated on an inadvertent error as it was based on the wrong information and date about the second arbitration. This is also consistent with the parties' Agreement, which does not provide for fee shifting. In the event the Arbitrator determines fees are appropriate for claims in the second arbitration that each party prevailed on, ***then both parties should receive their fees as to those specific claims***.

**Third**, even if the Arbitrator rejects BP's argument, PGS seeks an outrageous amount of fees totaling **$1.85 million**—triple what PGS recovered on the merits. There are also numerous errors with the little information that PGS provides. As one example, PGS requests costs that the Arbitration explicitly held were not recoverable. PGS also requests fees from three separate law firms, including $512,767 for PGS French counsel who did nothing at the second hearing, and hundreds of thousands of dollars relating to experts for PGS's counterclaim at the second hearing for which PGS did not recover any damages. PGS is attempting to use the Arbitrator's decision as a backdoor attempt at a seven-figure award that it could not obtain through its arguments on liability. This is contrary to well-established law and public policy regarding attorneys' fees.

Finally, either party seeking fees **must** provide invoices and support for those fees, ***and proof they were actually paid***. A party cannot be reimbursed for fees it did not incur or pay. And the fees must be reasonable. That is why BP requested a mechanism by which each party seeking attorneys' fees exchange invoices for the portion of the award they prevailed on, and then the responding party bring any dispute to the arbitrator's attention. BP reiterates this request, and is willing to confer with PGS's counsel on a mutually agreed upon briefing schedule given the upcoming holidays.

Sincerely,

Nicolas A. Jampol
Davis Wright Tremaine LLP

Daniel B. Lifschitz (SBN 285068)
**GIPSON HOFFMAN & PANCIONE APC**
1901 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-6002
Telephone: (310) 556-4660
Facsimile: (310) 556-8945
Email: dlifschitz@ghplaw.com

Attorneys for Respondent/Counter-Petitioner
PGS Entertainment

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAGDASARIAN PRODUCTIONS, LLC;<br>Petitioner,<br>vs.<br>PGS ENTERTAINMENT,<br>Respondent. | Case No.: 2:25–cv–03240 CV (Ex)<br>**OPPOSITION TO MOTION TO VACATE AND REMAND ARBITRATION AWARD**<br>Hearing Date: September 5, 2025<br>Time: 1:30 p.m.<br>Place: Courtroom 5D<br>Judge: Hon. Cynthia Valenzuela |
| PGS ENTERTAINMENT,<br>Counter-Petitioner,<br>vs.<br>BAGDASARIAN PRODUCTIONS, LLC,<br>Counter-Respondent. | Action Filed: April 11, 2025 |

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 7
II. BACKGROUND ..... 8
- A. PGS and BP Popularize the Series ..... 8
- B. BP Intentionally Sabotages the Series ..... 9
- C. PGS Initiates and Efficiently Pursues Arbitration ..... 10
- D. BP Retaliates by Vexaciously Multiplying the Proceedings ..... 10
- E. PGS Prevails and BP Loses on Every Claim ..... 11
- F. The Arbitrator Appropriately Amends His Award ..... 11

III. LEGAL STANDARD ..... 13
IV. ARGUMENT ..... 13
- A. Amendment of the Damages Award Was Proper ..... 13
  - 1. The Amended Award Is Proper Under *Functus Officio* ..... 14
  - 2. The Amended Award Is Proper Under Article 37.1 ..... 19
- B. The Award Properly Disposed of BP's Concealment Claim ..... 20
- C. The Award Properly Fixes the Fees and Costs Owed to PGS ..... 23
- D. PGS Was Properly Deemed the Prevailing Party ..... 23
- E. PGS Should Be Awarded Fees For Defending This Action ..... 25

V. CONCLUSION ..... 26

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

## TABLE OF AUTHORITIES

**Page**

**Cases**

*A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401 (9th Cir. 1992) ..... 21

*Aerojet Rocketdyne, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am,* No. CV 17-5122 PSG (SKX), 2017 WL 9500948 (C.D. Cal. Nov. 27, 2017) ..... 16

*Aria Fire Sys. v. Sprinkler Fitters UA Local 709*, No. 2:16-cv-03522-CAS (RAOx), 2016 WL 6745323 (C.D. Cal. Nov. 14, 2016) ..... 21

*Azod v. Robinson*, No. 2:22-cv-05214-CAS (MRW), 2022 WL 18143882 (C.D. Cal. Nov. 9, 2022) ..... 25

*Barinaga v. Cox*, No. CV-05-1432-HU, 2007 WL 184687 (D. Or. Jan. 12, 2007) ..... 21

*Bell Aerospace Co. Div. of Textron, Inc. v. Int'l Union, United Auto., etc.*, 500 F.2d 921 (2d Cir. 1974) ..... 22

*Bosack v. Soward*, 586 F.3d 1096 (9th Cir. 2009) ..... 18, 20

*Braggs v. Jones*, 614 F. App'x 901 (9th Cir. 2015) ..... 22

*Bridewell-Sledge v. Blue Cross*, 798 F.3d 923 (9th Cir. 2015) ..... 24

*BridgeLux, Inc. v. Ensure Enter.*, No. C 08-04576 JW, 2009 WL 10709801 (N.D. Cal. Mar. 6, 2009) ..... 7, 14, 15, 19

*Colonial Penn Ins. Co. v. Omaha Indem. Co.,* 943 F.2d 327 (3d Cir. 1991) ..... 15

*Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331 (9th Cir. 1985) ..... 20

*DigiTelCom, Ltd. v. Tele2 Sverige AB*, No. 12 CIV. 3082 RJS, 2012 WL 3065345 (S.D.N.Y. July 25, 2012) ..... 17

*Eagle Sys. & Servs. v. Int'l Ass'n of Machinists*, No. 2:16-cv-02077-JAM-EFB, 2016 WL 7324753 (E.D. Cal. Dec. 15, 2016) ..... 26

*ESCO Corp. v. Bradken Res. Pty Ltd.*, No. 10-788-AC, 2011 WL 1625815 (D. Or. Jan. 31, 2011) .......... 17, 20

*Fortunet, Inc. v. Melange Computer Servs.*, No. 2:04CV0556-PMP-PAL, 2007 WL 173863 (D. Nev. Jan. 17, 2007) .......... 24

*G.G. v. Valve Corp.*, No. C16-1941-JCC, 2019 U.S. Dist. LEXIS 50523 (W.D. Wash. Mar. 26, 2019) .......... 21

*Harris v. Sandro*, 96 Cal. App. 4th 1310 (2002) .......... 7, 20

*Harvey Aluminum v. United Steelworkers of Am.*, 263 F. Supp. 488 (C.D. Cal. 1967) .......... 18

*Heimlich v. Shivji*, 7 Cal. 5th 350 (2019) .......... 14

*Hudson v. Wylie*, 242 F.2d 435 (9th Cir. 1957) .......... 20

*IMAX Corp. v. Giencourt Invs., S.A.*, No. 17-62033-CIV, 2019 WL 8160700 (S.D. Fla. Sept. 27, 2019) .......... 23

*Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425 (9th Cir. 1983) .......... 26

*Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401 (9th Cir. 2011) .......... 13

*Kane v. Pacap Aviation Fin., LLC*, No. 19-00574 JAO-RT, 2025 WL 917013 (D. Haw. Mar. 4, 2025) .......... 23, 24

*Lagstein v. Certain Underwriters at Lloyd's of London*, 725 F.3d 1050 (9th Cir. 2013) .......... 13

*Leeward Constr. Co. v. Am. Univ. of Antigua - Coll. of Med.*, 826 F.3d 634 (2d Cir. 2016) .......... 21

*McClatchy Newspapers v. Cent. Valley Typographical Union*, 686 F.2d 731 (9th Cir. 1982) .......... 15

*Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826 (9th Cir. 1995) .......... 19, 20

*Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 389 F. Supp. 3d 687 (N.D. Cal. 2019) .......... 8, 23

*New Frontier Inv. AG v. BitCenter, Inc.*, 715 F. Supp. 3d 1245 (N.D. Cal. 2024) .......... 17, 18, 20

*Nikola Corp. v. Milton*, No. CV-23-02635-PHX-DJH, 2024 WL 4120320 (D. Ariz. Sep. 9, 2024) .......... 21

*Norfolk S. Ry. Co. v. Sprint Communs. Co. L.P.*, 883 F.3d 417 (4th Cir. 2018) .......... 22

*Pure Line Seeds, Inc. v. Gallatin Valley Seed Co*, No. 1:14-cv-00015-EJL-CWD, 2014 WL 3721271 (D. Idaho June 19, 2014) .......... 18

*Riverside Eng'g Inc. v. Gemini Ins. Co.*, No. CV-23-02465-PHX-DWL, 2024 WL 4165397 (D. Ariz. Sep. 12, 2024) .......... 18

*San Diego AFL-CIO Bus Drivers Loc. Div. 1309 of Amalgamated Transit Union v. San Diego Transit Corp.*., 972 F.2d 1342, 1992 WL 180221 (9th Cir. 1992) .......... 16

*San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys.*, 568 F.3d 725 (9th Cir. 2009) .......... 24

*San Martine Compania de Navegacion v. Saguenay Terminals Limited*, 293 F.2d 796 (9th Cir. 1961) .......... 13

*Smith v. Transp. Workers Union of Am.*, 374 F.3d 372 (5th Cir. 2004) .......... 19

*Starr v. Mayhew*, 83 Cal. App. 5th 842 (2022) .......... 18

*Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, etc.*, 886 F.2d 1200 (9th Cir. 1989) .......... 13

*Steinmann v. ZTE Corp.*, No. CV 11-01578 BRO (SPX), 2015 WL 13546434 (C.D. Cal. Dec. 11, 2015) .......... 23

*Sunfed Produce, LLC v. Vega-Tostado*, No. CV-11-393-TUC-DCB, 2017 WL 4876467 (D. Ariz. Jan. 31, 2017) .......... 13, 21

*Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985 (3d Cir. 1997) .......... 16, 17

*Thompson v. Tega-Rand Int'l*, 740 F.2d 762 (9th Cir. 1984) .......... 8

*U.S. Fin. Sec. Litig.*, 729 F.2d 628 (9th Cir. 1984) .......... 22

*United States Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167 (9th Cir. 2010) .......... 13

*United States v. Imperial Irrigation District*, 595 F.2d 525 (9th Cir. 1979) .......... 24

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

**Rules**

ICDR-IFTA Rules, Article 37 .................................................................... 20

ICDR-IFTA Rules, Article 37.1 ................................................................ 19

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

## I. INTRODUCTION

There is no basis to overturn the thorough and well-reasoned award rendered against Bagdasarian Productions ("BP"). The award was issued by one of the most experienced and well-regarded arbitrators in the entertainment community after 32 months of proceedings, during which time the arbitrator had the opportunity to become intimately acquainted with BP's lack of character and credibility. What should have been an efficient six-month proceeding was extended six-fold (and counting) by a series of retaliatory actions undertaken by BP that were found so bereft of merit by the arbitrator that he not only awarded BP no relief, but ordered BP to cover PGS's fees and costs as of the moment the retaliatory campaign began.

BP's challenge to the propriety of the arbitrator's award is nothing more than a ploy to continue draining the resources of PGS Entertainment ("PGS") via lawfare. The four claimed errors highlighted by BP's motion are themselves both legally and factually erroneous, thereby failing to justify the request for vacatur:

***First,*** the arbitrator's initial award expressly found that BP had acted in bad faith by refusing to allow PGS to negotiate a distribution deal with Nickelodeon, and PGS was entitled to its royalty against the value of that lost opportunity. The substance of that finding was left unchanged in the arbitrator's final award, which merely recalculated the amount of the royalty owed to PGS. Such recalculations have been repeatedly affirmed as within an arbitrator's authority. *See, e.g., BridgeLux, Inc. v. Ensure Enter.*, No. C 08-04576 JW, 2009 WL 10709801, at *13 (N.D. Cal. Mar. 6, 2009) (confirming that recalculation of an award based upon a request to review overlooked evidence was not a violation of *functus officio*).

***Second,*** the alleged concealment claim BP argues was improperly "omitted" from the arbitration award is one that BP failed to properly raise, preserve, or support in the first instance, providing numerous avenues to deny vacatur. The arbitrator was under no obligation to spill further ink detailing these failures. *See Harris v. Sandro*, 96 Cal. App. 4th 1310, 1313 (2002) ("An arbitrator's failure to



GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

render express findings on disputed questions does not invalidate the award where, as here, the award serves to settle the entire controversy.") (cleaned up).

***Third,*** the arbitrator fixed the costs of the arbitration by determining that, as the prevailing party, PGS was entitled to reimbursement of specific expenditures incurred over a specific period of the proceedings. Nothing more was required for this to be a valid "fixing of costs" under the governing arbitral rules or the FAA. *See Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 389 F. Supp. 3d 687, 703 (N.D. Cal. 2019) (rejecting argument "that an arbitrator's failure to specify the exact dollar amount of the fees violates Article 34 of the ICDR Rules or provides a basis for vacatur of an award under the FAA.").

***Fourth,*** BP claims PGS did not prevail in the retaliatory arbitration that BP initiated despite PGS (a) defeating *every single claim* brought by BP and (b) winning a monetary award on its own counterclaim (which BP falsely argues did not occur). BP apparently believes that by satisfying *one element* on a claim it ultimately failed to carry, and for which it was rewarded *zero relief* by the arbitrator, it somehow emerged the victor. To merely recite BP's position is to refute it.

In sum, BP's motion to vacate is a groundless delay tactic intended to further forestall a reckoning that is already years overdue. It should be rejected in its entirety and BP made to compensate PGS for the costs of opposing same. *See Thompson v. Tega-Rand Int'l*, 740 F.2d 762, 764 (9th Cir. 1984) ("Delaying and frivolous appeals have the effect of undermining both the arbitration and judicial systems. Attorneys' fees are an appropriate sanction in such a situation.").

## II. BACKGROUND[1]

### A. PGS and BP Develop and Popularize the Series

PGS was founded by brothers Philippe and Guillaume Soutter to develop and distribute children's animation. In 2013, PGS and BP entered into an agreement for

[1] PGS provides a more complete recitation of the relevant factual and procedural background in its companion petition and motion to confirm the arbitration award.



GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

PGS to fund and distribute the first season of BP's new television program in the *Alvin and the Chipmunks* franchise ("Alvin") entitled *Alvinnn!!! and the Chipmunks* (the "Series"). PGS directly acquired the distribution rights to the Series from BP in exchange for paying significant minimum guarantees ("MGs"). This meant PGS would license the Series in its own name and take on the risk of the agreements.

Because PGS assumed both the financial risk of the MG payments and the contractual risk of being in direct privity with the Series' broadcasters, it made sure to include a "deal approval" clause in its agreements with BP that gave it autonomy to choose which potential partnerships it would pursue. BP, in turn, was only given final sign-off rights as to execution of each such partnership, which could not be unreasonably withheld and was forfeited if not exercised within three business days.

The partnership between PGS and BP quickly proved a resounding success, and for the first five (5) seasons of the Series, the parties' incentives were fully aligned, yielding over $100 million in sales. BP approved virtually all PGS's deals and never once objected to PGS curating what it presented (rather than inundating BP with offers it had no intention to pursue, which would be a wasteful endeavor).

**B. <u>BP Intentionally Sabotages the Series</u>**

In June of 2020, several months after the COVID-19 pandemic sent the world into lockdown, BP signed an agreement (the "2020 Agreement") with PGS to distribute the sixth and seventh seasons of the Series ("Seasons 6 and 7").[2] PGS quickly signed more than $6 million worth of deals for Seasons 6 and 7 between four broadcasters, leaving plenty of runway to secure even more funding (as no scripts had been written and no episodes were due to be delivered for several years).

Then BP simply got greedy. Despite the clear terms of the 2020 Agreement only calling for payment of a $9 million MG, BP falsely claimed PGS had made an undocumented extracontractual commitment to secure millions more in presales

---

[2] Declaration of Daniel B. Lifschitz ("Lifschitz Decl.") ⁋ 3, Ex. A.

and threatened to force the production's cancellation if PGS did not renegotiate.

When BP failed to intimidate PGS into renegotiating the 2020 Agreement, it changed tactics. BP purported to resume production of the Series while secretly shopping the entire Alvin IP for a reported $300 million via UBS behind PGS's back, including to some of the very same broadcasters that PGS was then pitching to license Seasons 6 and 7. BP also went from *approving* all PGS's proposed deals for Seasons 6 and 7 to *rejecting* all proposed deals as of the date it partnered with UBS, providing nonsensical explanations that flummoxed PGS and the arbitrator.

When PGS still failed to buckle, BP turned its gaze to the Series' animation studio, Technicolor Animation Productions ("TAP"). BP made multiple unilateral changes to the Series' delivery schedule and budget that TAP expressly warned were jeopardizing the project, then petitioned TAP to take the fall for cancelling the production to obfuscate BP's role in orchestrating that outcome. TAP ultimately relented, and work on the Series was "indefinitely suspended" in April of 2022.

### C. PGS Initiates and Efficiently Pursues Arbitration

PGS initiated its arbitration against BP in May of 2022, alleging that BP acted in bad faith by refusing to produce Seasons 6 and 7 absent extracontractual remuneration, then subsequently torpedoing the production through its bad faith refusal to approve PGS's distribution efforts and manipulation of TAP's finances.[3] PGS requested both damages and termination of the 2020 Agreement. The hearings for this initial arbitration concluded in early December of 2022, leaving only the need for post-arbitration briefing before the arbitrator could render a decision.

### D. BP Retaliates by Vexaciously Multiplying the Proceedings

Less than two weeks after PGS's arbitration hearings concluded, BP opened a new arbitration proceeding against PGS based on specious claims already raised during the prior hearings, but strategically withheld from assertion in the hopes of

---

[3] *Id.* ⁋ 4, Ex. B.

presenting them to a different arbitrator.[4] For this nakedly strategic reason, BP refused to voluntarily consolidate the proceedings. This forced the parties to waste several months litigating the issue before a different arbitrator who invariably sided with PGS and consolidated the cases over BP's objections.[5] BP then *further* delayed the proceedings by amending its petition halfway into discovery to raise further specious claims, forcing additional discovery to be taken and pushing back the scheduled hearings on its claims (and PGS's counterclaim) by several months.[6]

**E. <u>PGS Prevails and BP Loses on Every Claim</u>**

After forcing an additional 18+ months of arbitration, BP walked away from the case in total defeat.[7] PGS prevailed in proving BP wrongfully blocked various licensing opportunities for the Series, requiring BP to pay PGS the royalties it would have received in connection with those opportunities. PGS also prevailed in proving that BP acted in bad faith throughout its clandestine effort to sell the Alvin IP behind PGS's back, requiring BP to pay PGS a penalty of $75,000. PGS additionally thwarted every single claim brought by BP, such that BP was award no damages. In recognition that BP had essentially wasted 18+ months of the parties' time, the arbitrator concluded that BP should be made to pay PGS's fees and costs incurred as of the day BP opened its completely unsuccessful second arbitration proceeding.

**F. <u>The Arbitrator Appropriately Amends His Award</u>**

In his original award, the arbitrator determined BP had wrongfully refused to approve four potential distribution deals with Disney, Discovery, Tele-Quebec, and Nickelodeon. However, the award errantly suggested that Nickelodeon had never placed a value on its anticipated license, prompting the arbitrator to hypothecate such a fee by averaging the value of the other three broadcasters' proposals as a

---

[4] *Id.* ⁋⁋ 6-7, Exs. D-E.
[5] *Id.* ⁋ 8, Ex. F.
[6] *Id.* ⁋ 9, Ex. G.
[7] *Id.* ⁋ 12, Ex. J.

gap-filling mechanism. The hypothetical license fee bore no relation to the actual value of Nickelodeon's offer, which covered significantly larger territory than the other three proposals. Moreover, it was unnecessary for the arbitrator to engage in this exercise, as Nickelodeon *had* placed a value on its intended license in an exhibit that was already part of the evidentiary record. PGS therefore dutifully pointed this exhibit out to the arbitrator in a request for correction of the initial award.[8]

To be clear, this exhibit ("Exhibit 62") was not new evidence. It had been offered and accepted into evidence on October 6, 2022, the seventh day of PGS's initial arbitration hearings.[9] PGS had engaged with Nickelodeon to license Seasons 6 and 7 on two separate occasions, first in 2020 (at which time Nickelodeon offered $6.5 million) and again in 2021 (picking up where the 2020 negotiations left off).

In other words, the parties were not starting from scratch in 2021, but rather reengaging discussions over the same deal terms that had been raised in 2020, and with the intention of *improving* upon the prior 2020 offer. However, upon hearing that Nickelodeon wanted BP to consider utilizing new assets for Seasons 6 and 7 (such as setting episodes in different locales), BP shut down the discussions without even affording PGS the opportunity to negotiate, which the arbitrator found to be bad faith conduct by BP. Under these circumstances, it was more than appropriate to conservatively ballpark the value of the lost 2021 offer against the 2020 offer.

At no point did PGS claim or concede that its request for correction was anything but computational and therefore permissible under the applicable IFTA Rules. Rather, PGS pointed out that BP's competing request for correction was indisputably substantive, as it sought to change the very designation of which party prevailed in the case, and that if the arbitrator believed the two requests were similar in nature, the appropriate decision would be to reject (rather than approve) both.

Ultimately, the arbitrator confirmed that PGS's requested correction was

---

[8] *Id.* ⁋ 14, Ex. L.

[9] *Id.* ⁋ 17, Ex. O.

computational and BP's request for correction was substantive.[10] The arbitrator otherwise declined to further modify his initial award beyond clarifying the scope of attorney fees and costs to which PGS was entitled. This action followed.

## III. LEGAL STANDARD

"The burden of establishing grounds for vacating an arbitration award is on the party seeking it." *United States Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010). As BP's authority notes, judicial review of an arbitration decision "is only for manifest disregard of the law by the arbitrator, or for one of the other highly deferential standards contained in the [FAA]." *Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 416 (9th Cir. 2011). "Indeed, as a general matter, a court is required to enforce the arbitration award as long as there is a 'barely colorable justification for the outcome reached.'" *Sunfed Produce, LLC v. Vega-Tostado*, No. CV-11-393-TUC-DCB, 2017 WL 4876467, at *1 (D. Ariz. Jan. 31, 2017) (citation omitted). This is the case even if the award contains erroneous findings of fact or misinterpretations of law. *See Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 640 (9th Cir. 2010); *San Martine Compania de Navegacion v. Saguenay Terminals Limited*, 293 F.2d 796, 801-02 (9th Cir. 1961). Any ambiguity in the award must be resolved in favor of its validity notwithstanding the presence of such factual or legal errors. *See, e.g., Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, etc.*, 886 F.2d 1200, 1209 (9th Cir. 1989).

## IV. ARGUMENT

### A. Amendment of the Damages Award Was Proper

BP raises two arguments against the propriety of the arbitrator revaluing PGS's lost opportunity to license Seasons 6-7 to Nickelodeon, the first under the doctrine of *functus officio* (pursuant to which BP makes subsidiary arguments regarding the facts of the case) and the second under the language of the IFTA rule

---

[10] *Id.* ⁋ 16, Ex. N.

pursuant to which the recalculation was made. Neither argument is persuasive.

**1. <u>The Amended Award Is Proper Under *Functus Officio*</u>**

BP's first argument contends that once the arbitrator issued his original award containing his first valuation of the lost Nickelodeon opportunity, "the Arbitrator's work on this issue was done," and he was forever barred from reconsidering the matter in any capacity. Mot. at 11:11-18. BP's argument is replete with errors.

To begin with, BP's argument bakes in an improper premise, which is that the arbitrator's assigned duties had in fact ended upon the issuance of his original award. This premise is, of course, required for BP to invoke *functus officio* at all. *See Heimlich v. Shivji*, 7 Cal. 5th 350, 363 (2019) ("The [*functus officio*] doctrine applies only after the arbitrator's assigned duties have ended."). But the arbitrator's duties had *not* ended with the original award. His assigned duties under the IFTA/ICDR Rules included hearing requests for correction to the award,[11] and courts have specifically concluded that this encompasses the power to reconsider a "mistaken application of the evidence." *BridgeLux,* 2009 WL 10709801, at *5.

In *BridgeLux*, the movant seeking vacatur argued that an arbitrator was precluded under the doctrine of *functus officio* and the ICDR Rules — the same authorities raised by BP here — from changing his valuation of company stock after issuing a "final award" on the matter. *Id.* at *3. The change in valuation was made pursuant to a request for correction that claimed the arbitrator had mistakenly relied on certain testimony to come to his conclusions. *Id.* at *4. The arbitrator ultimately agreed based on a review of the evidence that the stock had been misvalued and issued a corrected award. *Id.* at *5. The reviewing court rejected the movant's challenge to the arbitrator's correction, holding "[b]oth Article 30 [of the ICDR Rules] and the exceptions to *functus officio* permitted the Arbitrator to reconsider

---

[11] BP self-evidently recognized this by bringing its own motion under Article 37, wherein it requested that Mr. Donaldson change the prevailing party designation in the case – a request it obviously could not bring if *functus officio* were in effect.





GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

[a] mistaken application of the evidence. [Citation.] The Arbitrator, in other words, possessed the authority to reconsider a calculation that he had made on the basis of an erroneous application of the evidence presented. The Arbitrator did not attempt to reconsider the existence or overall magnitude of liability, but sought to correct a computational error that was apparent on the face of the [initial] Award." *Id.*

The instant case is virtually indistinguishable from *BridgeLux*. PGS made a request for correction to the arbitrator's initial damages award on the basis that the arbitrator had mistakenly assumed there was no evidence in the record as to the value of Nickelodeon's offer to distribute Seasons 6-7 when, in fact, Nickelodeon's own prior offer to be improved upon provided a reliable base value for what PGS could reasonably expect to earn had BP allowed the negotiations to proceed. The corrected award did not reconsider the existence of the liability (BP's failure to exercise approval rights in good faith) or the magnitude of its scope (distribution opportunities with four specific broadcasters), only a computational error that was apparent on the initial award's face (the statement that there was no evidence in the record upon which the court could calculate the value of Nickelodeon's offer).

None of BP's cited authority is to the contrary. In *McClatchy Newspapers v. Cent. Valley Typographical Union*, the Ninth Circuit rejected a claim that an arbitrator acted improperly when the arbitrator refused to reopen proceedings eight months after they officially closed to consider new evidence and potentially revise a prior award based thereupon. 686 F.2d 731, 734 (9th Cir. 1982). In this case, the proceedings never officially closed prior to the corrected award, which was based on evidence that had been in the record since October of 2022. Moreover, *McClatchy* acknowledged that "an arbitrator can correct a mistake which is apparent on the face of his award, complete an arbitration if the award is not complete, and clarify an ambiguity in the award." *Id.* at 734 n.1. That is the basis upon which the arbitrators in both this case and *BridgeLux* made their respective corrections.

Similarly, in *Colonial Penn Ins. Co. v. Omaha Indem. Co.*, an arbitral panel

issued an award in a reinsurance dispute ordering the respondent to release all claims to reserves held by the petitioner (assumed to be worth around $8 million), only to be informed after the fact that no such reserves existed. 943 F.2d 327, 329 (3d Cir. 1991). In response, the panel majority issued a second award purporting to "clarify" the first award by addressing the lack of available reserves, which the Third Circuit held to violate *functus officio* because it was based on evidence that was not in the evidentiary record at the time of the initial award and therefore could not possibly be evident on its face. *Id.* at 332. Conversely, *BP admits the prior offer from Nickelodeon is evident on the face of the initial award.* Mot. at 8:10-11.

In *San Diego AFL-CIO Bus Drivers Loc. Div. 1309 of Amalgamated Transit Union v. San Diego Transit Corp.*, an unpublished decision, the Ninth Circuit rejected a corrected award as violating *functus officio* where it changed the underlying merits of the original award's decision by holding that certain overtime requirements "shall not stand" (whereas the original award provided they "shall stand"). 972 F.2d 1342, 1992 WL 180221, at *2 (9th Cir. 1992). In this case, nothing about the merits of the arbitrator's original decision was altered. PGS still prevailed on the same bad faith claim against BP, and damages were still based off the same calculation, applying the same 27.5% royalty provided under the same agreement to the same lost opportunities with the same potential broadcasters for Seasons 6-7.

In *Aerojet Rocketdyne, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, the district court determined that after an arbitrator issued a final award that prescribed a specific remedy, it was beyond his powers under *functus officio* to purport to reserve the ability to revisit the award and fashion a *new* remedy if called for by a dispute over the award's implementation. No. CV 17-5122 PSG (SKX), 2017 WL 9500948, at *1, 5 (C.D. Cal. Nov. 27, 2017). Here, the arbitrator made no comparable reservation of right to amend the award.

In *Teamsters Local 312 v. Matlack, Inc.*, an arbitration award was vacated based on "fundamental procedural irregularities" where the arbitrator's initial

award ruled on matters that the parties had been assured would be saved for a further proceeding, thereby robbing them of due process. 118 F.3d 985, 996 (3d Cir. 1997). BP alleges no similar due process deprivation or misconduct to have occurred here.

In short, BP has failed to cite a single factually analogous case applying the *functus officio* doctrine to vacate a corrected arbitration award because none exist. PGS simply pointed out that the arbitrator's math did not make sense given the scope of Nickelodeon's proposals when compared to the other distributors, and that a facial error (the purported lack of evidence as to the mathematical value of the lost opportunity) was rectifiable by looking to evidence already in the record.

Faced with the foregoing, BP launches an attack against the factual propriety of using Exhibit 62 as a benchmark for the lost value of PGS's licensing opportunity with Nickelodeon. Mot. at 13:7-14:10. This attack is incorrect for the reasons already discussed *supra*, but further fails for at least two additional reasons.

***First,*** BP failed to raise this argument before the arbitrator when opposing PGS's request for correction.[12] "A party cannot assert challenges to confirmation of an arbitration award that were not raised during the arbitration." *ESCO Corp. v. Bradken Res. Pty Ltd.*, No. 10-788-AC, 2011 WL 1625815, at *16 (D. Or. Jan. 31, 2011), report and recommendation adopted, No. CV 10-788-AC, 2011 WL 1630355 (D. Or. Apr. 27, 2011); *see New Frontier Inv. AG v. BitCenter, Inc.*, 715 F. Supp. 3d 1245, 1261 (N.D. Cal. 2024) ("failure to preserve an issue for purposes of a petition to vacate should be applied more stringently than in the judicial appellate context."); *DigiTelCom, Ltd. v. Tele2 Sverige AB*, No. 12 CIV. 3082 RJS, 2012 WL 3065345, at *5 (S.D.N.Y. July 25, 2012) ("For arbitration to serve its purpose as a relatively fast, inexpensive, and final method of resolving disputes, parties must present arguments in the first instance to the arbitration panel.").

BP was given an opportunity to attack the factual relationship between the

[12] *See* Lifschitz Decl. ⁋ 15, Ex. L.

2020 and 2021 offers, but instead only objected to the alleged substantive nature of PGS's request and reliance upon an attached exhibit (which, again had been in the evidentiary record since 2022 and was attached to the request purely for the convenience of the arbitrator). BP is not entitled to now contrive additional challenges after having deprived the arbitrator of the ability to consider them.[13]

***Second,*** BP's argument violates the cardinal rule of arbitration, which is that courts cannot review the merits of the controversy, the validity of the arbitrator's reasoning, or the sufficiency of the evidence. *Starr v. Mayhew*, 83 Cal. App. 5th 842, 850 (2022). "Findings of the Arbitrator as to the facts or his interpretation of the law are not to be questioned by the court and obvious error in either is not grounds for vacating the Award if there has not been refusal to hear pertinent and material evidence and the hearing has been fair." *Harvey Aluminum v. United Steelworkers of Am*., 263 F. Supp. 488, 493 (C.D. Cal. 1967) (emphasis omitted).

Accordingly, BP cannot claim that the arbitrator misinterpreted the meaning, value, or import of Exhibit 62 through the guise of a *functus officio* challenge. "[R]eviewing courts 'have no authority to re-weigh the evidence.'" *Riverside Eng'g Inc. v. Gemini Ins. Co*., No. CV-23-02465-PHX-DWL, 2024 WL 4165397, at *7 (D. Ariz. Sep. 12, 2024) (quoting *Bosack v. Soward*, 586 F.3d 1096, 1105 (9th Cir. 2009); *see also Pure Line Seeds, Inc. v. Gallatin Valley Seed Co*., No. 1:14-cv-00015-EJL-CWD, 2014 WL 3721271, at *8 (D. Idaho June 19, 2014) ("Pure Line's argument hinges upon its contention the Arbitrator committed factual or legal error. In other words, Pure Line wants this Court to reweigh or reinterpret the evidence. […] The Court cannot revisit the Arbitrator's decision in that regard.").

In summary, the arbitrator's correction of the damages calculation did not

[13] Indeed, BP's tactics in this regard "invite sandbagging of arbitrators by raising issues in a limited fashion during arbitration, and then (if a party were to lose the arbitration) arguing to a court that the arbitrator manifestly disregarded the law in a context entirely different from the way it was raised with the arbitrator in the first instance. This would tend to undermine the purposes of the FAA, which is meant to streamline international arbitration." *New Frontier*, 715 F. Supp. 3d at 1261.



GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

offend *functus officio* and provides no basis to vacate the arbitration award.

**2. The Amended Award Is Proper Under Article 37.1**

BP contends that Article 37.1 of the ICDR-IFTA Rules codifies the common law doctrine of *functus officio,* such that violation of *functus officio* also violates Article 37.1. Mot. at 14:11-15:7. By necessity, this also means that if BP's *functus officio* argument fails, so too does its residual argument concerning Article 37.1.

Article 37.1 provides the arbitrator with the same authority — "to interpret the award or correct any clerical, typographical, or computational errors or make an additional award as to claims, counterclaims, or setoffs presented but omitted from the award" — as Article 30 of the ICDR Rules did in *BridgeLux*. 2009 WL 10709801, at *4 (providing authority "to interpret the award or correct any clerical, typographical or computation errors or make an additional award as to claims presented but omitted from the award"). As already discussed, *BridgeLux* found this authority permitted the arbitrator "to reconsider a calculation that he had made on the basis of an erroneous application of the evidence presented." *Id.* at *5.

As before, none of BP's authority is to the contrary. In *Smith v. Transp. Workers Union of Am.*, the Ninth Circuit vacated a modified award made more than a month after the initial award because the parties' contract required any modification to be made within three days of the initial award (and further prohibited the parties from making any requests for modification). 374 F.3d 372, 375 (5th Cir. 2004). Here, Article 37.1 (which is incorporated by reference into the parties' contract along with every other IFTA Rule) permits requests for correction made within 30 days of an award's issuance. BP makes no argument that PGS's request for correction was untimely under Article 37.1 or that any other language in the parties' contract circumscribed the arbitrator's power under Article 37.1.

*Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co*., meanwhile, involved a party challenging an arbitration award on the basis that the panel "ruled on a question not submitted to it," which the Ninth Circuit rejected because the question was implicit

in the submission of other matters to the panel. 44 F.3d 826, 830 (9th Cir. 1995). BP makes no argument that the arbitrator ruled on a question not submitted to him.

Lastly, *Bosack* held *functus officio* and a non-ICDR arbitration rule codifying it were inapplicable because the final award at issue had not been impermissibly reinterpreted by any later award. 586 F.3d at 1103-04. It did not deal with any requests for correction made under a non-ICDR rule equivalent to Article 37.1.

In summary, BP has failed to demonstrate that the arbitrator's correction fell outside the purview of Article 37.1, meaning vacatur remains unwarranted.

**B. The Award Properly Disposed of BP's Concealment Claim**

BP next argues that the arbitration award should be vacated as "imperfect" because the arbitrator ostensibly neglected to adjudicate BP's claim that PGS failed to inform BP regarding the existence of certain third-party offers to license the Series. Mot. at 15:8-17:2. This argument fails for at least three independent reasons.

***First***, BP once again failed to preserve this issue by not raising it to the arbitrator as part of its request to correct the award, despite Article 37 expressly permitting corrections based upon overlooked claims. *See ESCO Corp.*, 2011 WL 1625815, at *16; *New Frontier Inv. AG*, 715 F. Supp. 3d at 1261. To the contrary, BP expressly stated that it "does not challenge the substance of the Arbitrator's decisions regarding the parties' claims and defenses." The arbitrator's "failure" to rule on BP's claim was thus not only unpreserved, but invited error. *See Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1336 (9th Cir. 1985) ("one may not complain on review of errors below for which he is responsible") (quoting *Hudson v. Wylie*, 242 F.2d 435, 448 (9th Cir. 1957), cert. denied, 355 U.S. 828 (1957)).

***Second,*** as previously noted, "[a]n arbitrator's failure to render express findings on disputed questions does not invalidate the award where, as here, the award serves to settle the entire controversy." *Harris*, 96 Cal. App. 4th at 1313. "A reasoned award sets forth the basic reasoning of the arbitral panel on the central issue or issues raised before it. It need not delve into every argument made by the parties."

*Sunfed Produce*, 2017 WL 4876467, at *2 (quoting *Leeward Constr. Co. v. Am. Univ. of Antigua - Coll. of Med.*, 826 F.3d 634, 640 (2d Cir. 2016)); *see also A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir. 1992) (providing that "arbitrators are not required to state the reasons for their decisions"). Mr. Donaldson provided such reasoning, and with the express proviso that his award was "in full settlement of *all claims and counterclaims* submitted by the parties in this consolidated Arbitration proceeding." Initial Award at 11 (emphasis added).

Under this deferential standard, BP's assertion that the arbitrator simply held BP was not entitled to relief without any analysis "is insufficient to meet the extremely high burden to prove an arbitrator disregarded the law." *Nikola Corp. v. Milton*, No. CV-23-02635-PHX-DJH, 2024 WL 4120320, at *11 (D. Ariz. Sep. 9, 2024). Indeed, courts routinely find that the "failure" to grant relief upon a claim otherwise acknowledged by the arbitrator as having been raised in the proceeding constitutes an implicit rejection of the claim. *See, e.g., G.G. v. Valve Corp.*, No. C16-1941-JCC, 2019 U.S. Dist. LEXIS 50523, at *3 (W.D. Wash. Mar. 26, 2019), aff'd in relevant part, 799 F. App'x 557 (9th Cir. 2020) (holding arbitrator "implicitly rejected" movant's argument "when he issued his award and specifically denied [movant's] sought relief"); *Aria Fire Sys. v. Sprinkler Fitters UA Local 709*, No. 2:16-cv-03522-CAS (RAOx), 2016 WL 6745323, at *6 (C.D. Cal. Nov. 14, 2016) (holding issues not addressed in written decision were "implicit in [the arbitrator's] resolution of the grievance"); *Barinaga v. Cox*, No. CV-05-1432-HU, 2007 WL 184687, at *11 (D. Or. Jan. 12, 2007), aff'd, 321 F. App'x 664 (9th Cir. 2009) (denying vacatur based on arbitration panel's "fail[ure] to explain its decision or address [movant's] argument, which, by implication, the panel rejected").[14]

---

[14] None of BP's authority is to the contrary or resembles this case. *Norfolk S. Ry. Co. v. Sprint Communs*. Co. L.P., 883 F.3d 417, 423 (4th Cir. 2018) was not a "final" award because it reserved issues based on future occurrences, and *Bell Aerospace Co. Div. of Textron, Inc. v. Int'l Union, United Auto., etc.*, 500 F.2d 921, 924 (2d Cir. 1974) held an award was not merely silent on a raised issue, but contradictory.



GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

***Third***, even outside the deferential standards of arbitration, "[t]he failure to make an express finding of fact … does not require remand if a complete understanding of the issues may be had without the aid of separate findings." *Braggs v. Jones*, 614 F. App'x 901, 904 (9th Cir. 2015) (quoting *U.S. Fin. Sec. Litig*., 729 F.2d 628, 630 (9th Cir. 1984)). During the very first day of hearings on BP's claim, the arbitrator cut short BP's presentation regarding this allegedly overlooked claim because it was not sufficiently supported by any competent evidence or analysis, and BP failed to subsequently rectify these shortcomings.

Specifically, on May 20, 2024, BP put on testimony from Chris Minks, one of its employees, to have him present lay analysis of 73 supposedly concealed distribution offers and their alleged value. Lifschitz Decl. ⁋ 11, Ex. I at 106:13-19, 110:9-111:19. PGS objected, as Mr. Minks did not provide any individualized analysis of the proposals or establish a basis for his methodology's reliability, and secured the exclusion of Mr. Minks' testimony, leaving nothing but an unsupported demonstrative list. *Id.* at 115:19-119:12. As the arbitrator would later note:

> I don't know what possible weight I could give to a listing that characterizes Lord knows what as an undisclosed proposal, let alone an undisclosed deal. It just doesn't make any sense. And then the random selection of a certain percentage that would turn into deals is even -- I mean, the word 'ludicrous' comes to mind, and I want to find a softer word, but I'm afraid it is. Gee, we have this list, and "X" percent of them would come to a deal. What's that based on?

*Id.* at 798:18-799:2.

Rather than attempt to shore up Mr. Minks' testimony, BP elected to abandon its presentation entirely and never brought the matter up again. Because BP abandoned its one and only attempt to quantify the alleged harm incurred by PGS's alleged withholding of proposals, it failed to support any compensable claim.

In summary, BP failed to properly raise, preserve, or support this claim, the arbitrator was permitted to impliedly reject it, and the evidentiary record supports the arbitrator's rejection. For all these reasons, this issue cannot support vacatur.

**C. <u>The Award Properly Fixes the Fees and Costs Owed to PGS</u>**

BP next argues that the arbitrator failed to properly "fix the costs of arbitration" because — despite designating a prevailing party (PGS) and specific criteria by which PGS's reimbursable costs should be calculated (including the appropriate timeframe and categories) —– he declined to calculate a sum certain payable by BP. Mot. at 17:3-18:12. But the arbitrator was not required to do so.

Nowhere in BP's sole cited authority is it claimed that to "fix the costs of arbitration" requires the awarding of a specific dollar amount. *See Steinmann v. ZTE Corp.*, No. CV 11-01578 BRO (SPX), 2015 WL 13546434, at *3 (C.D. Cal. Dec. 11, 2015). Indeed, "the ICDR Rules do not define what it means to 'fix the costs of arbitration'" and BP "cites no authority in support of its contention that an arbitrator's failure to specify the exact dollar amount of the fees violates Article 34 of the ICDR Rules or provides a basis for vacatur of an award under the FAA." *Mike Rose's Auto Body*, 389 F. Supp. 3d at 703. Absent a clear textual obligation to do so, the arbitrator retained broad discretion to both interpret and implement Article 34 as he saw fit. *See IMAX Corp. v. Giencourt Invs., S.A.*, No. 17-62033-CIV, 2019 WL 8160700, at *9 (S.D. Fla. Sept. 27, 2019) (noting courts defer to a tribunal's interpretation of its own rules), report and recommendation adopted, 2020 WL 1067152 (S.D. Fla. Jan. 10, 2020), aff'd, 806 F. App'x 969 (11th Cir. 2020).

In summary, BP's frustration that the arbitrator did not elect to do more, absent an identifiable obligation to do more, provides no basis for vacatur.

**D. <u>PGS Was Properly Deemed the Prevailing Party</u>**

Lastly, BP claims that the arbitrator manifestly disregarded the law by finding PGS to be the prevailing party in the "second arbitration." Mot. at 18:13-21:15.

To begin with, the arbitrator had no obligation to distinguish between the "first" and "second" arbitration because they were consolidated for all purposes in March of 2024. Lifschitz Decl. ⁋ 8, Ex. 4; *cf. Kane v. Pacap Aviation Fin., LLC*, No. 19-00574 JAO-RT, 2025 WL 917013, at *5 (D. Haw. Mar. 4, 2025) (cases that

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

"were formally consolidated … should be viewed together when determining the prevailing parties in this case"), report and recommendation adopted, 2025 WL 1095295 (D. Haw. Apr. 11, 2025); *Fortunet, Inc. v. Melange Computer Servs*., No. 2:04CV0556-PMP-PAL, 2007 WL 173863, at *2 (D. Nev. Jan. 17, 2007) ("once a case is formally consolidated, prevailing party status depends on the outcome of the consolidated cases as a whole.") (citing *United States v. Imperial Irrigation District*, 595 F.2d 525, 531 (9th Cir. 1979)); *Bridewell-Sledge v. Blue Cross*, 798 F.3d 923, 925 (9th Cir. 2015) ("Under California law, when two actions are consolidated 'for all purposes,' the two actions are merged into a single proceeding with only one verdict or set of findings and one judgment..."). "It defies logic that pretrial and trial matters were consolidated, but the costs associated with the combined efforts to litigate this case should remain separate." *Kane*, 2025 WL 917013, at *3.

Examining the final award rendered in the consolidated proceeding, it is manifestly clear that PGS prevailed over BP. "[A party] 'prevails' when actual relief on the merits of [its] claim materially alters the legal relationship between the parties by modifying the [opposing party's] behavior in a way that directly benefits the [party]." *San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys*., 568 F.3d 725, 741 (9th Cir. 2009) (citation omitted). It is not "necessary for a party to prevail on all of its claims to be found the prevailing party." *Id*. (citation omitted). Here, PGS obtained all of the following relief from the arbitrator:

- $2,132,141.45 in damages for BP's misconduct relating to broadcasters;
- $75,000 in damages for BP's misconduct relating to UBS;
- A requirement that BP "must approve any [distribution deal] extensions in the same manner as past extensions have been approved";
- A prohibition against BP "mark[ing] up a [distribution] contract with new complaints not previously made when the relationship was copasetic";
- A prohibition against BP "allow[ing] any new agent they hire to make any sort of end run around PGS to discourage renewals of the agreement[s]

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

between broadcaster[s] and PGS";

- The requested termination of PGS's obligations relating to Seasons 6-7; and
- Reimbursement of its legal fees and costs beginning December 16, 2022.

Comparatively, BP received *nothing* from the arbitrator:[15]

- Zero dollars ($0.00) for every single one of its claims;
- Rejection of its request to terminate PGS's agreements for Seasons 1-5; and
- Zero reimbursement of its fees and costs.

Under these facts, BP cannot hope to demonstrate that the arbitrator's prevailing party determination was "completely irrational" or exhibited a "manifest disregard of law." *Azod v. Robinson*, No. 2:22-cv-05214-CAS (MRW), 2022 WL 18143882, at *9 (C.D. Cal. Nov. 9, 2022), aff'd, 2024 WL 163371 (9th Cir. Jan. 16, 2024).

Indeed, even if one were to consider the later proceeding separately, BP lost every single claim it brought and received no contested relief of any kind despite being the aggressor in the case. To claim the proceeding was a draw because PGS's UBS-related counterclaim was effectively combined with its earlier UBS-related principal claim, for which PGS was awarded monetary relief, is simply ludicrous.

In summary, the arbitrator's finding that PGS was the prevailing party in the combined proceeding was entirely proper and provides no basis for vacatur.

**E. <u>PGS Should Be Awarded Fees For Defending This Action</u>**

BP's motion to vacate is a thoroughly flawed document that was only filed to gain leverage over PGS by further taxing its resources, which is the same *modus operandi* the arbitrator found to warrant a fee-shift in the underlying proceeding. The same outcome should occur here. As the Ninth Circuit has previously held:

> [A]n unjustified refusal to abide by an arbitrator's award may equate an act taken in bad faith, vexatiously or for oppressive reasons. It is clear that bad

[15] Faced with this stark reality, BP is forced to adopt the farcical position that it spent two years and millions of dollars to obtain an offhand observation regarding the propriety of PGS withholding a delivery schedule for which BP received no relief (whether monetary, injunctive, or otherwise). This finding did not materially alter BP's legal relationship with PGS or directly benefit BP in any way, shape, or form.

> faith supporting an award of attorneys' fees may be found in conduct that led to the lawsuit or in conduct occurring during the course of the action. Moreover, bad faith may be demonstrated by showing that a defendant's obstinancy in granting a plaintiff his clear legal rights necessitated resort to legal action with all the expense and delay entailed in litigation. The award of attorneys' fees in the latter context satisfies a dual purpose -- deterrence and compensation. The threat of an award of attorneys' fees tends to deter frivolous dilatory tactics.

*Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983) (internal quotation marks and citations omitted); *see also Eagle Sys. & Servs. v. Int'l Ass'n of Machinists*, No. 2:16-cv-02077-JAM-EFB, 2016 WL 7324753, at *8-9 (E.D. Cal. Dec. 15, 2016) (granting award of attorney fees to respondent where challenge to arbitration award relied on "insubstantial arguments that fly in the face of well-settled law concerning an arbitrator's authority").

BP's motion to vacate is legally and factually spurious, as detailed herein. Its primary purpose is to tax PGS's resources and deter collection efforts. It is simply the latest effort in a years-long campaign of delay and obstruction intended to punish PGS for holding BP to account. An award of attorneys' fees in connection with these proceedings is therefore warranted to deter BP and compensate PGS.

## B. CONCLUSION

For the foregoing reasons, BP's motion should be denied in its entirety, and PGS should be awarded its reasonable costs and fees in this action.

Respectfully submitted,

Dated: June 23, 2025

GIPSON HOFFMAN & PANCIONE
A Professional Corporation

[signature]

DANIEL B. LIFSCHITZ
Attorneys for Respondent
and Counter-Petitioner
PGS ENTERTAINMENT

***L.R. 11–6.2 Certificate of Compliance***

The undersigned counsel of record for Respondent and Counter-Petitioner PGS Entertainment certifies that this brief is 7,000 words, which complies with the word limit provided by C.D. Cal. Local Rule 11-6.1.

Dated: June 23, 2025

GIPSON HOFFMAN & PANCIONE
A Professional Corporation

DANIEL B. LIFSCHITZ
Attorneys for Respondent
and Counter-Petitioner
PGS ENTERTAINMENT

# EXHIBIT E

LAW OFFICES
GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION
1901 AVENUE OF THE STARS
SUITE 1100
LOS ANGELES, CALIFORNIA 90067-6002
(310) 556-4660
FAX (310) 556-8945

WRITER'S DIRECT DIAL NUMBER: (310) 557-8820
WRITER'S DIRECT INTERNET E-MAIL: dlifschitz@ghplaw.com
OUR FILE NO.: 06303.00001

December 11, 2024

**VIA E-MAIL**

Arbitrator Michael Donaldson
Independent Film & Television Alliance
5600 W. Adams Blvd., Suite 300
Los Angeles, CA 90016
mdonaldson@dcp.law

Bagdasarian Productions
c/o Nicolas A. Jampol
Davis Wright Tremaine LLP
5870 West Jefferson Boulevard, Suite H
Los Angeles, CA 90016
nicolasjampol@dwt.com

Re: **Request for Correction of Award Pursuant to IFTA Article 37**
*PGS Entertainment v. Bagdasarian Productions*, ICDR Case No. 01-22-0002-2640
*Bagdasarian Productions v. PGS Entertainment*, ICDR Case No. 01-22-0005-2712

Dear Arbitrator Donaldson:

PGS Entertainment hereby submits (1) an objection to Bagdasarian Productions' "Request for Correction of Award Pursuant to IFTA Article 37" dated December 10, 2024 (the "BP Request") and (2) PGS's own request for correction pursuant to Article 37 of the IFTA Rules.

1. **BP's Request For Correction Is Noncompliant With Article 37**

Although styled as a "Request for Correction of Award Pursuant to IFTA Article 37," what BP has submitted is a request for reconsideration as to the substantive basis of the Arbitrator's final award issued November 21, 2024 (the "Final Award"), which is not a permissible ground for "correction" under Article 37 of the IFTA Rules. The full text of Article 37 is as follows:

> 1. Within 30 days after the receipt of an award, any party, with notice to the other party, may request the arbitrator to interpret the award or correct any clerical, typographical, or computational errors or make an additional award as to claims, counterclaims, or setoffs presented but omitted from the award.

2. If the arbitrator considers such a request justified after considering the contentions of the parties, it shall comply with such a request within 30 days after receipt of the parties' last submissions respecting the requested interpretation, correction, or additional award. Any interpretation, correction, or additional award made by the arbitrator shall contain reasoning and shall form part of the award.

3. The arbitrator on its own initiative may, within 30 days of the date of the award, correct any clerical, typographical, or computational errors or make an additional award as to claims presented but omitted from the award.

4. The parties shall be responsible for all costs associated with any request for interpretation, correction, or an additional award, and the arbitrator may allocate such costs.

Pursuant to Paragraph 1 of Article 37, only three types of "errors" may be flagged for potential correction: "clerical, typographical, or computational errors." BP does not describe the error it purportedly seeks to correct as clerical, typographical, or computational. Instead, it refers to the error as "inadvertent" and proceeds to argue that the Arbitrator made the error by misstating the factual record of the case in the Final Award. In other words, BP argues that the Arbitrator erred in rendering judgment. That is a request for reconsideration, not a request for correction.

The California courts have explained the difference between a clerical error – the type permissibly flagged for correction under Article 37 – and a judicial error as follows:

> A clerical error in the judgment includes inadvertent errors made by the court which cannot reasonably be attributed to the exercise of judicial consideration or discretion. Clerical error . . . is to be distinguished from judicial error which cannot be corrected by amendment. The distinction between clerical error and judicial error is whether the error was made in rendering the judgment, or in recording the judgment rendered. Any attempt by a court, under the guise of correcting clerical error, to revise its deliberately exercised judicial discretion is not permitted. A judicial error is the deliberate result of judicial reasoning and determination.

*Conservatorship of Tobias*, 208 Cal. App. 3d 1031, 1034-35 (1989); *accord Estate of Douglas*, 83 Cal. App. 5th 690, 695 (2022). To the extent the Arbitrator attributed the inciting incident for BP bringing claims against PGS as one event rather than another, it was during the process of arbitral consideration or discretion, not due to the clerical process of transcribing the Final Award.

A clerical error, by definition, cannot affect the underlying reasoning of the award. Yet BP seeks by way of its "correction" a wholesale reconsideration of whether PGS is entitled to fees and costs. This, in turn, invites a reciprocal argument as to whether the purported "error" at issue is harmless, as BP's sought correction requires nothing more than changing "the testimony of Xavi Mas" to "the correspondence from Super RTL" without any deviation in reasoning.

Indeed, the Arbitrator previously found BP at fault for delaying the institution of claims arising from the so-called "revelation" of Super RTL regarding the broadcast schedule until after the first round of hearings had closed. Absent such delay, the entire second proceeding – for which BP was not awarded a single dollar in relief – would have been unnecessary. *See* December 30, 2022 E-mail from Arbitrator Donaldson[1] ("This particular relevant factor was known by BP at the time of the evidentiary hearing in PGS vs. BP[.] But when I reexamined the transcript, I did not find even a murmur about it by BP. The new claim as written does not provide significant justification for ignoring the problem when it was first discovered."). This, alongside the reference to BP switching legal representation (which occurred in 2022), makes clear that the Arbitrator had the events of 2022, not 2023, in mind when determining the appropriate starting point for fees.

As the Arbitrator can see, BP's request prompts a back-and-forth argument over the merits of the Final Award by seeking to modify the underlying reasoning for the award. The IFTA Rules were designed with finality in mind by expressly declining to provide a basis for an unsatisfied party to challenge the *reasoning* of an award under Article 37. BP is not merely unsatisfied with the Final Award, but with its options under Article 37, and so now seeks to graft on a right of internal appeal not found thereunder. BP's request should be rejected as procedurally improper (and, in the event the Arbitrator reaches the matter, substantively unfounded, given that the logic of the award holds even when swapping out Mr. Mas for Super RTL as the inciting incident).

PGS additionally opposes BP's request that the parties engage in a further adversarial exercise wherein "[PGS] should provide their invoices to [BP] (along with confirmation that those invoices were actually paid by the party) and the parties should jointly agree on a date by which the opposing party can challenge any particular entries or other aspects of the invoices." The Final Award unambiguously grants PGS all attorney's fees and costs incurred starting from December 16, 2022 with the sole exception of "the costs incurred by PGS for travel and food and lodging" in connection with attending the arbitral hearings. BP's request that the Arbitrator modify the substance of the award to provide recovery of only a subset of those fees and costs, as well as a right of challenge to BP, is once again not a request to correct a clerical, typographical, or computational error and therefore finds no basis as a request purportedly made under Article 37.

2. **PGS's Request for Correction**

PGS submits its own request for correction and/or interpretation of the Final Award based upon the permissible grounds of Article 37 as follows:

A. **Clarifying the Amount of Attorney Fees and Costs Granted**

In the Final Award, the Arbitrator awards to PGS "attorney fees and costs starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022." PGS requests interpretation of the Final Award to reduce that award to an identifiable sum, which

---

[1] A copy of this e-mail is attached hereto as **Exhibit A**.

is **$1,853,632.00**. Below is a chart summarizing all qualifying fees and costs incurred by PGS during the recoverable period, and which excludes travel, lodging, and meals incurred by PGS's principals pursuant to the Arbitrator's circumscription of the recoverable costs in the Final Award.

| Amount (USD) | Start 12.16.2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|
| **Arbitration Session 2** | **21 238** | **573 419** | **1 258 976** | **1 853 632** |
| **Arbitrator Cost** | | **45 522** | **19 125** | **64 647** |
| American Arbitration Association | | 45 522 | 19 125 | 64 647 |
| **Consultant** | | | **53 584** | **53 584** |
| Gardiner | | | 4 330 | 4 330 |
| OLISA | | | 49 254 | 49 254 |
| **Interests** | | | **86 084** | **86 084** |
| Coficiné | | | 86 084 | 86 084 |
| **Legal and Professional Fee** | **21 238** | **527 897** | **1 100 184** | **1 649 318** |
| Deprez Guignot Associés (DDG) | | 176 455 | 336 312 | 512 767 |
| Green Hasson Janks | 21 238 | | | 21 238 |
| Johnson&Johnson | | 280 412 | 445 473 | 725 885 |
| Professor Stoffel-Munck | | | 36 751 | 36 751 |
| Sorgem | | 52 812 | | 52 812 |
| Eight Advisory | | 18 218 | 128 451 | 146 669 |
| Jody Zucker | | | 44 663 | 44 663 |
| Sippel Advisory Services | | | 58 534 | 58 534 |
| GIPSON HOFFMAN PANCIONE | | | 50 000 | 50 000 |
| **TOTAL** | **21 238** | **573 419** | **1 258 976** | **1 853 632** |

PGS stands ready to provide back-up documentation for these fees and costs upon request.

### B. Correcting a Computational Error Regarding the Nickelodeon License

In the Final Award, the Arbitrator determined that PGS is entitled to its lost license fees stemming from BP's unreasonable rejection of licensing offers for Seasons 6 and 7 from four broadcasters: Disney, Nickelodeon, Discovery, and Tele-Quebec. In calculating these fees, it appears the Arbitrator overlooked Nickelodeon's licensing offer contained in PGS Exhibit 62,[2] which proposed $6.24 million to license Seasons 6 and 7. PGS's commission of 27.5% on Nickelodeon's offer would have been $1.716 million, or a difference of **$1,620,233.55** when compared to the Arbitrator's calculation. Given that the Final Award expressly looks to the offers made by each of the broadcasters in measuring PGS's damages, PGS believes a request to add the aforementioned difference to the Final Award is fairly characterized as a request to correct a computational error rather than a request for reconsideration. <u>However, in the event the Arbitrator disagrees, PGS will withdraw this request to remain consistent with its opposition to BP's request.</u>

[2] A copy of this exhibit is attached hereto as **Exhibit B**.

Based upon the foregoing, PGS respectfully requests that BP's request for "correction" of the Final Award be rejected and PGS's request for correction of the Final Award be granted.

Sincerely,

Daniel B. Lifschitz

DBL:DBL

# Exhibit A

**From:** Michael Donaldson <MDonaldson@dcp.law>
**Sent:** Friday, December 30, 2022 4:06 PM
**To:** Daniel Lifschitz; ShakeyaSaffold@adr.org; Frank Cohen
**Cc:** Jampol, Nicolas; Neville Johnson; vince@vcoxlaw.com vince@vcoxlaw.com; Christopher Mesnooh; Haas, Mary; Vallens, Adrian; Bouhenic Jean-Daniel
**Subject:** [EXTERNAL] RE: PGS Vs BP in relation to Bagdasarian Productions, LLC v. PGS Entertainment - Case 01-22-0005-2712

I have read and considered the email from counsel for PGS Entertainment. I am disinclined to grant the third request under any circumstances because there is no guarantee it will avoid the legitimate concern for conflicting awards.

With regard to the first request, I am hesitant to grant the request although it is certainly within my power to do so and makes a certain amount of sense. However, the issue before the Arbitrator in the above referenced Arbitration and the pre-existing Arbitration (PGS vs BP) is essentially the same: How did the parties treat each other under the final contract between them and does one of them owe the other any money damages on account of a breach of the requirement under French law for parties to a contract to act in good faith and cooperation. These two arbitration claims are inextricably connected. To separate them makes no sense as discussed above. To disallow an amendment to the extant arbitration would be permissible for the reason stated in the first option offered up by PGS but is contrary to the IFTA goal to settle such differences after consideration of all the relevant factors. This particular relevant factor was known by BP at the time of the evidentiary hearing in PGS vs. BP But when I reexamined the transcript, I did not find even a murmur about it by BP. The new claim as written does not provide significant justification for ignoring the problem when it was first discovered.

Therefore, I would like to set a hearing on whether PGS's first or second option should control the dispute over the Agent contract in issue in both arbitration claims. I have time available on both Wednesday, January 4th and Thursday, January 5th. Please talk between yourselves and coordinate with Frank to find a mutually acceptable time on one of those days. If you will be relying on some case or cases to make this determination, please provide them in advance of the hearing.

Michael C. Donaldson, Esq.
*Attorney of the Year 2016 - California Lawyer*
*Southern California Super Lawyer*
*Power Lawyer - Hollywood Reporter*
*Published papers on SSRN at: https://ssrn.com/author=2014813*
**Donaldson + Callif, LLP**
**Daily Journal "Top Boutique Law Firms" 2015**
400 S. Beverly Dr., Suite 400
Beverly Hills, CA 90212
O 310-277-8394
F 310-277-4870
www.donaldsoncallif.com

Information in this e-mail transmission, including any attachments, may contain privileged and confidential information. If you are not the intended recipient, please do not read, distribute or reproduce this transmission. If you have received this e-mail transmission in error, please call 310-277-8394. Thank you.

---

**From:** Daniel Lifschitz <DLifschitz@jjllplaw.com>
**Sent:** Friday, December 30, 2022 12:01 PM
**To:** Michael Donaldson <MDonaldson@dcp.law>; ShakeyaSaffold@adr.org; Frank Cohen <fcohen@dcp.law>
**Cc:** Jampol, Nicolas <NicolasJampol@dwt.com>; Neville Johnson <njohnson@jjllplaw.com>; vince@vcoxlaw.com vince@vcoxlaw.com <vince@vcoxlaw.com>; Christopher Mesnooh <Christopher.Mesnooh@fieldfisher.com>; Haas, Mary <maryhaas@dwt.com>; Vallens, Adrian <AdrianVallens@dwt.com>; Bouhenic Jean-Daniel <BOUHENIC@ddg.fr>
**Subject:** FW: Bagdasarian Productions, LLC v. PGS Entertainment - Case 01-22-0005-2712

Mr. Donaldson,

Two weeks ago, Bagdasarian Productions ("BP") notified PGS Entertainment ("PGS") and IFTA that it is initiating a brand new IFTA arbitration, *BP v. PGS* (Case No. 01-22-0005-2712), predicated on a claim that could have and should have been raised during the preexisting and ongoing IFTA arbitration between the parties in *PGS v. BP* (Case No. 01-22-0002-2640). BP's notice of arbitration, attached, is predicated on a letter from Super RTL regarding nondelivery of Season 6 of Alvin that BP admits to learning of on November 3, 2022, more than a month before hearings closed in the *PGS v. BP* matter, and which was in fact addressed during those hearings. To the extent this letter provides any basis for a claim against PGS, it clearly arises from the same common nucleus of operative facts as PGS's claims against BP and should have been raised during the prior hearings pursuant to Article 10 of the IFTA Rules governing amendment or supplementing of counterclaims. Instead, BP held its tongue, allowed the hearings to close without objection, and is now engaging in blatant claim-splitting that will force PGS to divert resources away from post-arbitration briefing in the *PGS*

*v. BP* matter to deal with BP's gamesmanship. Accordingly, we request one of the following determinations, in order of preference:

1) PGS requests a determination from the appointed arbitrator in *PGS v. BP*, Mr. Donaldson, that BP did not timely seek relief under Article 10 of the IFTA Rules to pursue its claim, with a concomitant determination from IFTA pursuant to Article 5 that BP's initiation is a procedurally improper attempt to avoid compliance with Article 10. *BP v. PGS* should be dismissed accordingly, with all claims and available relief between the parties relating to Seasons 6 and 7 of Alvin being relegated to the current operative pleadings in *PGS v. BP*.

2) In the event PGS's first request is declined, PGS requests that BP's initiating pleading in *BP v. PGS* be construed as a request to amend its responsive pleading in *PGS v. BP* to include a counterclaim related to Super RTL, with PGS then given an opportunity to amend its initiating pleading in *PGS v. BP* to both respond to BP's counterclaim and similarly conform its own operative claims to the matters already raised in the prior hearings. Once the amended pleadings have settled, the parties can proceed directly to post-arbitration briefing on all matters so raised, avoiding the need for a second redundant discovery period and set of hearings.

3) In the event PGS's first and second requests are declined, PGS requests that *BP v. PGS* be consolidated with *PGS v. BP* pursuant to Article 9 of the IFTA Rules and *BP v. PGS* stayed until final resolution of *PGS v. BP*, which will avoid conflicting determinations and any other complications that would arise from concurrent proceedings.

We would be happy to schedule a call with all parties next week to discuss the foregoing.

Best regards,

Best regards,
**Daniel B. Lifschitz**
**Associate Counsel**
439 N. Canon Drive, Suite 200 Beverly Hills, CA 90210
dlifschitz@jjllplaw.com| www.jjllplaw.com
tel 310-975-1080 | direct 310-975-1082 | fax 310-975-1095
email | map | website

Attorney-Client Privilege/Attorney Work Product. This transmittal may contain privileged and confidential information, and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s), nor a person responsible for the delivery of his transmittal to the intended recipient(s), you are hereby notified that any distribution or copying of this transmittal is prohibited. If you have received this transmittal in error, please notify Johnson & Johnson, LLP immediately at (310) 975-1080 or by return email.

---

**From:** ShakeyaSaffold@adr.org <ShakeyaSaffold@adr.org>
**Sent:** Monday, December 19, 2022 10:41 AM
**To:** Daniel Lifschitz <DLifschitz@jjllplaw.com>; maryhaas@dwt.com; Neville Johnson <njohnson@jjllplaw.com>; nicolasjampol@dwt.com; adrianvallens@dwt.com
**Subject:** [EXTERNAL] Bagdasarian Productions, LLC v. PGS Entertainment - Case 01-22-0005-2712

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

**ICDR Shakeya Saffold**
**Case Administrator III**

American Arbitration Association

T: +1 212 484 3279 F: +1 212 246 7274 E: ShakeyaSaffold@adr.org
120 Broadway, 21st Floor, New York, NY 10271
adr.org | icdr.org | aaamediation.org

NPT's BEST NONPROFITS TO WORK FOR ★2022★

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# Exhibit B

**Objet:** RE: Alvin International offer
**Date:** lundi, 24 février 2020 à 11.14:48 h heure normale du Pacifique nord-américain
**De:** Handelsman, Or
**À:** Philippe SOUTTER, Lewis, Layla, Guillaume SOUTTER
**Cc:** Kouri, Amanda

Bonjour Les Soutters!

Hope you had a lovely weekend!

I am very happy to send you our offer for the International pick-up of Seasons 6 and 7 of Alvinnn (see below).

We had to revisit some of the past terms and rights given how the market and the requirements from our affiliates have evolved since the show was first negotiated in 2013. We also had to review the fee given the softening performance, the volume of the pick-up, and the time line, especially as we still have half of season 4 delivering throughout this year, and season 5 delivering across 2021 into 2022.

As we are re-discussing some these terms in the non-linear space, It allowed us to reconsider your request regarding AVOD in Spain and Germany from late last year. In the broader context of this pick-up, we were able to be more flexible than back in November, when the discussion was insular. I have included it into the offer below.

Looking forward to your reply.

Best and thanks,
Or

PS. Unfortunately not quite. Tell your friend, Seasons 6-7 does bring Alvinnn to top 5 echelon of most season for 3rd party shows, but not quite the top spot. ☺

**<u>NICKELODEON INTERNATIONAL PROPOSAL a/o 24 February 2020</u>**

**Title**: **Alvinnn!!! And the Chipmunks (season 6-7)**
**Licensor**: PGS
**Format**: S6: 52x11’
S7: 52 x 11’
**License Fee**: **60,000 USD per episode/ 120,000 USD per Half-hour. (3.12M USD Total per Season)**

**Payment terms**: same split as previous agreements.

**License Period**: 5 years from delivery of last episode (co-terminus across both seasons).

**Runs**: Unlimited

**Licensed Rights/ Territories**:

- **<u>Exclusive All Linear Rights:</u>**
Benelux (Dutch and French, French Belgium FTA Rights Non Exclusive), Greece, and Argentina.

- **<u>Exclusive Pay TV Rights:</u>**
**APAC:** Australia, New Zealand, Pacific Islands, Southeast Asia (Including Hong Kong, Macau and

Taiwan), Indian sub-continent, South Korea
**EMEA:** Scandinavia (Finland in Swedish language only), Spain and Andorra, Portugal and PALOP, France and DOM TOM, Italy, Greece, Israel, Turkey, CEE, Baltics, Russia and CIS, Sub-Saharan Africa, MENA, UK, Ireland,
**LATAM:** Mexico, Central America (including Crebbin Basin), South America

- **Non-Exclusive Non-Linear Rights:**
  All above territories + Brazil
  To Be extended to previous seasons under license (Seasons 1-5)

  **Catch up**: 60 Days from TX
  **AVOD/ FVOD:** Limited to 5 HH per season.
  Max 3 months available.
  On VCNI owned and operated, controlled, branded and/ or affiliated content distribution services platforms
  **SVOD:** On VCNI owned and operated, controlled, branded and/ or affiliated content distribution services platforms

**Licensor Holdbacks with regards to Seasons 6 -7:**

- On per-batch basis, Non-linear rights (including all On Demand Rights or DTO/EST) for a period of 12 months from the first airing of first episode
- AVOD – Past initial On Demand Holdback (above), licensor may exploit, or cause to exploit AVOD Rights, in relation to an FTA Broadcaster License, on a frequency and episode volume not greater than the one granted to VCNI (i.e. 5 HH per season, available for a max of 3 Months).
  - Notwithstanding, Licensor may grant AVOD Rights limited to 15x11' episodes per season for a max period of 60 days, limited to one season at a single time, to be granted to SRTL (Germany) and A3 (Spain) – aligned with their respective FTA licenses.
- On per-batch basis, Free TV Rights for a period of 6 months from First Airing of the last episode in the Pay TV Territories.
- Free TV Rights for a period of 12 months from First Airing of the last episode in Italy, Africa, and MENA

**Exclusivity:** Exclusive in English all local languages dubbed and/or subtitled.

**Materials and Language:**
- Licensor to deliver English, French and German materials to VCNI.
- Viacom International Media Networks to be responsible for all other dubbing and allow access in applicable markets at 50% cost.
- Licensor to provide German Materials for seasons 2-5.

---

**From:** Philippe SOUTTER <psoutter@pgs.media>
**Sent:** Saturday, February 22, 2020 1:18 AM
**To:** Lewis, Layla <Layla.Lewis@viacom.com>; gsoutter@pgshkltd.com
**Cc:** Handelsman, Or <Handelsman.Or@vimn.com>; Kouri, Amanda <Amanda.Kouri@viacom.com>
**Subject:** Re: Alvin International offer

[EXTERNAL SENDER]

What a beautiful and long lasting partnership. We are very excited and look forward to continue this adventure all together!

With S6&7 would Alvinnn be the most season ever done for a third party show for nick or at least from

the past decade? (asking for a friend)

Have a great weekend everyone,
Phil

---

**De :** "Lewis, Layla" <Layla.Lewis@viacom.com>
**Date :** vendredi 21 février 2020 à 14:08
**À :** Guillaume SOUTTER <gsoutter@pgsentertainment.com>, Philippe SOUTTER <psoutter@pgs.media>
**Cc :** "Handelsman, Or" <Handelsman.Or@vimn.com>, "Kouri, Amanda" <Amanda.Kouri@viacom.com>
**Objet :** Alvin International offer

Hello Brothers Soutter!

I wanted to let you know that we have been able to do all of our due diligence with regard to the ROI on the international pick up of Seasons 6&7 now. As a result Or will be sending you our proposal on Monday.

We look forward to discussing more in due course and in the meantime have great weekends!

Thanks,

Layla

*************************************************************************

CONFIDENTIALITY NOTICE

The contents of this e-mail are confidential to the ordinary user of the e-mail address to which it was addressed, and may also be privileged. If you are not the addressee of this e-mail you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. If you have received this e-mail in error, please e-mail the sender by replying to this message.

It is your responsibility to carry out appropriate virus and other checks to ensure that this message and any attachments do not affect your systems / data. Any views or opinions expressed in this e-mail are solely those of the author and do not necessarily represent those of Viacom International Media Networks unless specifically stated, nor does this message form any part of any contract unless so stated.

Viacom International Media Networks reserves the right to monitor e-mail communications from external/internal sources for the purposes of ensuring correct and appropriate use of Viacom International Media Networks communication equipment.

VIMN Germany GmbH
Boxhagener Straße 80, 10245 Berlin
Tel: +49 30 700100-0
Fax: +49 30 700100-599

Geschäftsführer: Dr. Mark Specht, Raffaele Annecchino, Thomas Goller und Till Weidemüller
Jugendschutzbeauftragter: Sascha Pridat (Jugendschutz@vimn.com)
Sitz: Berlin, Amtsgericht: Charlottenburg HRB 113345

UID: DE 813366708

**************************************************************************

# EXHIBIT D

Davis Wright Tremaine LLP

5870 West Jefferson Boulevard
Suite H
Los Angeles, CA 90016

**Nicolas A. Jampol**
213.633.8651
nicolasjampol@dwt.com

December 10, 2024

**By Email**

Arbitrator Michael Donaldson
Independent Film & Television Alliance
5600 W. Adams Blvd., Suite 300
Los Angeles, CA 90016
mdonaldson@dcp.law

PGS Entertainment
c/o Neville L. Johnson
Johnson & Johnson, LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
njohnson@jjllplaw.com

Daniel Lifschitz
Gipson Hoffman & Pancione, APC
1901 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
dlifschitz@ghplaw.com

Re: **Request for Correction of Award Pursuant to IFTA Article 37**
*PGS Entertainment v. Bagdasarian Productions*, ICDR Case No. 01-22-0002-2640
*Bagdasarian Productions v. PGS Entertainment*, ICDR Case No. 01-22-0005-2712

Dear Arbitrator Donaldson:

Pursuant to Article 37 of the ICDR International Arbitration Rules for IFTA Arbitrations, BP submits this request for the correction of an error in the attorneys' fee award. BP does not challenge the substance of the Arbitrator's decisions regarding the parties' claims and defenses; this request solely concerns the correction of an error underlying the fee award.[1]

Specifically, the Arbitrator's November 21, 2024 Final Arbitration Award (the "Award") provides that BP filed the second arbitration on December 16, 2022 based on testimony by Xavi Mas. *See* Award at 11. That was an inadvertent error. The second arbitration was triggered by

[1] Article 37 provides that a party may, "[w]ithin 30 days of the receipt of an award," "request the arbitrator to interpret the award or correct any clerical, typographical, or computational errors[.]" Pursuant to the Rules and the parties' Agency Agreement, the parties may *not* challenge the substance of the Award, which is "conclusive."

PGS's revelation that it did not disclose the revised delivery schedule to broadcasters, which occurred ***one year prior*** to Mr. Mas's deposition on December 15, **2023**. In fact, Mr. Mas's deposition was conducted as ***part*** of discovery the Arbitrator authorized in the second arbitration. Moreover, BP's revised delivery schedule claim, on which BP prevailed, was asserted ***in the second arbitration***. *See* **Exhibit 1** (BP's Demand for Arbitration).

BP ***amended*** its notice of arbitration on February 2, 2024 to include allegations that PGS withheld third-party deals it was obligated to disclose to BP. *See* **Exhibit 2** (the Amended Notice of Arbitration). As a result, the second arbitration (a) was not triggered by Mr. Mas's testimony, which took place more than a year after the second arbitration was initiated; and (b) BP prevailed on its argument in that second arbitration that PGS's failure to disclose the revised delivery schedule to broadcasters constituted bad faith. There can be no fee award in favor of PGS for an arbitration that was successful for BP, even in part, and BP requests the Award be corrected on this point.

To the extent the Arbitrator determines that PGS can still recover attorneys' fees because part of the second arbitration was unsuccessful, BP requests the same treatment, i.e., an attorneys' fees award in its favor for the portions of PGS's claims that were unsuccessful.

In addition, to the extent the Arbitrator awards attorneys' fees to either party, the recovering party should provide their invoices to the opposing party (along with confirmation that those invoices were actually paid by the party) and the parties should jointly agree on a date by which the opposing party can challenge any particular entries or other aspects of the invoices.

Sincerely,



Nicolas A. Jampol
Davis Wright Tremaine LLP

# EXHIBIT 1

Davis Wright Tremaine LLP

Suite 2400
865 South Figueroa Street
Los Angeles, CA 90017-2566

**Nicolas A. Jampol**
(213) 633-8651
nicolasjampol@dwt.com

December 16, 2022

**By Email**

Independent Film & Television Alliance
International Centre for Dispute Resolution Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043
casefiling@adr.org

PGS Entertainment
c/o Neville L. Johnson and Daniel B. Lifschitz
Johnson & Johnson, LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
njohnson@jjllplaw.com
dlifschitz@jjllplaw.com

**Re: Notice of Arbitration**
***Bagdasarian Productions v. PGS Entertainment***

Dear All:

Pursuant to the ICDR International Arbitration Rules for IFTA Arbitrations, Bagdasarian Productions LLC ("BP") hereby notifies PGS Entertainment ("PGS"), the Independent Film & Television Alliance, and the International Centre for Dispute Resolution of the following claim against PGS for breach of its contractual and good-faith obligations under French law, and hereby requests that the following dispute be referred to IFTA Arbitration.

## Introduction

BP is the owner of the iconic children's entertainment franchise Alvin and the Chipmunks, which includes numerous successful albums, television series, and feature films over the last sixty years. Despite BP generating millions of dollars for its sales agent PGS over many years in connection with BP's television series *ALVINNN!!! and the Chipmunks* (the "Series"), when faced with a global pandemic, a changing marketplace for animated content, and lower-than-promised sales to broadcasters, PGS refused to work with its long-time contractual partner in good faith, and instead shifted its focus to positioning itself for litigation against BP. Even worse, PGS intentionally concealed from broadcasters important schedule changes relating to the Series with the goal of inducing a breach of its agreements with those broadcasters, so that it could blame those breaches on BP, which is exactly what it did. It was not until *just last month* that PGS admitted that it never told broadcasters about the revised schedule *and never had any*

*intention to do so*. This newly discovered information forms the basis of BP's claim that PGS violated its contractual and good-faith obligations to BP under French law.

**Factual Background**

Approximately ten years ago, sensing an opportunity for a new television series as a result of the highly successful Alvin and the Chipmunks feature films, BP conceived of the Series. In an agency representation agreement dated May 7, 2013, BP engaged PGS as its international sales agent, except for France, for one season of the Series. The Series was a success, and BP and PGS entered into multiple additional agency representation agreements for subsequent seasons. In 2019, BP and PGS initiated discussions for an agreement relating to the distribution of two additional seasons of the Series – Seasons 6 and 7. Based on representations from PGS that it had "confirmed" various broadcasters for those seasons – including most notably Viacom, which accounted for approximately 40% of international revenue for prior seasons – BP engaged PGS as its sales agent for the two additional seasons in an agreement dated November 31, 2019[1] (the "Agreement"). *See* Ex. 1 (the Agreement).

The Agreement contains an initial tentative delivery schedule providing delivery dates for various episodes of Seasons 6 and 7, beginning with Episodes 1-13, which were initially scheduled to be delivered by August 1, 2022. Importantly, the Agreement specifically states that PGS "acknowledges that these dates are tentative" and that "delays may occur." Ex. 1 at 8. The Agreement provides that BP will inform PGS "of any such delays within a reasonable amount of time, which in no event shall be less than two (2) months before the excepted delivery date for each set of episodes as set forth above or as revised." *Id.* PGS would then notify broadcasters of the revised schedule to ensure they knew when to expect delivery.

In March 2020, the global COVID pandemic began to take hold around the world, which, beyond the tremendous loss of life, resulted in significant disruption in the entertainment industry. This was particularly true for content that, like the Series, was animated in Bangalore, India, which was hit extremely hard by the pandemic and lacked the infrastructure available in other countries that would allow a pivot more quickly to remote work. During this same timeframe, the entertainment market was shifting, with a dramatic reduction in audiences for broadcast television, including children's animation. In addition to these significant problems, it became apparent that PGS misled BP about having "confirmed" Viacom and then proved unable to deliver on its assurances that it could find a replacement.

In April 2021, as a result of the confluence of numerous factors, including those explained above, BP informed PGS that it could not move forward with Seasons 6 and 7 at that time. Instead of working with its long-time partner BP to address the challenges facing them both, PGS immediately began threatening (and, behind the scenes, preparing for) litigation, resulting in the parties participating in a mediation in June 2021. Following the unsuccessful mediation, BP decided to press forward with Seasons 6 and 7 in an effort to appease PGS and to avoid litigation, despite the weak presales and unfavorable market conditions. On August 29, 2021, approximately a year before the start of the initial tentative delivery, BP provided PGS

---

[1] This obviously incorrect date was discovered subsequent to execution.

with a revised delivery schedule, as expressly allowed under the Agreement. The revised schedule shifted dates by approximately one year, with the deadline for the delivery of the first batch of episodes shifting to August 1, 2023. At the end of the email containing the revised schedule, BP specifically asked PGS to "[p]lease confirm these dates with the broadcasters that had already signed up for Season 6 and confirm their receipt."

PGS never objected to that revised delivery schedule or suggested it was unacceptable or unreliable. In fact, a few weeks later, PGS expressly reassured BP that it was "on board and in line with our agreement on seasons 6 and 7 and are doing our best effort to generate new deals." (Notably, BP learned later that instead of using best efforts to generate new deals, PGS was spending its time and attention preparing a damages analysis for use in litigation against BP.) As a result of PGS's assurances, BP continued its work on the Series. Throughout this period, PGS never informed BP that it had decided that it would not communicate the revised schedule to broadcasters, leaving BP completely in the dark that broadcasters were expecting the Series a year earlier than the revised schedule indicated. Approximately seven months later, on April 21, 2022, as the result of a variety of factors, including continuing disruption from COVID and still-insufficient presales, BP's co-producer Technicolor informed BP and PGS that it was unable to produce Seasons 6 and 7 at that time, and recommended a postponement on those seasons. On April 30, 2022, BP informed PGS that they had no choice but no suspend production on Seasons 6 and 7, and invited PGS to meet to figure out how to resolve the situation. PGS refused to meet, however, and instead initiated the arbitration proceedings that it had been planning and preparing for over a year. *See PGS Entertainment v. Bagdasarian Productions, LLC*, IFTA Case 01-22-0002-2640.

On November 3, 2022, after eight days of arbitration, PGS emailed BP that it had received a notice from the German broadcaster Super RTL ("SRTL") threatening claims against PGS for failure to deliver the Series as promised. SRTL's letter, however, stated that it was expecting the initial batch of Season 6 episodes to be delivered on August 1, ***2022***, which was the initial schedule set forth in the Agreement, but which had been revised by BP more than a year prior. Notably, SRTL sent that letter to PGS on October 14, 2022 – approximately three weeks earlier – and demanded a response to its letter by November 3, the day that PGS finally notified BP. BP responded to PGS the following day, stating that it was confused why SRTL would reference the outdated delivery schedule and asked PGS to confirm that it had provided the updated schedule to broadcasters in August 2021 as BP had requested. Waiting *another* three weeks, PGS finally responded on November 29, 2022, admitting for the first time that it did not provide the revised delivery schedule to broadcasters in August 2021 and, in fact, *never had any intention of providing them with the revised schedule* even while it continued to falsely represent to BP that PGS was fully committed to Seasons 6 and 7. PGS also provided BP with PGS's response to SRTL's letter, in which PGS blamed BP and Technicolor for the failure to deliver the initial episodes by August 2022, when in reality it was PGS's fault for concealing the revised schedule from SRTL and then concealing this failure from BP, which assumed – until it learned otherwise in November 2022 – that PGS had informed all broadcasters of the revised schedule.

In sum, PGS failed to notify broadcasters of the revised delivery schedule, which is expressly permitted under the Agreement, intentionally concealed this failure from BP until broadcasters began to complain, misrepresented to BP that it was fully committed to Seasons 6

and 7, and then blamed BP for the seeming failure to deliver based on the out-of-date delivery schedule – all without letting broadcasters know that since August 2021 PGS *knew* that delivery would not begin until two years later, in August ***2023***. BP brings this arbitration against PGS to seek compensation for the damage that PGS has caused and will cause to BP, the Series, and its Alvin and the Chipmunks brand as the result of PGS's misconduct.

**Legal Claims**

PGS is liable for breach of contract and a violation of the duty to perform its contractual obligations in good faith under French law, as set forth under French Civil Code, Article 1104 ("Contracts must be negotiated, formed and performed in good faith."). As discussed above, BP followed the contractual requirements of the delivery provision of the Agreement, notifying PGS of a revised delivery schedule well in advance of the required two-month delivery window, to be communicated by PGS to the Series' broadcasters. PGS never objected to the new schedule, and in fact, represented that it was moving forward with Seasons 6 and 7. PGS never once stated that it would not provide the new schedule to broadcasters as BP had requested, or otherwise objected to the new delivery dates. Nor did PGS ever provide BP with information regarding its conversations with broadcasters, who BP now knows were expecting delivery a full year before the revised delivery date. It was not until November 2022, *just last month*, that PGS finally admitted that it failed to notify broadcasters and, in fact, never had any intention to do so – a fact that it knowingly concealed from BP. PGS' behavior violates its contractual and good-faith obligations to BP.

In accordance with IFTA Rule 2.3(a), BP respectfully requests that this IFTA demand between BP and PGS be referred to arbitration. As required by IFTA Rule 2.3(b), the names and contact information of the parties and their representatives are as follows:

| | |
|---|---|
| **Claimant**<br>Bagdasarian Productions LLC<br>1192 E. Mountain Drive<br>Montecito, CA 93108<br>Tel: (805) 969-3349<br>alvin@chipmunks.com | **Respondent**<br>PGS Entertainment<br>26 rue Jacques Dulud<br>92200 Neuilly-sur Seine, France<br>psoutter@pgsentertainment.com<br>gsoutter@thepgscompany.com |
| **Claimant's Counsel**<br>Nicolas A. Jampol<br>Mary H. Haas<br>Adrian F. Vallens<br>865 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>nicolasjampol@dwt.com<br>maryhaas@dwt.com<br>adrianvallens@dwt.com | **Respondent's Counsel**<br>Neville L. Johnson<br>Daniel B. Lifschitz<br>Johnson & Johnson, LLP<br>439 N. Canon Drive, Suite 200<br>Beverly Hills, CA 90210<br>njohnson@jjllplaw.com<br>dlifschitz@jjllplaw.com |

A copy of the 2019 Agreement between BP and PGS is attached to this Notice of Arbitration as **Exhibit 1**. That Agreement contains the following Arbitration clause:

> "Any dispute under, relating to, or arising out of this agreement shall be resolved by binding, final, exclusive and non-appealable international arbitration in Los Angeles County, California, under the International Arbitration Rules of Independent Film and Television Alliance (the "Rules") in effect as of the date of the request for arbitration, before a sole arbitrator which rules and procedures are incorporated into and made part of this agreement. The parties shall abide by any decision rendered in such arbitration and each party agrees that a final judgment in any such arbitration action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. The parties shall submit to the exclusive jurisdiction of the courts in the forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award. The parties shall accept service of process for all arbitral proceedings in accordance with such Rules and to accept service of process for any judicial or other proceedings by registered mail. The parties shall abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such award may be enforced in any court of law with jurisdiction over any of the entire agreement."

## Relief Sought

BP seeks monetary damages resulting from the economic and reputational harm that PGS has caused and will cause due to its decision to knowingly conceal the revised delivery schedule from broadcasters, and to further knowingly conceal that failure from BP. By this action, BP is seeking to recover monetary damages for losses incurred due to PGS' acts and omissions, and the full costs of pursuing this matter to resolution. BP requests an oral hearing in connection with the above-described claim.

This notice of arbitration does not include a complete recitation of all facts relating to this dispute and nothing in this notice should be construed as a waiver of any sort. BP expressly reserves all rights, claims, and arguments in connection with this arbitration, including the right to supplement the facts described above and to assert new claims or arguments.[2]

Sincerely,

Nicolas A. Jampol
Davis Wright Tremaine LLP

[2] As stated above, the parties previously conducted a mediation in mid-2021 related to Seasons 6 and 7 of the Series, which was unsuccessful. While BP believes that the parties have satisfied IFTA's mediation requirement, *see* IFTA Rule 6, BP is willing to participate in a further mediation at PGS's request.

# EXHIBIT 1

PGS

# AGENCY REPRESENTATION AGREEMENT

November 31st 2019

**BETWEEN**

| | |
|---|---|
| **AGENT:** PGS Entertainment<br>**Address:** 26 rue Jacques Dulud,<br>92200 Neuilly-sur-Seine, France<br>**VAT NUMBER:** FR 45 507 934 594<br>**email:** psoutter@pgsentertainment.com<br><br>Hereafter referred to as **"Agent"** or **"PGS Entertainment"** | **LICENSOR:** Bagdasarian Productions, LLC<br>**Address:** 1192 E. Mountain Drive Montecito, CA 93108, United States<br>Represented by Ross Bagdasarian, CEO<br><br>Hereafter referred to as **"Licensor"** or **"Bagdasarian Productions"** |
| | Technicolor Animation Productions<br>(formerly known as Technicolor)<br>**Address:** 1-5 rue Jeanne d'Arc 92130 Issy-Les-Moulineaux, France<br>Represented by Boris Hertzog, CEO<br><br>Hereafter referred to as **"Technicolor"** |

**Recitals:** PGS Entertainment, Bagdasarian Productions and Technicolor have executed successive agreements whereby PGS Entertainment has been granted certain distribution rights to the first five seasons, with an option on subsequent seasons, of the animated series "ALVINNN!!! and The Chipmunks" (the "Series").

PGS Entertainment and Bagdasarian Productions have agreed to enter into the present agreement in order to set forth the terms and conditions upon which PGS Entertainment is granted the representation of the sixth and seventh seasons of the Series. By its signature below, Technicolor, as coproducer, acknowledges the terms of this agreement, and agrees that the terms of this agreement between Agent and Licensor are in full compliance with the terms of the agreements between Licensor and Technicolor

**Program:** Sixth and seventh seasons of "ALVINNN!!! and The Chipmunks" – Animated Series (**"Program"**), which are being co-produced by Bagdasarian Productions and Technicolor.

**Format:** 104x11' being 52x11' for Season 6 and 52x11' for Season 7

**Territory:** Worldwide excluding France and the United States (including its territories, possessions and commonwealths) (**"Licensed Territory"**)

**Term:** Shall start upon signature of this agreement and the term for each season shall end seven (7) years from the initial broadcast of the first episode of the season or in the event that delivery of the entire season to PGS Entertainment is not completed within three (3) months of the



BH GS

initial broadcast of the first episode of that season, then the term shall end seven (7) years from the date delivery of the season to PGS Entertainment is complete (the **"Initial Period"**).

The Initial Period shall be automatically extended for an additional seven-year (7) period provided that PGS Entertainment has paid Licensor a minimum total amount of US$16,000,000 (sixteen million US dollars) net of any tax from the exploitation of the Media Rights to the Program as defined hereunder (**"Safeguard Amount"**). The Safeguard Amount is composed of a US$ 8,000,000 for Season 6 and an US$ 8,000,000 for Season 7. For the avoidance of any doubt, the Safeguard Amount shall include the amount of the Minimum Guarantee paid to Technicolor and Bagdasarian Productions as defined hereunder.

In the event PGS Entertainment is close to paying Licensor the Safeguard Amount within the Initial Period but has not received all monies due to PGS Entertainment by third parties under executed agreements with respect to the exploitation of the Media Rights to the Program, then PGS Entertainment may advance to Licensor up to US$2,000,000 (two million US dollars) – allocated 50/50 to Seasons 6 and 7 - of such earned but unpaid monies in order to reach the Safeguard Amount if PGS Entertainment provides Licensor with a schedule of all earned but unpaid monies due under executed agreements, including the approved payment schedule relating to earned but unpaid monies.

For the avoidance of any doubt, Agent shall be entitled to execute license agreements concerning the exploitation of the Media Rights to the Program with terms that extend up to five (5) years after the expiration of the Term. Notwithstanding the foregoing, any deal, as well as any extension, renewal, or revision thereof, shall be subject to the Deal Approval process as set forth in the present agreement.

The Initial Period and any applicable extension are referred to herein as the **"Term."**

Pursuant to and consistent with the agency representation agreement dated as of March 7th, 2013 executed by PGS Entertainment, Bagdasarian Productions and Technicolor with respect to the first season of the Series, all Media Rights acquired by PGS Entertainment to Season 1 and subsequent seasons of the Series (including Seasons 2, 3, 4, 5, 6, and 7) shall end co-terminus with PGS Entertainment Media Rights to the last represented season if PGS Entertainment has paid Licensor the Safeguard Amount of US$ 8 million (eight million US dollars) in accordance for each season of "ALVINNN !!!".

**Minimum Guarantee:** Agent shall pay as an advance on the revenues to be paid to Licensor from the exploitation of the Media Rights to the Program, the amount of €9,123,840 (nine million one hundred twenty three thousand and eight hundred forty EUROS) (**"Minimum Guarantee"**), payable as follows:

(i) A minimum guarantee of € 4,147,200 (four million one hundred forty seven thousand and two hundred EUROS) for Season 6, payable as follows:

- 10% upon Agent's receipt of written confirmation that Technicolor has obtained full financing for the Program and written confirmation of a schedule of when each episode of Season 6 shall be delivered to PGS Entertainment;
- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards



BH GS

to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 1 to 26 of Season 6; and

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 27 to 52 of Season 6.

Licensor has requested PGS Entertainment and PGS Entertainment has agreed to pay the Minimum Guarantee due to Licensor for Season 6 under the present paragraph as follows:

- € 3,421,760 (three million four hundred twenty-one thousand and seven hundred sixty Euros) shall be paid directly to Technicolor; and
- € 725,440 (eight hundred and thirteen thousand Euros) shall be paid directly to Bagdasarian Productions.

(ii) A minimum guarantee of € 4,976,640 (four million nine hundred seventy six thousand and six hundred forty EUROS) for Season 7, payable as follows:

- 10% upon Agent's receipt of written confirmation that Technicolor has obtained full financing for the Program and written confirmation of a schedule of when each episode of Season 7 shall be delivered to PGS Entertainment;

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 1 to 26 of Season 7; and

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 27 to 52 of Season 7.

Licensor has requested PGS Entertainment and PGS Entertainment has agreed to pay the Minimum Guarantee due to Licensor for Season 7 under the present paragraph as follows:

- € 3,434,139 (three million four hundred thirty fort thousand and one hundred thirty nine Euros) shall be paid directly to Technicolor; and
- € 1,542,501 (one million five hundred forty two thousand and five hundred one Euros) shall be paid directly to Bagdasarian Productions.

When the event triggering payment of any portion of the Minimum Guarantee occurs, Agent shall be invoiced for the amount due, and Agent shall pay Technicolor the amount due no later than the end of the next month following receipt of the invoice. The Minimum Guarantee is non-returnable.

**Represented Rights:** PGS Entertainment shall be the exclusive agent regarding the representation, distribution and exploitation of all the following media rights to the Program in the Licensed Territory, as defined in the IFTA International Schedule of Definitions, dated October 20, 2010:



BH GS

(i) Ancillary Rights;

(ii) Pay TV Rights and Free TV Rights;

(iii) Video Rights (excluding "Commercial Video Rights");

(iv) Internet Rights provided however that the licensing of such rights does not interfere with Licensor's rights outside the Licensed Territory;

(v) PayPerView Rights; and

(vi) ClosedNet Rights

which rights are collectively referred to herein as **"Media Rights."**

To the extent the IFTA Schedule of Definitions is revised to incorporate any technology hereafter devised that is analogous to the Media Rights granted to PGS Entertainment, the Media Rights shall incorporate such revised definitions.

"Cinematic Rights" and "Commercial Video Rights," or rights similar thereto, are expressly excluded from Media Rights. Licensor agrees not to use, exploit or grant to any third party any "Cinematic Rights" or "Commercial Video Rights," or rights similar thereto, to the Program in the Licensed Territory during the Term.

For the avoidance of any doubt, all Media Rights to the Program shall only be exploited by Agent in the Licensed Territory during the Term, except Licensor may use and license excerpts of the Program of up to three (3) minutes in length per episode in the Licensed Territory.

All rights not expressly licensed to Agent are **"Reserved Rights"** which Licensor may exploit without restriction except as provided for in this agreement. However, Licensor may allow Agent to exploit some of the Reserved Rights on a case by case basis. For the avoidance of doubt, if Licensor approves a deal which includes some Reserved Rights under the Deal Approval process as set forth below, the Agent shall be deemed authorized by Licensor to exploit such Reserved Rights for such specific approved deal.

**Deal Approval:** PGS Entertainment shall provide Licensor with a written summary of the basic terms, including estimated distribution costs (e.g. material and dubbing costs but excluding withholding tax), of any potential third-party deal. Licensor shall have sole approval over the basic terms of any potential third-party deal, as well as sole approval over any decision to extend, renew, or revise any third-party deal, which approval shall not be unreasonably withheld by Licensor. Licensor shall notify Agent of Licensor's written approval (or disapproval) within three (3) business days following Licensor's receipt of the basic terms of any potential third-party deal proposed by Agent. If Licensor does not send notice to Agent of Licensor's written response by email or overnight delivery service (e.g. UPS, FedEx, DHL, etc.) within this three (3) business day period, the basic terms of the potential third-party deal shall be deemed approved by Licensor.

**Marketing Approval:** All marketing and promotional materials of the Program (including but not limited to press materials, ads, characterization of the characters, costs, etc.) shall be subject to Licensor's prior approval. For the avoidance of any doubt, Licensor may reject any marketing and promotional material in whole or in part, if, in Licensor's sole discretion, Licensor considers



BH GS

the material, or any part of the material, not to be in the best interest of the Program or the "Alvin and The Chipmunks" property.

Licensor shall notify Agent of Licensor's written approval (or disapproval) of any marketing and promotional materials within three (3) business days following Licensor's receipt of Agent's proposed marketing and promotional materials. If Licensor does not send notice to Agent of Licensor's written response by email or overnight delivery service (e.g. UPS, FedEx, DHL, etc.) within this three (3) business day period, Agent's proposed marketing and promotional material shall be deemed approved by Licensor.

PGS Entertainment agrees to manage the marketing and promotion of the Program in at least as favorable a manner as it manages the marketing and promotion of any other property.

PGS Entertainment may not couple or co-promote the Program with any other third-party brands in any kind of advertising or promotion.

**Options:** All provisions related to PGS Entertainment's options for subsequent seasons and any new television series derived from "ALVINNN!!! and The Chipmunks" contained in the First Season Agreement shall remain in full force and effect.

**Agency Commission:** PGS Entertainment shall receive a 27.5% GROSS commission on all monies/revenues actually received by PGS Entertainment resulting from the exploitation of the Media Rights. In case of a sub-agent, the GROSS commission for PGS Entertainment and its subagent may not exceed 35% in total.

**Remuneration:** Agent shall have the right, after deducting its Agency Commission, to deduct the Minimum Guarantee, its actual marketing costs ("**Marketing Costs**") and its actual distribution costs ("**Distribution Costs**") before paying any amount due to Licensor from Agent's exploitation of Agent's Media Rights.

Money collected or received from third parties by Agent in connection with the exercise of Agent's Media Rights shall be held and accounted for separately from the funds related to Agent's other business activities.

**Marketing Costs:** Marketing Costs shall be capped at 5% of gross receipts, according to standard industry practice. Marketing Costs include but are not limited to B to B advertising, specific events, etc. Notwithstanding the foregoing, any Marketing Costs in excess of US$5,000 (five thousand US dollars) if paid by Agent in US dollars or €4,000 (four thousand EUROS) if paid by Agent in Euros must be approved by Licensor in advance and in writing.

**Distribution Costs:** Distribution Costs shall include (but are not limited to): Withholding Tax (if applicable); all actual dubbing or subtitling costs if not borne directly by broadcasters or advanced by Agent; all actual costs associated with accessing such dubbed or subtitled versions or the existing dubbed or subtitled versions; all reversioning in connection with the delivery of the Program and at broadcaster discretion. Distribution Costs shall be based upon standard industry practices, and shipment and bank fees shall be no higher than €500 (five hundred EUROS) per deal.

Licensor shall have ninety (90) days from receipt of each royalty statement to object to Distribution Costs, but Licensor may only object on the grounds that the Distribution Costs are not based upon standard industry practice or are higher than market costs. After this ninety (90) day delay, the Distribution Costs shall be deemed approved by Licensor.



BH GS

DocuSign Envelope ID: 6B0FB8A0-0A29-4982-83F8-1CBB5DBD092E

Notwithstanding the foregoing, if actual Distribution Costs are similar to – i.e. within no more than 3% of – the estimated Distribution Costs approved by Licensor, Licensor may not exercise any of its rights to reject Distribution Costs.

**Licensor's approval of dubbing versions:**

Approval of International Version Cast

Licensor shall have approval rights on lead cast and recorded dialogue test excerpts, including the cast and dialogue test excerpts for David Seville, the Chipmunks and the Chipettes, for all languages Worldwide.

Licensor shall notify its written approval (or disapproval) within three (3) business days following Licensor's receipt of a recorded dialogue test excerpt from the Program for the lead cast of a particular language. If Licensor does not respond within this three (3) business day period, the lead cast shall be deemed approved by Licensor for that particular language.

The recorded dialogue test excerpt approved by Licensor shall set the minimum quality standard and be representative of how the dialogue should sound for the Program in that particular language.

PGS Entertainment shall use its best efforts to match as closely as possible Licensor's approved English dubs and ancillary voices in recording dialogue for any other language. Licensor acknowledges that broadcasters in certain territories may choose to record ancillary voices that significantly differ from the English dubs for the best interest of their particular market. For the avoidance of any doubt, the lead cast and recorded dialogue test excerpts for David Seville, the Chipmunks and the Chipettes shall always be subject to Licensor's prior approval.

Approval of Neutral Spanish Version

Licensor shall have approval rights on the ancillary cast of the Spanish dubbing for exploitation in Latin America.

**Licensor's ownership of dubbing versions:**

Licensor shall own all foreign language dubs to the extent of the rights cleared in the dubbing contract (with respect to the rights granted, the duration of the rights and the territories covered) for each territory in which PGS Entertainment is responsible for such dubbing. To the extent Agent elects to acquire anything less than 100% of the rights in perpetuity to any foreign language dub (where such rights are possible to be cleared), Agent shall offer Licensor the opportunity to obtain such rights to the extent of the rights available at Licensor's own expense. In the event a third party is responsible for foreign language dubs (including all corresponding costs), PGS Entertainment shall use its best efforts to allow Licensor to acquire the foreign language dub upon the most favorable terms possible and such rights shall be to the extent of the rights cleared in the dubbing contract. In no event shall Licensor be required to pay the broadcaster more than 50% of the actual dubbing costs in order to acquire ownership of the foreign language dubs.

Notwithstanding the foregoing, at Licensor's sole expense, which shall not exceed US$1,000 (one thousand US dollars) per language dub for each Season of the Program – i.e. 26 half-hours – Licensor shall be entitled to a master dub, in the form of digital delivery, of each new language version created per territory once such recordings are approved by Licensor. In



BH GS

order to keep material costs down, Licensor shall accept digital delivery of such foreign language dubs.

**Material Delivery:**

HD Version in English and French according to the following technical specifications:

**DIGITAL FORMAT**

Apple ProRes HQ 422 / 1920*1080p 16:9 25fps (& 23.98psf) 160Mbps
A1/2 = Original Version LtRt & Stereo
A3-8 = 5.1 Original Version
A9/10 = M&E LtRt & Stereo
A11/16 = 5.1 M&E

**TAPES**

HDCAMSR 1920x1080, 4 :4 :4, 24PsF with the following audio configuration:
A1/2 = Original Version LtRt or Stereo
A3/4 = M&E LtRt or Stereo
A5/10 = 5.1 Original Version

**PROSPECTION FORMAT**

MPEG4
A1/2 = Original Version

Legal ownership of all delivery materials will remain with Licensor subject to Agent's right to use such materials under this agreement.

**Delivery Schedule:**

**Delivery of the English Version:**

**Season 6**

Episodes 1-13: August 1st 2022
Episodes 14-26: December 18th 2022
Episodes 27-39: May 7th 2023
Episodes 40-52: September 25th 2023

**Season 7**

Episodes 1-13: April 8th 2024
Episodes 14-26: August 19th 2024
Episodes 27-39: January 15th 2025
Episodes 40-52: May 18th 2025

**Delivery of the French Version:**

**Season 6**

Episodes 1-13: September 5th 2022
Episodes 14-26: January 31st 2023
Episodes 27-39: June 12th 2023
Episodes 40-52: October 29th 2023

**Season 7**

Episodes 1-13: May 12th 2024
Episodes 14-26: September 30th 2024
Episodes 27-39: February 22nd 2025
Episodes 40-52: June 23rd 2025



BH GS

Agent acknowledges that these dates are tentative. The Program is currently in production, but delays may occur. Licensor will inform Agent of any such delays within a reasonable amount of time, which in no event shall be less than two (2) months before the expected delivery date for each set of episodes as set forth above or as revised.

**Statements/Payments:** Timely payment is of the essence. Agent shall provide Licensor with the first royalty statement(s) in English and initial payment(s) no later than the end of the month immediately following receipt and approval by Agent of the broadcast quality of the first episode of the Program. Agent's approval of the broadcast quality of the first episode, and all subsequent episodes, shall be based upon standard industry practices, and Agent's approval shall not be unreasonably withheld or delayed.

Thereafter, Agent shall provide royalty statements in English and payments to Licensor no later than forty-five (45) days from the end of each quarter, provided the amount due Licensor for the exploitation period exceeds US$500 (five hundred US dollars). Licensor shall send an invoice for the corresponding amount no less than 30 days from receipt of payment.

**Enforcement:** Enforcement of the terms of the present agreement is subject to the execution of French broadcaster deal and compliance with Euro Quotas. In case of non-compliance with Euro Quotas, Agent shall have the right to terminate this agreement if, after Agent provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Licensor of Agent's intention to terminate due to failure to comply with Euro Quotas, Licensor does not cure the non-compliance with Euro Quotas within thirty (30) calendar days from receipt of Agent's notice.

**PGS Entertainment Approval:** None with the exception of territory specific broadcast regulations or as otherwise specified in this agreement.

**Additional Terms:** Key Man:

For the first three (3) years after this agreement is executed, Philippe Soutter, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by him, except in the event of his death, will personally supervise all business aspects of the distribution of Agent's Media Rights to the Program, and such supervision shall be "of the essence" to this agreement and a material inducement for Licensor to enter into this agreement.

After the initial three-year (3) period after this agreement is executed, Philippe Soutter, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by Philippe Soutter or Guillaume Soutter, shall oversee and manage all key business aspects of the distribution of Agent's Media Rights to the Program.

All services and rights as outlined in this agreement are subject to Philippe Soutter being willing and available to serve as Agent's representative, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by him, in connection with the Program.

Notwithstanding the above, Licensor shall have the right to terminate this agreement if Philippe Soutter is no longer a direct or indirect shareholder of the company PGS Entertainment.



BH GS

The provisions of the present "Key Man" clause shall be unenforceable if Ross Bagdasarian is no longer an owner of Bagdasarian Productions, LLC or Bagdasarian Productions, LLC no longer controls the rights to the Program.

For the sake of clarity, the present "Key Man" clause is construed in order to maintain Philippe Soutter's involvement in the distribution of Agent's Media Rights to the Program and shall not be interpreted as granting to Licensor the right to terminate this agreement at any given time at its sole discretion.

Assignment

PGS Entertainment shall not be entitled to assign any rights under this agreement to any third party without Licensor's prior written consent. If Agent seeks to assign any rights under this Agreement to any entity owned in majority by Philippe Soutter, Licensor's consent shall not be unreasonably withheld.

Termination

Each party shall have the right at any time, after giving written notice to the other, to terminate this agreement if (a) either party is adjudged bankrupt or (b) either party ceases to carry on its business.

For the avoidance of any doubt, neither party shall be considered to cease to do business due to a corporate restructuring or reorganization, unless that restructuring or reorganization is incident or related to that party's insolvency, receivership, or bankruptcy.

In the event of a breach by Agent of its financial obligations under this agreement, including Agent's failure to make timely payments due to Licensor, Licensor shall have the right to terminate this agreement, if, after Licensor provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Agent of such breach, Agent fails to cure such breach within thirty (30) calendar days from receipt of such notice.

In the event of such termination by Licensor, any and all ongoing contracts approved by Licensor and entered into by Agent prior to Licensor's termination shall survive such termination and remain in effect for the benefit of Licensor provided that all monies due Agent under such agreements under this agreement shall be paid by Licensor to Agent upon the following terms:

(i) Agent shall immediately assign to Licensor all contracts and all payments due under any contract concerning Agent's exploitation of any right under this agreement; and

(ii) The rate of any commission due to Agent under this agreement as of the date Licensor provides notice to Agent of Agent's breach and thereafter shall be reduced to 10% of the monies/revenue actually generated and received from Agent's exploitation of its Media Rights (**"Agent's Revised Commission"**) and shall be payable to Agent only after (a) Licensor recoups from Agent all unpaid amounts owed to Licensor by Agent, (b) Licensor recoups from Agent all costs associated with addressing Agent's breach, and (c) an account penalty is assessed against Agent of US$500,000 (five hundred thousand US dollars). For the avoidance of any doubt, the US$500,000 account penalty shall be deducted from the gross monies/revenues actually generated and received from Agent's exploitation of its Media Rights before the calculation of Agent's Revised Commission (e.g. if gross monies/revenues



BH GS

actually generated and received are US$3,000,000, Agent's Revised Commission shall be based upon US$2,500,000).

In the event Licensor fails to deliver the Program to Agent according to the Delivery Schedule or any amendments thereto as identified by Licensor, Agent shall have the right to terminate this agreement, if, after Agent provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Licensor of such breach, Licensor fails to cure such breach by delivering the specific Episodes at issue within one hundred eighty (180) calendar days from receipt of such notice. In the event of such termination by Agent, Licensor shall be directly liable for all penalties and fees triggered by or resulting from the non-delivery of the ordered Program in all third-party agreements approved by Licensor and signed by Agent.

Moreover, in the event of such termination, any and all ongoing contracts entered into by Agent prior to Agent's termination shall survive such termination and remain in effect for the benefit of Licensor provided that all monies due to Agent under such agreements shall be paid by Licensor to Agent under the same conditions of payment as set forth in this agreement.

**Arbitration:** Any dispute under, relating to, or arising out of this agreement shall be resolved by binding, final, exclusive and non-appealable international arbitration in Los Angeles County, California, under the International Arbitration Rules of Independent Film and Television Alliance (the "**Rules**") in effect as of the date of the request for arbitration, before a sole arbitrator which rules and procedures are incorporated into and made part of this agreement. The parties shall abide by any decision rendered in such arbitration and each party agrees that a final judgment in any such arbitration action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. The parties shall submit to the exclusive jurisdiction of the courts in the forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award. The parties shall accept service of process for all arbitral proceedings in accordance with such Rules and to accept service of process for any judicial or other proceedings by registered mail. The parties shall abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such award may be enforced in any court of law with jurisdiction over any of the entire agreement.

**Applicable Law:** The validity, construction and performance of this agreement shall be governed in accordance with French law.

IN WITNESS WHEREOF, the parties hereto have affixed their signature,

| | |
|---|---|
| **AGENT: PGS ENTERTAINMENT** | **LICENSOR: BAGDASARIAN PRODUCTIONS, LLC** |
| Guy Soutter | [signature] |
| **By: Guy Soutter** | **By: Ross Bagdasarian** |
| **Title: C.E.O** | **Title: C.E.O.** |

**TECHNICOLOR ANIMATION PRODUCTIONS**
**(formerly known as OuiDo Productions)**

Boris Hertzog

**By: Boris Hertzog**
**Title: C.E.O.**

# EXHIBIT 2

Davis Wright Tremaine LLP

Suite 2400
865 South Figueroa Street
Los Angeles, CA 90017-2566

**Nicolas A. Jampol**
(213) 633-8651
nicolasjampol@dwt.com

February 2, 2024

**By Email**

Independent Film & Television Alliance
International Centre for Dispute Resolution Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043
casefiling@adr.org

PGS Entertainment
c/o Neville L. Johnson and Daniel B. Lifschitz
Johnson & Johnson, LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
njohnson@jjllplaw.com
dlifschitz@jjllplaw.com

**Re: Amended Notice of Arbitration**
***Bagdasarian Productions v. PGS Entertainment***

Dear All:

Pursuant to the ICDR International Arbitration Rules for IFTA Arbitrations and the Arbitrator's December 31, 2023 Order, Bagdasarian Productions LLC ("BP") provides PGS Entertainment ("PGS"), the Independent Film & Television Alliance, and the International Centre for Dispute Resolution with this amended notice of arbitration against PGS for breach of its contractual, agency, and good-faith obligations under French law.

## Introduction

BP is the owner of the iconic children's entertainment franchise Alvin and the Chipmunks, which includes numerous successful albums, television series, and feature films over the last sixty-five years. Despite BP generating tens of millions of dollars for its sales agent PGS over many years in connection with BP's television series *ALVINNN!!! and the Chipmunks* (the "Series"), when faced with a global pandemic, a changing marketplace for animated content, and lower-than-promised sales to broadcasters, PGS refused to work with its long-time contractual partner in good faith, and instead shifted its focus to positioning itself for litigation against BP and otherwise violating its obligations to BP in a misguided attempt to punish BP for suspending production of Seasons 6 and 7 of the Series.

BP has uncovered multiple instances of PGS violating its contractual, agency, and good-faith obligations to BP, which form the basis of BP's claims against PGS. First, as raised in BP's

December 16, 2022 Notice of Arbitration, PGS intentionally concealed from broadcasters important schedule changes relating to the Series that BP had communicated to PGS in August 2021, misled BP into believing that PGS was fully committed to Seasons 6 and 7 of the Series, and then expressly admitted that it never had any intention of disclosing these changes to broadcasters no matter the harm to BP.

Second, PGS again intentionally concealed information from broadcasters regarding the suspension of Seasons 6 and 7, waiting more than three months to reveal the suspension, which impeded the broadcasters' ability to make alternative arrangements for their programming. This created unnecessary turmoil for the broadcasters, who need significant lead time to make programming changes, and harmed BP's reputation in the industry.

Third, when PGS did finally tell broadcasters that Seasons 6 and 7 were suspended, PGS pretended that they *just* learned of the suspension – which they had known about for months – and improperly disclosed these confidential arbitration proceedings to broadcasters and disparaged BP, causing further harm to BP's reputation.

Finally, as BP discovered just last month, PGS ***again*** withheld critical information from BP, including multiple multi-million-dollar third-party proposals made by broadcasters for licenses for various seasons of the Series, despite the parties' agreement specifically providing BP with ***sole*** approval over any and all potential deals and renewals – a deal point that was ***specifically negotiated*** between the parties. Even worse, PGS then deceptively attempted to use this concealed information against BP in this arbitration, once against establishing that PGS's primary motivation is trying to create leverage in this dispute, not working in good faith with its long-time business partner.

BP brings this action to stop PGS's serious violations of its obligations to BP and to recover damages for the significant harms caused by PGS's misconduct.

## Factual Background

### A. BP and PGS Enter into Multiple Sales Representation Agreements

Approximately ten years ago, sensing an opportunity for a new television series as a result of the highly successful Alvin and the Chipmunks feature films, BP conceived of the Series, and began various pre-production activities at its sole expense. In an agency representation agreement dated May 7, 2013, BP engaged PGS, which had been founded less than five years before, as its international sales agent, except for the United States and France. The Series was a success, and BP and PGS entered into multiple additional agency representation agreements for subsequent seasons (collectively, the "Representation Agreements"). In 2019, BP and PGS initiated discussions for an agreement relating to the distribution of Seasons 6 and 7 of the Series. Based on representations from PGS that it had "confirmed" various broadcasters for those seasons – including most notably Viacom, which accounted for approximately 40% of international revenue for prior seasons – BP engaged PGS

as its sales agent for the two additional seasons in an agreement dated November 31, 2019[1] (the "Season 6/7 Agreement"). *See* Ex. A (the Season 6/7 Agreement).

The Representation Agreements between BP and PGS all contain an extensively negotiated provision, which provides that PGS "shall provide [BP] with a written summary of the basic terms … of ***any*** potential third-party deal" and that BP "shall have ***sole approval*** over the basic terms of ***any*** potential third-party deal, as well as ***sole approval*** over ***any*** decision to extend, renew, or revise any third-party deal." (Emphases added.) While PGS initially proposed that BP have a more typical "approval right," BP specifically demanded that it have "sole approval," to which PGS agreed. The only limitation on BP's sole decision-making authority is that BP cannot unreasonably withhold approval for a proposal that PGS recommends. Based on the plain language of this provision, PGS was required to disclose to BP any potential third-party deal, and BP had the sole right to decide whether to renew any existing deals.

In addition to a deal-approval provision, the Season 6/7 Agreement contains an initial tentative delivery schedule providing delivery dates for various episodes of Seasons 6 and 7, beginning with Episodes 1-13 of Season 6, which were initially scheduled to be delivered by August 1, 2022. Importantly, the Season 6/7 Agreement specifically states that PGS "acknowledges that these dates are tentative" and that "delays may occur." Ex. 1 at 8. The Season 6/7 Agreement provides that BP will inform PGS "of any such delays within a reasonable amount of time, which in no event shall be less than two (2) months before the excepted delivery date for each set of episodes as set forth above or as revised." *Id.* PGS would then notify broadcasters of the revised schedule to ensure they knew when to expect delivery.

### B. The Parties Encounter a Pandemic and Changing Entertainment Industry

In March 2020, the global COVID pandemic began to take hold around the world, which, beyond the tremendous loss of life, resulted in significant disruption in the entertainment industry. This was particularly true for content that, like the Series, was animated in Bangalore, India, which was hit extremely hard by the pandemic and lacked the infrastructure available in other countries that would allow a pivot more quickly to remote work. During this same timeframe, the entertainment market was shifting, with a dramatic reduction in audiences for broadcast television, including children's animation.

In addition to these significant problems, it became apparent that PGS lied to BP about having "confirmed" Viacom, and then PGS failed to deliver on its assurances that it could find a better replacement.

### C. PGS Conceals BP's Revised Delivery Schedule from Broadcasters

In April 2021, as a result of the confluence of numerous factors, including those explained above, BP informed PGS that it could not move forward with Seasons 6 and 7 at that time. Instead of working with its long-time partner BP to address the challenges facing them both, PGS immediately began threatening (and, behind the scenes, preparing for) litigation, resulting in the parties participating in a mediation in June 2021. Following the unsuccessful

[1] This obviously incorrect date was discovered subsequent to execution.

mediation, BP decided to press forward with Seasons 6 and 7 in an effort to appease PGS and to avoid litigation, despite the weak presales and unfavorable market conditions. On August 29, 2021, approximately a year before the start of the initial tentative delivery, BP provided PGS with a revised delivery schedule, as expressly allowed under the Season 6/7 Agreement. The revised schedule shifted dates by approximately one year, with the deadline for the delivery of the first batch of episodes shifting to August 1, 2023. At the end of the email containing the revised schedule, BP specifically asked PGS to "[p]lease confirm these dates with the broadcasters that had already signed up for Season 6 and confirm their receipt." BP again provided these revised delivery dates to PGS on January 25, 2022.

PGS never objected to that revised delivery schedule or suggested it was unacceptable or unreliable. In fact, PGS expressly reassured BP that it was "on board and in line with our agreement on seasons 6 and 7 and are doing our best effort to generate new deals." (Notably, BP learned later that instead of using best efforts to generate new deals, PGS was spending its time and attention preparing a damages analysis for use in litigation against BP.) As a result of PGS's assurances, BP continued its work on the Series. Throughout this period, PGS never informed BP that it had decided not to communicate the revised schedule to broadcasters, leaving BP completely in the dark that broadcasters were expecting the Series a year earlier than the revised schedule indicated. Because of PGS's failure to communicate the revised delivery schedule, the broadcasters operated based on the outdated delivery schedule. As one example, a broadcaster contacted PGS in August 2022 to ask about the status of Seasons 6, which it expected to be delivered *the following week*, despite BP's notice to PGS a year before that delivery would be delayed. PGS never responded to the broadcaster. Such conduct significantly damaged BP's reputation for timely providing high-quality content to broadcasters.

**D. PGS Waits Months to Inform Broadcasters that the Series was Suspended**

In April 2022, with the continuing disruption from COVID and still-insufficient presales, BP's co-producer Technicolor informed BP and PGS that it was unable to produce Seasons 6 and 7 at that time, and recommended a postponement on those seasons. On April 30, 2022, BP informed PGS that they had no choice but to suspend production on Seasons 6 and 7, and invited PGS to meet to figure out how to resolve the situation. PGS refused to meet, however, and instead initiated the arbitration proceedings that it had been planning and preparing for over a year. *See PGS Entertainment v. Bagdasarian Productions, LLC*, IFTA Case 01-22-0002-2640.

Worse yet, PGS ***again*** decided not to provide broadcasters with critical information about the Series, and ***again*** failed to tell BP that it had not done so. In fact, PGS inexplicably waited more than three months to provide notice to international broadcasters that the Series was indefinitely suspended. When PGS finally provided notice of the suspension to broadcasters in August 2022, PGS pretended that it had just learned of the suspension, disparaged its business partner BP, and disclosed the existence of this confidential arbitration to various broadcasters. For example, on August 12, 2022, PGS informed RTL that BP had told PGS that Seasons 6 and 7 were indefinitely suspended, and after RTL expressed surprise at the suspended production, PGS stated that it was "unexpected to us as well." PGS then informed RTL that it had "taken legal action against BP on the matter." PGS did not inform RTL that BP had provided a notice

of delay and revised delivery schedule approximately a year prior, or that production had actually been suspended months before.

PGS never informed BP that it had disclosed the parties' confidential litigation to BP's business partners or requested permission to do so. Instead, as with many of PGS's concealed actions, BP only found out about them through discovery in this arbitration.

### E. PGS Admits it Failed to Communicate the Revised Schedule to Broadcasters

On November 3, 2022, after eight days of arbitration, PGS emailed BP that it had received a notice from the German broadcaster RTL threatening claims against PGS for failure to deliver the Series as promised. RTL's letter, however, stated that it was expecting the initial batch of Season 6 episodes to be delivered on August 1, 2022, which was the initial schedule set forth in the Agreement, but which had been revised by BP more than a year prior. BP responded to PGS the following day, stating that it was confused why RTL would reference the outdated delivery schedule and asked PGS to confirm that it had provided the updated schedule to broadcasters in August 2021 as BP had requested.

Waiting another three weeks, PGS finally responded on November 29, 2022, admitting to BP for the first time that it did not provide the revised delivery schedule to broadcasters in August 2021 and, in fact, ***never had any intention of providing them with the revised schedule*** even while it continued to falsely represent to BP that PGS was fully committed to Seasons 6 and 7. PGS also provided BP with PGS's response to RTL's letter, in which PGS blamed BP and Technicolor for the failure to deliver the initial episodes by August 2022, when in reality it was PGS's fault for concealing the revised schedule from RTL and then concealing this failure from BP, which had assumed that PGS had complied with its obligation to inform the broadcasters of the revised schedule.

### F. PGS Admits It Withheld Numerous Proposals from BP, In Violation of Its Contractual, Agency, and Good-Faith Obligations

On December 13, 2023, PGS disclosed the report of its damages expert, Floriane Merias, who asserted that PGS suffered a "loss of revenue" based on a $3.5 million proposal from Nickelodeon for renewals of Seasons 1-5 of the Series because PGS wrongly speculated that Nickelodeon somehow gained access to PGS's allegedly confidential information and used that information to make its proposal years later, on September 27, 2023.[2] The expert report attached the proposed deal from Nickelodeon, which consisted of two pages of proposed terms addressing everything from license fees to rights and territories to social media to dubbing costs. BP was taken completely by surprise by this information, as ***PGS had never informed BP of this multi-million dollar proposal from Nickelodeon***, which was made three months earlier. At the deposition of PGS's EVP of Global Sales, Xavi Mas, he confirmed that while this proposal was a "big one," PGS did not disclose it to BP. Mr. Mas also disclosed for the first time that PGS also

[2] In reality, only Comcast/NBCUniversal obtained access to the data room in October 2021 containing the allegedly confidential information that PGS references here.

received a proposal from Netflix, and that he was "sure" that there were other proposals relating to the Series – none of which had been disclosed to BP.

On January 26, 2024, PGS revealed that there had been ***almost ten proposals*** that PGS never disclosed to BP in 2023 alone, one of which PGS concealed for almost a year. PGS knew that it was obligated to provide proposals to BP, but decided to disregard its contractual obligations, supplant its own judgment for BP's, and keep BP in the dark regarding multi-million-dollar proposals, to the extreme detriment of BP.

***

In sum, PGS failed to notify broadcasters of the revised delivery schedule, intentionally concealed this failure from BP until broadcasters began to complain, misrepresented to BP that it was fully committed to Seasons 6 and 7, and then blamed BP for the seeming failure to deliver based on the out-of-date delivery schedule – all without letting broadcasters know that, since August 2021, PGS knew that delivery would not begin until two years later. PGS also failed to inform broadcasters of the suspension for more than three months, and when it finally did so, PGS disclosed to the broadcasters the existence of this confidential arbitration. Finally, PGS unilaterally withheld multiple multi-million dollar proposals from BP despite its contractual and good-faith obligation to disclose ***any*** potential third-party deal for BP's sole approval.

Accordingly, BP brings this arbitration against PGS to seek compensation for the damage that PGS has caused and will cause to BP, the Series, and its Alvin and the Chipmunks brand as the result of PGS's misconduct.

**Legal Claims**

PGS is liable for breach of contract, a violation of the duty to perform its obligations in good faith, as set forth under French Civil Code, Article 1104 ("Contracts must be negotiated, formed and performed in good faith."), and violations of its agency obligations, pursuant to French Civil Code Article 1991 ("the agent must perform the agency agreement as long as it is in force and will be liable for any damages that may stem from its non-performance") and 1992 ("an agent is liable not only for its misrepresentations, but also for any breach of duties in its performance of the agency agreement").

As discussed above, while BP followed the contractual and good faith requirements of the Representation Agreements, PGS did not do the same, repeatedly failing to keep broadcasters updated of critical information relating to the Series, later disclosing confidential litigation information to those broadcasters at great reputational harm to BP, and failing to inform BP of third-party broadcast proposals despite being contractually and legally obligated to do so. PGS's behavior violates its contractual, agency, and good-faith obligations to BP.

In accordance with IFTA Rule 2.3(a) and the Arbitrator's December 31, 2023 Order, BP submits this Amended IFTA Notice of Arbitration. As required by IFTA Rule 2.3(b), the names and contact information of the parties and their representatives remain the same, as follows:

| **Claimant** | **Respondent** |
| --- | --- |
| Bagdasarian Productions LLC<br>1192 E. Mountain Drive<br>Montecito, CA 93108<br>Tel: (805) 969-3349<br>alvin@chipmunks.com | PGS Entertainment<br>26 rue Jacques Dulud<br>92200 Neuilly-sur Seine, France<br>psoutter@pgsentertainment.com<br>gsoutter@thepgscompany.com |
| **Claimant's Counsel** | **Respondent's Counsel** |
| Nicolas A. Jampol<br>Mary H. Haas<br>Alex F. Porter<br>Adrian F. Vallens<br>Farrah C. Vazquez<br>865 S. Figueroa Street, 24th Floor<br>Los Angeles, CA 90017<br>nicolasjampol@dwt.com<br>maryhaas@dwt.com<br>alexporter@dwt.com<br>adrianvallens@dwt.com<br>farrahvazquez@dwt.com | Neville L. Johnson<br>Daniel B. Lifschitz<br>Johnson & Johnson, LLP<br>439 N. Canon Drive, Suite 200<br>Beverly Hills, CA 90210<br>njohnson@jjllplaw.com<br>dlifschitz@jjllplaw.com<br><br>Jean-Daniel Bouhenic<br>DDG Law<br>21 Clement Marot Street<br>75008 Paris, France<br>bouhenic@ddg.fr |

A copy of the 2019 Agreement between BP and PGS is attached to this Notice of Arbitration as **Exhibit A**. That Agreement contains the following Arbitration clause:

> "Any dispute under, relating to, or arising out of this agreement shall be resolved by binding, final, exclusive and non-appealable international arbitration in Los Angeles County, California, under the International Arbitration Rules of Independent Film and Television Alliance (the "Rules") in effect as of the date of the request for arbitration, before a sole arbitrator which rules and procedures are incorporated into and made part of this agreement. The parties shall abide by any decision rendered in such arbitration and each party agrees that a final judgment in any such arbitration action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. The parties shall submit to the exclusive jurisdiction of the courts in the forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award. The parties shall accept service of process for all arbitral proceedings in accordance with such Rules and to accept service of process for any judicial or other proceedings by registered mail. The parties shall abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such award may be enforced in any court of law with jurisdiction over any of the entire agreement."

**Relief Sought**

BP seeks monetary damages resulting from the economic and reputational harm that PGS has caused and will cause due to its decision to knowingly conceal the revised delivery schedule from broadcasters and knowingly concealing that failure from BP, by belatedly disclosing the indefinite suspension of the Series, by repeatedly disclosing confidential information to broadcasters and potential broadcasters about the parties' confidential arbitration and by disparaging BP, and by selectively withholding proposals from BP for millions of dollars, depriving BP of significant revenues, and severely harming BP's reputation. By this action, BP is seeking to recover monetary damages for losses incurred due to PGS' acts and omissions, and the full costs of pursuing this matter to resolution.

This Amended Notice of Arbitration does not include a complete recitation of all facts relating to this dispute and nothing in this notice should be construed as a waiver of any sort. BP expressly reserves all rights, claims, and arguments in connection with this arbitration, including the right to supplement the facts described above and to assert new claims or arguments.

Sincerely,

Nicolas A. Jampol
Davis Wright Tremaine LLP

# EXHIBIT A

DocuSign Envelope ID: 6B0FB8A0-0A29-4982-83F8-1CBB5DBD092E

PGS

# AGENCY REPRESENTATION AGREEMENT

November 31st 2019

**BETWEEN**

| | |
|---|---|
| **AGENT:** PGS Entertainment<br>**Address:** 26 rue Jacques Dulud, 92200 Neuilly-sur-Seine, France<br>**VAT NUMBER:** FR 45 507 934 594<br>**email:** psoutter@pgsentertainment.com<br><br>Hereafter referred to as **"Agent"** or **"PGS Entertainment"** | **LICENSOR:** Bagdasarian Productions, LLC<br>**Address:** 1192 E. Mountain Drive Montecito, CA 93108, United States<br>Represented by Ross Bagdasarian, CEO<br><br>Hereafter referred to as **"Licensor"** or **"Bagdasarian Productions"** |
| | Technicolor Animation Productions<br>(formerly known as Technicolor)<br>**Address:** 1-5 rue Jeanne d'Arc 92130 Issy-Les-Moulineaux, France<br>Represented by Boris Hertzog, CEO<br><br>Hereafter referred to as **"Technicolor"** |

**Recitals:** PGS Entertainment, Bagdasarian Productions and Technicolor have executed successive agreements whereby PGS Entertainment has been granted certain distribution rights to the first five seasons, with an option on subsequent seasons, of the animated series "ALVINNN!!! and The Chipmunks" (the "Series").

PGS Entertainment and Bagdasarian Productions have agreed to enter into the present agreement in order to set forth the terms and conditions upon which PGS Entertainment is granted the representation of the sixth and seventh seasons of the Series. By its signature below, Technicolor, as coproducer, acknowledges the terms of this agreement, and agrees that the terms of this agreement between Agent and Licensor are in full compliance with the terms of the agreements between Licensor and Technicolor

**Program:** Sixth and seventh seasons of "ALVINNN!!! and The Chipmunks" – Animated Series (**"Program"**), which are being co-produced by Bagdasarian Productions and Technicolor.

**Format:** 104x11' being 52x11' for Season 6 and 52x11' for Season 7

**Territory:** Worldwide excluding France and the United States (including its territories, possessions and commonwealths) (**"Licensed Territory"**)

**Term:** Shall start upon signature of this agreement and the term for each season shall end seven (7) years from the initial broadcast of the first episode of the season or in the event that delivery of the entire season to PGS Entertainment is not completed within three (3) months of the



BH GS

initial broadcast of the first episode of that season, then the term shall end seven (7) years from the date delivery of the season to PGS Entertainment is complete (the **"Initial Period"**).

The Initial Period shall be automatically extended for an additional seven-year (7) period provided that PGS Entertainment has paid Licensor a minimum total amount of US$16,000,000 (sixteen million US dollars) net of any tax from the exploitation of the Media Rights to the Program as defined hereunder (**"Safeguard Amount"**). The Safeguard Amount is composed of a US$ 8,000,000 for Season 6 and an US$ 8,000,000 for Season 7. For the avoidance of any doubt, the Safeguard Amount shall include the amount of the Minimum Guarantee paid to Technicolor and Bagdasarian Productions as defined hereunder.

In the event PGS Entertainment is close to paying Licensor the Safeguard Amount within the Initial Period but has not received all monies due to PGS Entertainment by third parties under executed agreements with respect to the exploitation of the Media Rights to the Program, then PGS Entertainment may advance to Licensor up to US$2,000,000 (two million US dollars) – allocated 50/50 to Seasons 6 and 7 - of such earned but unpaid monies in order to reach the Safeguard Amount if PGS Entertainment provides Licensor with a schedule of all earned but unpaid monies due under executed agreements, including the approved payment schedule relating to earned but unpaid monies.

For the avoidance of any doubt, Agent shall be entitled to execute license agreements concerning the exploitation of the Media Rights to the Program with terms that extend up to five (5) years after the expiration of the Term. Notwithstanding the foregoing, any deal, as well as any extension, renewal, or revision thereof, shall be subject to the Deal Approval process as set forth in the present agreement.

The Initial Period and any applicable extension are referred to herein as the **"Term."**

Pursuant to and consistent with the agency representation agreement dated as of March 7th, 2013 executed by PGS Entertainment, Bagdasarian Productions and Technicolor with respect to the first season of the Series, all Media Rights acquired by PGS Entertainment to Season 1 and subsequent seasons of the Series (including Seasons 2, 3, 4, 5, 6, and 7) shall end co-terminus with PGS Entertainment Media Rights to the last represented season if PGS Entertainment has paid Licensor the Safeguard Amount of US$ 8 million (eight million US dollars) in accordance for each season of "ALVINNN !!!".

**Minimum Guarantee:** Agent shall pay as an advance on the revenues to be paid to Licensor from the exploitation of the Media Rights to the Program, the amount of €9,123,840 (nine million one hundred twenty three thousand and eight hundred forty EUROS) (**"Minimum Guarantee"**), payable as follows:

(i) A minimum guarantee of € 4,147,200 (four million one hundred forty seven thousand and two hundred EUROS) for Season 6, payable as follows:

- 10% upon Agent's receipt of written confirmation that Technicolor has obtained full financing for the Program and written confirmation of a schedule of when each episode of Season 6 shall be delivered to PGS Entertainment;

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards



BH GS

to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 1 to 26 of Season 6; and

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 27 to 52 of Season 6.

Licensor has requested PGS Entertainment and PGS Entertainment has agreed to pay the Minimum Guarantee due to Licensor for Season 6 under the present paragraph as follows:

- € 3,421,760 (three million four hundred twenty-one thousand and seven hundred sixty Euros) shall be paid directly to Technicolor; and
- € 725,440 (eight hundred and thirteen thousand Euros) shall be paid directly to Bagdasarian Productions.

(ii) A minimum guarantee of € 4,976,640 (four million nine hundred seventy six thousand and six hundred forty EUROS) for Season 7, payable as follows:

- 10% upon Agent's receipt of written confirmation that Technicolor has obtained full financing for the Program and written confirmation of a schedule of when each episode of Season 7 shall be delivered to PGS Entertainment;

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 1 to 26 of Season 7; and

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 27 to 52 of Season 7.

Licensor has requested PGS Entertainment and PGS Entertainment has agreed to pay the Minimum Guarantee due to Licensor for Season 7 under the present paragraph as follows:

- € 3,434,139 (three million four hundred thirty fort thousand and one hundred thirty nine Euros) shall be paid directly to Technicolor; and
- € 1,542,501 (one million five hundred forty two thousand and five hundred one Euros) shall be paid directly to Bagdasarian Productions.

When the event triggering payment of any portion of the Minimum Guarantee occurs, Agent shall be invoiced for the amount due, and Agent shall pay Technicolor the amount due no later than the end of the next month following receipt of the invoice. The Minimum Guarantee is non-returnable.

**Represented Rights:** PGS Entertainment shall be the exclusive agent regarding the representation, distribution and exploitation of all the following media rights to the Program in the Licensed Territory, as defined in the IFTA International Schedule of Definitions, dated October 20, 2010:



BH GS

(i) Ancillary Rights;

(ii) Pay TV Rights and Free TV Rights;

(iii) Video Rights (excluding "Commercial Video Rights");

(iv) Internet Rights provided however that the licensing of such rights does not interfere with Licensor's rights outside the Licensed Territory;

(v) PayPerView Rights; and

(vi) ClosedNet Rights

which rights are collectively referred to herein as **"Media Rights."**

To the extent the IFTA Schedule of Definitions is revised to incorporate any technology hereafter devised that is analogous to the Media Rights granted to PGS Entertainment, the Media Rights shall incorporate such revised definitions.

"Cinematic Rights" and "Commercial Video Rights," or rights similar thereto, are expressly excluded from Media Rights. Licensor agrees not to use, exploit or grant to any third party any "Cinematic Rights" or "Commercial Video Rights," or rights similar thereto, to the Program in the Licensed Territory during the Term.

For the avoidance of any doubt, all Media Rights to the Program shall only be exploited by Agent in the Licensed Territory during the Term, except Licensor may use and license excerpts of the Program of up to three (3) minutes in length per episode in the Licensed Territory.

All rights not expressly licensed to Agent are **"Reserved Rights"** which Licensor may exploit without restriction except as provided for in this agreement. However, Licensor may allow Agent to exploit some of the Reserved Rights on a case by case basis. For the avoidance of doubt, if Licensor approves a deal which includes some Reserved Rights under the Deal Approval process as set forth below, the Agent shall be deemed authorized by Licensor to exploit such Reserved Rights for such specific approved deal.

**Deal Approval:** PGS Entertainment shall provide Licensor with a written summary of the basic terms, including estimated distribution costs (e.g. material and dubbing costs but excluding withholding tax), of any potential third-party deal. Licensor shall have sole approval over the basic terms of any potential third-party deal, as well as sole approval over any decision to extend, renew, or revise any third-party deal, which approval shall not be unreasonably withheld by Licensor. Licensor shall notify Agent of Licensor's written approval (or disapproval) within three (3) business days following Licensor's receipt of the basic terms of any potential third-party deal proposed by Agent. If Licensor does not send notice to Agent of Licensor's written response by email or overnight delivery service (e.g. UPS, FedEx, DHL, etc.) within this three (3) business day period, the basic terms of the potential third-party deal shall be deemed approved by Licensor.

**Marketing Approval:** All marketing and promotional materials of the Program (including but not limited to press materials, ads, characterization of the characters, costs, etc.) shall be subject to Licensor's prior approval. For the avoidance of any doubt, Licensor may reject any marketing and promotional material in whole or in part, if, in Licensor's sole discretion, Licensor considers



BH GS

the material, or any part of the material, not to be in the best interest of the Program or the "Alvin and The Chipmunks" property.

Licensor shall notify Agent of Licensor's written approval (or disapproval) of any marketing and promotional materials within three (3) business days following Licensor's receipt of Agent's proposed marketing and promotional materials. If Licensor does not send notice to Agent of Licensor's written response by email or overnight delivery service (e.g. UPS, FedEx, DHL, etc.) within this three (3) business day period, Agent's proposed marketing and promotional material shall be deemed approved by Licensor.

PGS Entertainment agrees to manage the marketing and promotion of the Program in at least as favorable a manner as it manages the marketing and promotion of any other property.

PGS Entertainment may not couple or co-promote the Program with any other third-party brands in any kind of advertising or promotion.

**Options:** All provisions related to PGS Entertainment's options for subsequent seasons and any new television series derived from "ALVINNN!!! and The Chipmunks" contained in the First Season Agreement shall remain in full force and effect.

**Agency Commission:** PGS Entertainment shall receive a 27.5% GROSS commission on all monies/revenues actually received by PGS Entertainment resulting from the exploitation of the Media Rights. In case of a sub-agent, the GROSS commission for PGS Entertainment and its subagent may not exceed 35% in total.

**Remuneration:** Agent shall have the right, after deducting its Agency Commission, to deduct the Minimum Guarantee, its actual marketing costs (**"Marketing Costs"**) and its actual distribution costs (**"Distribution Costs"**) before paying any amount due to Licensor from Agent's exploitation of Agent's Media Rights.

Money collected or received from third parties by Agent in connection with the exercise of Agent's Media Rights shall be held and accounted for separately from the funds related to Agent's other business activities.

**Marketing Costs:** Marketing Costs shall be capped at 5% of gross receipts, according to standard industry practice. Marketing Costs include but are not limited to B to B advertising, specific events, etc. Notwithstanding the foregoing, any Marketing Costs in excess of US$5,000 (five thousand US dollars) if paid by Agent in US dollars or €4,000 (four thousand EUROS) if paid by Agent in Euros must be approved by Licensor in advance and in writing.

**Distribution Costs:** Distribution Costs shall include (but are not limited to): Withholding Tax (if applicable); all actual dubbing or subtitling costs if not borne directly by broadcasters or advanced by Agent; all actual costs associated with accessing such dubbed or subtitled versions or the existing dubbed or subtitled versions; all reversioning in connection with the delivery of the Program and at broadcaster discretion. Distribution Costs shall be based upon standard industry practices, and shipment and bank fees shall be no higher than €500 (five hundred EUROS) per deal.

Licensor shall have ninety (90) days from receipt of each royalty statement to object to Distribution Costs, but Licensor may only object on the grounds that the Distribution Costs are not based upon standard industry practice or are higher than market costs. After this ninety (90) day delay, the Distribution Costs shall be deemed approved by Licensor.



BH GS

Notwithstanding the foregoing, if actual Distribution Costs are similar to – i.e. within no more than 3% of – the estimated Distribution Costs approved by Licensor, Licensor may not exercise any of its rights to reject Distribution Costs.

**Licensor's approval of dubbing versions:**

Approval of International Version Cast

Licensor shall have approval rights on lead cast and recorded dialogue test excerpts, including the cast and dialogue test excerpts for David Seville, the Chipmunks and the Chipettes, for all languages Worldwide.

Licensor shall notify its written approval (or disapproval) within three (3) business days following Licensor's receipt of a recorded dialogue test excerpt from the Program for the lead cast of a particular language. If Licensor does not respond within this three (3) business day period, the lead cast shall be deemed approved by Licensor for that particular language.

The recorded dialogue test excerpt approved by Licensor shall set the minimum quality standard and be representative of how the dialogue should sound for the Program in that particular language.

PGS Entertainment shall use its best efforts to match as closely as possible Licensor's approved English dubs and ancillary voices in recording dialogue for any other language. Licensor acknowledges that broadcasters in certain territories may choose to record ancillary voices that significantly differ from the English dubs for the best interest of their particular market. For the avoidance of any doubt, the lead cast and recorded dialogue test excerpts for David Seville, the Chipmunks and the Chipettes shall always be subject to Licensor's prior approval.

Approval of Neutral Spanish Version

Licensor shall have approval rights on the ancillary cast of the Spanish dubbing for exploitation in Latin America.

**Licensor's ownership of dubbing versions:**

Licensor shall own all foreign language dubs to the extent of the rights cleared in the dubbing contract (with respect to the rights granted, the duration of the rights and the territories covered) for each territory in which PGS Entertainment is responsible for such dubbing. To the extent Agent elects to acquire anything less than 100% of the rights in perpetuity to any foreign language dub (where such rights are possible to be cleared), Agent shall offer Licensor the opportunity to obtain such rights to the extent of the rights available at Licensor's own expense. In the event a third party is responsible for foreign language dubs (including all corresponding costs), PGS Entertainment shall use its best efforts to allow Licensor to acquire the foreign language dub upon the most favorable terms possible and such rights shall be to the extent of the rights cleared in the dubbing contract. In no event shall Licensor be required to pay the broadcaster more than 50% of the actual dubbing costs in order to acquire ownership of the foreign language dubs.

Notwithstanding the foregoing, at Licensor's sole expense, which shall not exceed US$1,000 (one thousand US dollars) per language dub for each Season of the Program – i.e. 26 half-hours – Licensor shall be entitled to a master dub, in the form of digital delivery, of each new language version created per territory once such recordings are approved by Licensor. In



BH GS

order to keep material costs down, Licensor shall accept digital delivery of such foreign language dubs.

**Material Delivery:**

HD Version in English and French according to the following technical specifications:
**DIGITAL FORMAT**
Apple ProRes HQ 422 / 1920*1080p 16:9 25fps (& 23.98psf) 160Mbps
A1/2 = Original Version LtRt & Stereo
A3-8 = 5.1 Original Version
A9/10 = M&E LtRt & Stereo
A11/16 = 5.1 M&E

**TAPES**
HDCAMSR 1920x1080, 4 :4 :4, 24PsF with the following audio configuration:
A1/2 = Original Version LtRt or Stereo
A3/4 = M&E LtRt or Stereo
A5/10 = 5.1 Original Version

**PROSPECTION FORMAT**
MPEG4
A1/2 = Original Version

Legal ownership of all delivery materials will remain with Licensor subject to Agent's right to use such materials under this agreement.

**Delivery Schedule:**

**Delivery of the English Version:**
**Season 6**
Episodes 1-13: August 1st 2022
Episodes 14-26: December 18th 2022
Episodes 27-39: May 7th 2023
Episodes 40-52: September 25th 2023

**Season 7**
Episodes 1-13: April 8th 2024
Episodes 14-26: August 19th 2024
Episodes 27-39: January 15th 2025
Episodes 40-52: May 18th 2025

**Delivery of the French Version:**
**Season 6**
Episodes 1-13: September 5th 2022
Episodes 14-26: January 31st 2023
Episodes 27-39: June 12th 2023
Episodes 40-52: October 29th 2023

**Season 7**
Episodes 1-13: May 12th 2024
Episodes 14-26: September 30th 2024
Episodes 27-39: February 22nd 2025
Episodes 40-52: June 23rd 2025



BH GS

Agent acknowledges that these dates are tentative. The Program is currently in production, but delays may occur. Licensor will inform Agent of any such delays within a reasonable amount of time, which in no event shall be less than two (2) months before the expected delivery date for each set of episodes as set forth above or as revised.

**Statements/Payments:** Timely payment is of the essence. Agent shall provide Licensor with the first royalty statement(s) in English and initial payment(s) no later than the end of the month immediately following receipt and approval by Agent of the broadcast quality of the first episode of the Program. Agent's approval of the broadcast quality of the first episode, and all subsequent episodes, shall be based upon standard industry practices, and Agent's approval shall not be unreasonably withheld or delayed.

Thereafter, Agent shall provide royalty statements in English and payments to Licensor no later than forty-five (45) days from the end of each quarter, provided the amount due Licensor for the exploitation period exceeds US$500 (five hundred US dollars). Licensor shall send an invoice for the corresponding amount no less than 30 days from receipt of payment.

**Enforcement:** Enforcement of the terms of the present agreement is subject to the execution of French broadcaster deal and compliance with Euro Quotas. In case of non-compliance with Euro Quotas, Agent shall have the right to terminate this agreement if, after Agent provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Licensor of Agent's intention to terminate due to failure to comply with Euro Quotas, Licensor does not cure the non-compliance with Euro Quotas within thirty (30) calendar days from receipt of Agent's notice.

**PGS Entertainment Approval:** None with the exception of territory specific broadcast regulations or as otherwise specified in this agreement.

**Additional Terms:** Key Man:

For the first three (3) years after this agreement is executed, Philippe Soutter, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by him, except in the event of his death, will personally supervise all business aspects of the distribution of Agent's Media Rights to the Program, and such supervision shall be "of the essence" to this agreement and a material inducement for Licensor to enter into this agreement.

After the initial three-year (3) period after this agreement is executed, Philippe Soutter, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by Philippe Soutter or Guillaume Soutter, shall oversee and manage all key business aspects of the distribution of Agent's Media Rights to the Program.

All services and rights as outlined in this agreement are subject to Philippe Soutter being willing and available to serve as Agent's representative, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by him, in connection with the Program.

Notwithstanding the above, Licensor shall have the right to terminate this agreement if Philippe Soutter is no longer a direct or indirect shareholder of the company PGS Entertainment.



BH GS

The provisions of the present "Key Man" clause shall be unenforceable if Ross Bagdasarian is no longer an owner of Bagdasarian Productions, LLC or Bagdasarian Productions, LLC no longer controls the rights to the Program.

For the sake of clarity, the present "Key Man" clause is construed in order to maintain Philippe Soutter's involvement in the distribution of Agent's Media Rights to the Program and shall not be interpreted as granting to Licensor the right to terminate this agreement at any given time at its sole discretion.

Assignment

PGS Entertainment shall not be entitled to assign any rights under this agreement to any third party without Licensor's prior written consent. If Agent seeks to assign any rights under this Agreement to any entity owned in majority by Philippe Soutter, Licensor's consent shall not be unreasonably withheld.

Termination

Each party shall have the right at any time, after giving written notice to the other, to terminate this agreement if (a) either party is adjudged bankrupt or (b) either party ceases to carry on its business.

For the avoidance of any doubt, neither party shall be considered to cease to do business due to a corporate restructuring or reorganization, unless that restructuring or reorganization is incident or related to that party's insolvency, receivership, or bankruptcy.

In the event of a breach by Agent of its financial obligations under this agreement, including Agent's failure to make timely payments due to Licensor, Licensor shall have the right to terminate this agreement, if, after Licensor provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Agent of such breach, Agent fails to cure such breach within thirty (30) calendar days from receipt of such notice.

In the event of such termination by Licensor, any and all ongoing contracts approved by Licensor and entered into by Agent prior to Licensor's termination shall survive such termination and remain in effect for the benefit of Licensor provided that all monies due Agent under such agreements under this agreement shall be paid by Licensor to Agent upon the following terms:

(i) Agent shall immediately assign to Licensor all contracts and all payments due under any contract concerning Agent's exploitation of any right under this agreement; and

(ii) The rate of any commission due to Agent under this agreement as of the date Licensor provides notice to Agent of Agent's breach and thereafter shall be reduced to 10% of the monies/revenue actually generated and received from Agent's exploitation of its Media Rights (**"Agent's Revised Commission"**) and shall be payable to Agent only after (a) Licensor recoups from Agent all unpaid amounts owed to Licensor by Agent, (b) Licensor recoups from Agent all costs associated with addressing Agent's breach, and (c) an account penalty is assessed against Agent of US$500,000 (five hundred thousand US dollars). For the avoidance of any doubt, the US$500,000 account penalty shall be deducted from the gross monies/revenues actually generated and received from Agent's exploitation of its Media Rights before the calculation of Agent's Revised Commission (e.g. if gross monies/revenues



BH GS

actually generated and received are US$3,000,000, Agent's Revised Commission shall be based upon US$2,500,000).

In the event Licensor fails to deliver the Program to Agent according to the Delivery Schedule or any amendments thereto as identified by Licensor, Agent shall have the right to terminate this agreement, if, after Agent provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Licensor of such breach, Licensor fails to cure such breach by delivering the specific Episodes at issue within one hundred eighty (180) calendar days from receipt of such notice. In the event of such termination by Agent, Licensor shall be directly liable for all penalties and fees triggered by or resulting from the non-delivery of the ordered Program in all third-party agreements approved by Licensor and signed by Agent.

Moreover, in the event of such termination, any and all ongoing contracts entered into by Agent prior to Agent's termination shall survive such termination and remain in effect for the benefit of Licensor provided that all monies due to Agent under such agreements shall be paid by Licensor to Agent under the same conditions of payment as set forth in this agreement.

**Arbitration:** Any dispute under, relating to, or arising out of this agreement shall be resolved by binding, final, exclusive and non-appealable international arbitration in Los Angeles County, California, under the International Arbitration Rules of Independent Film and Television Alliance (the "**Rules**") in effect as of the date of the request for arbitration, before a sole arbitrator which rules and procedures are incorporated into and made part of this agreement. The parties shall abide by any decision rendered in such arbitration and each party agrees that a final judgment in any such arbitration action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. The parties shall submit to the exclusive jurisdiction of the courts in the forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award. The parties shall accept service of process for all arbitral proceedings in accordance with such Rules and to accept service of process for any judicial or other proceedings by registered mail. The parties shall abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such award may be enforced in any court of law with jurisdiction over any of the entire agreement.

**Applicable Law:** The validity, construction and performance of this agreement shall be governed in accordance with French law.

IN WITNESS WHEREOF, the parties hereto have affixed their signature,

| | |
|---|---|
| **AGENT: PGS ENTERTAINMENT** | **LICENSOR: BAGDASARIAN PRODUCTIONS, LLC** |
| Guy Soutter | [signature] |
| **By: Guy Soutter** | **By: Ross Bagdasarian** |
| **Title: C.E.O** | **Title: C.E.O.** |

**TECHNICOLOR ANIMATION PRODUCTIONS**
**(formerly known as OuiDo Productions)**

Boris Hertzog

---

**By: Boris Hertzog**
**Title: C.E.O.**

# EXHIBIT C

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

International Arbitration Tribunal

PGS Entertainment, ICDR Case No. 01-22-00002-2640

v.

Bagdasarian Productions, LLC.

and

Bagdasarian Productions, LLC, ICDR Case No. 01-22-0005-2712

v.

PGS Entertainment.

**DISPOSITION OF APPLICATION FOR INTERPRETATION OR CORRECTION OF AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and dated November 31, 2019, and having been duly sworn and having duly heard the proofs and allegations of the parties, and having previously rendered a Final Award dated November 21, 2024, do hereby determine, as follows:

---

On December 10, 2024, Bagdasarian Productions, LLC ("BP") submitted a letter setting forth their Request for Correction of Award pursuant to Article 37 of the ICDR International Arbitration Rules for IFTA Arbitrations (the "BP Request"). On December 11, 2024, PGS Entertainment ("PGS") submitted a letter objecting to the BP Request and setting forth their own Request for Correction of Award pursuant to Article 37 of the ICDR International Arbitration Rules for IFTA Arbitrations (the "PGS Request"). On December 13, 2024, BP submitted an additional letter objecting to the PGS Request.

## I. ARTICLE 37

Article 37 of the ICDR International Arbitration Rules ("Article 37") provides as follows:

> 1. Within 30 days after the receipt of an award, any party, with notice to the other party, may request the arbitrator to interpret the award or correct any clerical, typographical, or computational errors or make an additional award as to claims, counterclaims, or setoffs presented but omitted from the award.
>
> 2. If the arbitrator considers such a request justified after considering the contentions of the parties, it shall comply with such a request within 30

days after receipt of the parties' last submissions respecting the requested interpretation, correction, or additional award. Any interpretation, correction, or additional award made by the arbitrator shall contain reasoning and shall form part of the award.

3. The arbitrator on its own initiative may, within 30 days of the date of the award, correct any clerical, typographical, or computational errors or make an additional award as to claims presented but omitted from the award.

4. The parties shall be responsible for all costs associated with any request for interpretation, correction, or an additional award, and the arbitrator may allocate such costs.

## II. THE BP REQUEST

### A. Circumstances Triggering the Second Arbitration

The BP Request asks for a correction regarding the circumstances that triggered the second arbitration brought by BP. The Final Award states that the second arbitration was triggered by the testimony of Xavi Mas. However, the record reflects that Mr. Mas' testimony was given on December 15, 2023, while the second arbitration commenced on December 16, 2022. Therefore, this is a factual, clerical error and a request to correct it is proper under Article 37.

However, BP is incorrect that such a correction requires a wholesale reevaluation of compensation awarded under the Final Award. The Final Award should merely be amended to state that the second arbitration brought by BP against PGS was triggered by the correspondence from Super RTL. As noted by PGS in the PGS Request, I had previously conveyed my concern with the delayed initation of a second arbitration premised upon information that either was or should have been known by BP at the time of the first arbitration.

### B. The Second Arbitration

The BP Request also asks that the Award "be corrected on the point that there can be no fee award in favor of PGS for an arbitration that was successful for BP, even in part, given BP prevailed on its argument in that second arbitration that PGS's failure to disclose the revised delivery schedule to broadcasters constituted bad faith." Further, the BP Request asks that "To the extent the Arbitrator determines that PGS can still recover attorneys' fees because part of the second arbitration was unsuccessful, BP requests the same treatment."

These requests do not fall within the ambit of Article 37 as set forth above. A request to revoke PGS' financial compensation as set forth in the Final Award is a substantive request to reverse a decision thoughtfully made after weighing PGS' relatively minor bad faith against BP's much more costly and serious bad faith. It is not a correction of a "clerical, typographical, or computation error[]" and, as such, the Final Award will not be revised in response to these requests.

### C. Attorneys' Fees and Costs

Lastly, the BP Request seeks that "To the extent the Arbitrator awards attorneys' fees to either party, the recovering party should provide their invoices to the opposing party (along with confirmation that those invoices were actually paid by the party) and the parties should jointly agree on a date by which the opposing party can challenge any particular entries or other aspects of the invoices."

A request for a clarification of the attorneys' fees and costs awarded in the Final Award is a proper request under Article 37. The Final Award dated November 21, 2024 states that "PGS is entitled to attorney fees and costs starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022." The final computation of PGS' attorney fees and costs is yet to be determined and requires interpretation. Therefore, it falls within the ambit of Paragraph 1 of Article 37.

As this request relates to a similar request by PGS, I will address it substantively in Section IV hereinbelow.

## III. THE PGS REQUEST

### A. Attorneys' Fees and Costs

Similarly to the BP Request, the PGS Request also seeks a clarification of the amount of attorneys' fees and costs granted within the Final Award. As set forth above, this is a proper request under Article 37 and will be substantively discussed in Section IV hereinbelow.

### B. The Nickelodeon License

Additionally, the PGS Request requests a correction of the Final Award in relation to the Nickelodeon licensee fee. The Final Award states that the Nickelodeon proposal was never formalized and that there was no proposed license fees on which to base the calculations of PGS' lost revenue. This is inaccurate and PGS is correct that Nickelodeon's licensing offer contained in Exhibit 62 was inadvertently overlooked.

This oversight can and should be categorized as a computational error. Put simply, in computing PGS' lost license fee, an incorrect number was used in the calculations. The Final Award shall be revised to state that PGS' projected revenue fee for the Nickelodeon proposal shall be $1,716,000.

## IV. ATTORNEYS FEES AND COSTS

Both parties have requested an interpretation of the amount of attorneys' fees and costs owed under the Final Award. As discussed above, this is a proper request under Article 37.

In their respective requests, the parties have proposed different solutions on how to finalize this amount. The BP Request proposes that PGS provide its invoices and confirmation of the invoices' payment to BP and provide BP an opportunity to challenge any entries or aspects of the invoices by a mutually determined date. Conversely, the PGS Request includes a simple and general breakdown of the recoverable costs it claims it is owed: $1,853,632.00.

The BP Request also seems to suggest that there should be briefing and a hearing on the amount of attorneys' fees and costs. Such request shall be turned down in the interest of putting an end to this consolidated arbitration. Surely the attorneys for the parties, both well qualified in such matters, can meet and confer and determine the proper amount. Therefore, I order that the parties and their counsel meet and confer to mutually determine the proper amount of attorneys' fees and costs. The parties shall meet and confer within 45 calendar days of this Disposition being sent to them. Of course, PGS will have to present invoices and proof of payment for services rendered within the dates provided in this order. BP can contest any claim, but only reasonable claims should be made. The fact that French counsel traveled from Europe but did not actively speak within the hearings does not establish that they were not used or that it was unreasonable to anticipate that they may need to speak during the hearings. In fact, their travel seems especially prudent considering that remote participation may have been frustrated due to the time difference. The parties shall provide a total amount within fifteen (15) calendar days thereafter, which must be paid within thirty (30) days thereafter. This corrected award needs no further input. If the talented lawyers in this case can't reach an agreement, other avenues are available to them rather than running up further fees in this case, such as mediation or a collection action in traditional litigation mode.

## V. ADDITIONAL ARBITRATOR FEES

There are no fees charged for referring to the record to establish the veracity of the request by BP, for drafting the ruling on the correction, and entering the correction and issuing it. Similarly, there are no fees charged for the interpretation of attorneys' fees and costs in the BP Request or the PGS Request. However, BP also made a motion to modify the Final Award in relation to PGS' award of attorneys fees and costs. The time to address the motion by BP including drafting and issue the ruling on the motion is billable. The parties

will be expected to each pay fifty percent (50%) of the bill for services rendered in connection with responding to BP's motion.

## VI. CONCLUSION

BP and PGS' Request for Interpretation or Correction of Award is hereby granted in part and denied in part. Specifically, the Final Award shall be amended as follows:

1. Paragraphs seven and eight of Section V(4) shall be deleted in their entirety and replaced with the following:

   "For the Nickelodeon deal described in 5.b.2, the proposed license fee was $6,240,000 USD. Therefore, PGS' projected revenue shall be $1,716,000 USD.

   The total damages on account of the four deals held to be refused in bad faith by BP equals $2,132,141.45 USD."

2. The second paragraph of Section V(6) shall be deleted in its entirety and replaced with the following:

   "The second arbitration brought by BP against PGS was triggered by the correspondence from Super RTL. No formal attention had been paid to this testimony until the second arbitration."

3. The following paragraph shall be added to the end of Section V(6):

   "To determine the attorneys' fees and costs to be awarded, the parties shall meet and confer within 45 calendar days of the Disposition of Application for Interpretation or Correction of Award being sent to them. PGS will have to present invoices and proof of payment for services rendered within the dates provided in this order. BP can contest any claim, but only reasonable claims should be made. The parties shall provide a total amount within fifteen (15) calendar days thereafter, which must be paid within thirty (30) days thereafter."

4. Section VI(1) shall be deleted in its entirety and replaced with the following:

   "Within thirty (30) days from the transmittal of the Disposition of Application for Interpretation or Correction of Award to the parties, Bagdasarian Productions, LLC shall pay to PGS Entertainment, the sum of $2,207,141.45 USD in damages. Attorneys' fees and costs shall be determined and paid as specified in the Award."

The compensation and expenses of the arbitrator incurred in deciding this Disposition, totaling $1575 USD, shall be split equally (50/50) by BP and PGS.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Disposition of Request for Interpretation or Correction of Award was made in Los Angeles, California, USA.

1/24/25
Date

Michael C. Donaldson
Michael C. Donaldson, Arbitrator

# EXHIBIT B

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

PGS Entertainment, ICDR Case No. 01-22-0002-2640

v.

Bagdasarian Productions, LLC.

Bagdasarian Productions, LLC, ICDR Case No. 01-22-0005-2712

v.

PGS Entertainment.

**FINAL AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements entered into between the above-named parties and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

## I. OVERVIEW

In this consolidated arbitration there is so much to unpack that makes sense to start the award with an overview of the case before delving into the detailed chronology of relevant events and procedural history.

In a relationship that was enormously profitable to both parties and marked by a collegial and cooperative relationship, PGS Entertainment ("PGS") represented the television series *Alvinnn!!! and the Chipmunks* ("*Alvinnn!!!*"). After five productive seasons, the creators of the series and owners of the IP, Bagdasarian Productions ("BP") decided (for the third time) that they wanted to sell the company. Of course, they had every right to do that. Of course, they wanted to keep the issue confidential until they knew whether or not this third effort to sell the company would be successful.

BP had just signed its fifth agency agreement with PGS to sell the 6th and 7th seasons of *Alvinnn!!!* (respectively, "S6" and "S7"). BP did not mention their efforts to sell the entire company. PGS, for its part, sensed a change in the way that BP was reacting to proposals, so they adjusted their own behavior with regard to informing broadcasters and how they related to BP.

The only contract before the arbitrator in this consolidated arbitration is the contract for S6 and S7 between BP and PGS (the "S6 and S7 Agreement").

Fortunately, the parties are essentially in agreement with the facts. However, ill will has resulted in each side assuming the most negative possible intent in the minds of the other party. Fortunately, this animus has nothing to do with the facts on the controlling law. French law controls validity, construction, and performance of the S6 and S7 Agreement.

## II. PROCEDURAL AND FACTUAL HISTORY

| | |
|---|---|
| 2013 | • PGS and BP enter into their initial Agency Agreement that allows BP sole approval over all potential *Alvinnn!!!* deals with international |

| | |
|---|---|
| | distributors. The Agreement says, in part, the following: *"Licensor shall have sole approval over the basic terms of any potential third-party deal, as well as sole approval over any decision to extend, renew, or revise any third-party deal, which approval shall not be unreasonably withheld by Licensor. Licensor shall notify Agent of Licensor's written approval (or disapproval) within three (3) business days following Licensor's receipt of the basic terms of any potential third-party deal proposed by Agent."* |
| Spring 2015 | • *Alvinnn!!!* premieres to a positive reception. |
| November 31, 2019 | • PGS and BP's S6 and S7 Agreement is effective. |
| Early 2020 | • Viacom/Nickelodeon makes a low offer for S6 and S7 of *Alvinnn!!!*, which both parties agree to reject. |
| June 2020 | • Disney tells PGS that it is interested in expanding its international licensing for S6 and S7 of *Alvinnn!!!* PGS had previously entered into an agreement with Disney for the rights to *Alvinnn!!!* in Spain a few months prior. |
| June 24, 2020 | • BP executes the S6 and S7 Agreement. |
| September 2020 | • BP declines to amend its previous agreement with Disney that would expand its streaming service rights in Spain. According to PGS, this declination derailed Disney's interest in a broader international agreement. |
| November 2020 | • After a three-month long negotiation, PGS enters into a SVOD deal with Amazon for Seasons 1 and 2 of *Alvinnn!!!* in the United Kingdom, Italy and Spain. |
| Late 2020 | • PGS solicits an offer from Cartoon Network and, after a delay, Cartoon Networks responds with a very low offer that is mutually rejected by PGS and BP. |
| Early 2021 | • Disney Turkey proposes a deal. BP sends back redlines for the deal but Disney Turkey decides not to move forward. |
| March 2021 | • BP meets with UBS to discuss the potential sale of the company. |
| April 23, 2021 | • BP's production partner, Technicolor Animation Productions ("TAP") tells BP that a senior animator in India died from COVID-19. |
| April 2021 | • BP tells PGS it can't move forward with S6 and S7 at this time and suspends production.<br><br>• PGS proposes an agreement with Puls that is approved by BP. |
| May 2021 | • In a meeting with PGS, Bagdasarian says he feels bullied by Disney. PGS claims that this shows that BP sabotaged the Disney deal based on personal animosity. |
| May 4, 2021 | • PGS tells BP it can't find a license that will generate the revenue necessary to replace the Viacom license. |
| June 2021 | • Parties participate in mediation related to the S6 and S7 Agreement but are unsuccessful in resolving the dispute. |
| July 2021 | • BP informs PGS that S6 and S7 of *Alvinnn!!!* will be moving forward. |
| July 3, 2021 | • BP formally engages UBS to explore a potential sale of the company. |
| August 17, 2021 | • Nickelodeon makes an offer for S5 of *Alvinnn!!!* that PGS rejects without informing BP. |
| August 29, 2021 | • BP provides PGS with a revised delivery schedule for S6 and S7. PGS does not provide this delivery schedule to the distributors with whom it has entered into deals with for S6 and S7. |
| September 2021 | • Viacom/Nickelodeon tells PGS that it is interested in making another offer for S6 and S7 but wants changes to the creative direction of the |

| | |
|---|---|
| | series. PGS claims that these changes are minor but BP claims that the changes would amount to a spinoff of *Alvinnn!!!* Two days later, BP declines to proceed.<br><br>• Discovery makes an offer to distribute S6 and S7 of *Alvinnn!!!* in Italy. BP redlines Discovery's proposal to exclude S7 and include a cancellation clause and the deal does not move forward.<br><br>• Tele-Quebec makes an offer to distribute S6 and S7 of *Alvinnn!!!* BP declined the offer, citing the low licensing fee. |
| October 2021 | • Comcast/NBCUniversal accesses a data room that was established to allow potential BP acquirers access to confidential documents. PGS claims that documents including its confidential information are contained within the data room.<br><br>• Discussions between PGS and Nickelodeon for S5 of *Alvinnnn!!!* officially fall through when PGS makes a final offer of $1.5 million. PGS never informs BP of the negotiations. |
| November 2, 2021 | • CNBC publishes an article reporting that BP is exploring the sale of its company. |
| December 14, 2021 | • BP terminates its agreement with UBS and ceases exploring the possibility of the company's sale. |
| January 2022 | • PGS requests to meet with BP to coordinate efforts to maximum potential sales for S6 and S7. Two days later, BP declines to meet with PGS.<br><br>• BP removes PGS' credit on Season 5 of *Alvinnn!!!*<br><br>• BP discusses production on S6 and S7 with TAP. PGS claims that PGS attempts to persuade TAP to abandon the new seasons. |
| January 25, 2022 | • BP provides revised delivery dates to PGS again. PGS does not provide the revised delivery dates to its distribution partners. |
| March 4, 2022 | • After being approached to license S6 and S7, Amazon declines to make an offer due to their "complicated" experience finalizing their previous deal. |
| April 21, 2022 | • TAP's President, Boris Hertzog, recommends postponing S6 and S7 based on difficulties created by the COVID-19 pandemic and the difficult financial forecast. |
| April 22, 2022 | • BP suspends production of S6 and S7 and asks to meet with PGS to renegotiate the S6 and S7 Agreement. |
| May 27, 2022 | • PGS submits its Notice of Arbitration for this matter and claims that BP has breached the S6 and S7 Agreement by acting in bad faith. |
| July 8, 2022 | • BP submits its response to PGS's Notice of Arbitration and denies PGS' claims. |
| August 2022 | • RTL and Globo ask PGS about delivery of S6.<br><br>• PGS informs broadcasters about the indefinite suspension of S6 and S7 and informs them of pending legal proceedings. |
| September 2022 | • PGS informs RTL of its difficult relationship with BP. |
| October 2022 | • PGS informs Globo of its difficult relationship with BP. |
| November 3, 2022 | • PGS informs BP that it has received threats from RTL related to the non-delivery of S6. |

| | |
|---|---|
| November 29, 2022 | • PGS confirms to BP that PGS did not provide the revised delivery schedule for S6 and S7 and did not inform the parties of the indefinite suspension in April. |
| December 16, 2022 | • BP files its own Notice of Arbitration, claiming that PGS breached the S6 and S7 Agreement by failing to inform broadcasters of the revised delivery schedule for S6 and S7. |
| April 18, 2023 | • Judith M. Sasaki, the Consolidation Arbitrator, granted PGS's request to consolidate the First Arbitration (which was initiated by PGS on May 27, 2022) and the Second Arbitration (which was initiated by BP on December 16, 2022). The Second Arbitration was thus consolidated into the First Arbitration. |
| September 27, 2023 | • Viacom/Nickelodeon proposes a renewal deal for Seasons 1-5 of *Alvinnn!!!* PGS does not disclose this proposal to BP. |
| January 26, 2024 | • PGS informs BP of nearly ten proposals that it did not disclose to BP in 2023. |
| February 2, 2024 | • BP files Amended Notice of Arbitration and claims that PGS breached the S6 and S7 Agreement by failing to disclose potential deals to BP, failing to keep broadcasters apprised of the changing delivery schedule, and disclosing the legal proceedings to the broadcasters. |
| February 16, 2024 | • PGS files a response to BP's Amended Notice of Arbitration and denies BP's claims. PGS also asserts that BP breached the S6 and S7 Agreement by disclosing PGS' confidential information via data rooms. |

## III. CLAIMS

### 1. PGS Claims

In its initial claim, PGS claims that BP is liable for breach of contract because it failed to perform the S6 and S7 Agreement in good faith. Specifically, PGS claims that BP's failure to approve potential S6 and S7 distribution deals "exceed[ed] the bounds of [BP's] contractual discretion, as the S6 and S7 Agreement specifically states that BP's approval cannot be unreasonably withheld…". According to PGS, BP's justifications for rejecting deals are "specious at best." Additionally, PGS claims that BP "compounded its bad faith conduct" by repeatedly threatening to cancel the production of S6 and S7, which further hindered PGS' ability to secure distribution proposals for the seasons. PGS asserts that this behavior led TAP to rescind its production commitment for the seasons and eventually led to the breakdown of all production for S6 and S7.

In its counterclaim in the arbitration that BP filed, PGS also claims that BP "improperly disclosed PGS' confidential business information to PGS' business partners and direct competitors in an attempt to secure personal gains at the expense of the parties' shared venture and of PGS' partners." Specifically, PGS alleges that in the process of exploring potential sale opportunities, BP provided potential acquirers with access to a data room that contained confidential documents related to PGS' business.

### 2. BP Claims

BP claims that PGS is the party liable for breach of contract and a failure to perform its contractual obligations in good faith based upon PGS' failure or refusal to provide BP's revised delivery schedule for S6 and S7 to broadcasters. Further, BP alleges that PGS purposefully concealed this inaction from BP. BP also claims that PGS wrongfully disclosed confidential litigation information to its broadcasters. Additionally, BP alleges that PGS failed to inform BP of third-party broadcast proposal deals, "despite being contractually and legally obligated to do so."

## IV. ISSUES

1. Did BP breach the S6 and S7 Agreement or act in bad faith in performing the S6 and S7 Agreement?
   a. Did BP unfairly withhold their intention to sell their company and its intellectual property?
   b. Did BP unreasonably reject S6 and S7 deals that were proposed by PGS?
   c. Did BP threaten to cancel the production of S6 and S7 in order to hinder PGS' ability to secure deals for S6 and S7? If so, was this an act of bad faith?
   d. Did BP improperly disclose PGS' confidential information to third parties when exploring the sale of its company? If so, was this an act of bad faith?

2. Did PGS breach the S6 and S7 Agreement or act in bad faith in performing the S6 and S7 Agreement?
   a. Was PGS' failure to provide BP's revised delivery schedule to broadcasters an act of bad faith?
   b. Was PGS' disclosure of the ongoing litigation proceedings an act of bad faith?

3. Is termination of the S6 and S7 Agreement available?

4. Did PGS suffer any damages because of the course of conduct by BP?

5. Did BP suffer any damages because of the course of conduct by PGS?

6. Is either party entitled to attorney fees and costs?

## V. DISCUSSION

This and all the discussion sections that follow below are in the same order as the issues above and focus on the same subject matter.

### 1. Did BP breach the S6 and S7 Agreement or act in bad faith in performing the S6 and S7 Agreement?

a) **Did BP unfairly withhold their intention to sell their company and its intellectual property?** BP correctly argued they had no obligation to tell PGS they were trying to sell the company. However, BP could have told PGS of the many reasons that they desired to sell the company, as were set forth in the record at the Evidentiary Hearing. Those reasons (including exhaustion, health, and market changes) certainly would have been sufficient justification for BP to end such a recitation with a comment such as "Therefore, please don't waste your time trying to sell S6 and S7 until we are up and running again. Unfortunately, we cannot tell you exactly how long that will be, but we will keep you posted." French law sets a different (and lower bar) in defining the bad faith and fair dealing under American law.

French law necessitates that parties to an agreement act in good faith to facilitate open communication and cooperation in carrying out the purpose of their agreement. Surely, good communication and cooperation in the S6 and S7 Agreement would require some conversation by BP to PGS informing them that their attitude towards new business in Europe might be altered by their attempt to sell the company. Instead, BP permitted PGS to expend substantial effort to distribute *Alvinnn!!!* during this period while simultaneously engaging in conduct which can only be explained by their effort to sell the company. See the below discussion.

b) **Did BP unreasonably reject S6 and S7 deals that were proposed by PGS?** While PGS pointed out four proposals which they allege were handled differently than similar proposals were handled prior to BP's commencement of its efforts to sell the company. BP's response was to point out other contracts they signed during the period. However, the fact that BP signed some contracts during the period does not mean that the contracts they rejected were rejected in good faith under French law. BP provided insufficient testimony to support a conclusion that the rejection of those contracts was in good faith. Therefore, BP is found to have rejected three contracts in bad faith.

1. **Disney.** PGS alleges that BP initially withheld certain rights for Disney Spain based on BP's desire to leave SVOD rights unencumbered for the benefit of prospective purchasers. Subsequently, PGS alleges that BP provided a redline that was so aggressive that it caused Disney to become uninterested in a potential deal with PGS. BP claims that its actions were in line with PGS' own perspective on the Disney Spain proposal. Based on BP's unusually heavy redline and subsequent proposal of a much more conservative redline after the termination of its agreement with UBS, it is reasonable to conclude that BP's initial rejection of the Disney agreement was done in bad faith.

2. **Nickelodeon.** PGS alleges that Nickelodeon expressed interest in S6 and S7, subject to BP's willingness to make certain creative changes to S6 and S7. The parties' opinion on the reasonableness and severity of these creative changes differs. However, given BP's outright refusal to even entertain a conversation about such changes, it is reasonable to conclude that BP's rejection was done in bad faith.

3. **Discovery.** PGS alleges that BP rejected a Discovery proposal based on the lack of a "onerous cancellation clause." PGS also alleges that BP redlined Discovery's proposal to intentionally excise all mentions of S7. BP did not deny these claims but said that it was merely attempting to include a force majeure clause due to the ongoing COVID-19 pandemic. Given the ongoing global pandemic and its impact on the entertainment industry at large, a request for such a clause may not be unreasonable, except for the lack of willingness to negotiate. Therefore, it is reasonable to conclude that this was a decision made in bad faith by BP.

4. **Tele-Quebec.** PGS alleges that BP rejected a "respectable offer" by Tele-Quebec without reason. BP claims that it rejected the deal because the terms and fees associated with the proposal were so poor. BP made no counteroffer. Given the fact that BP rejected the deal outright without any competing or prospective offer for the territory, it is reasonable to conclude that BP's rejection was done in bad faith.

c) **Did BP threaten to cancel the production of S6 and S7 in order to hinder PGS' ability to secure deals for S6 and S7? If so, was this an act of bad faith?** This allegation by PGS was set forth in their claims but not effectively argued or supported by evidence in any of the hearings other than the suppositions and imaginings of a witness. This is not enough to establish what someone was thinking — what was going on in their head — or to support a finding of bad faith. This is not to say that PGS' conclusions were unreasonable or impossible. It merely says the arbitrator was unable to find enough evidence to determine what was or was not going on in the minds of BP when those two contracts were rejected.

d) **Did BP improperly disclose PGS' confidential information to third parties when**

**exploring the sale of its company? If so, was this an act of bad faith?** It is undisputed that a data room was opened, and many documents were deposited including BP's contract with PGS and various contracts which PGS had entered with broadcasters. Unfortunately, the record is incomplete as to how many companies entered the room because the manager of the room had destroyed that information, leaving BP with only Comcast/NBCUniversal ("Comcast") as a company that entered the room. They copied everything in the room. There is no evidence at all of what use was made of it by Comcast. Comcast had signed a nondisclosure agreement. However, this is little solace to PGS who sees the contracts they ordered with broadcasters in Europe as being valuable information to any competitor. Comcast owns several competitors of PGS. BP defended its actions by pointing out that there was no requirement in their agreement with PGS to hold the contracts confidential, but such an agreement is not necessary when evaluating good faith in cooperation. Clearly, it would have been appropriate to simply not supply such contracts until one was in negotiation with a potential buyer or discuss it with PGS first. The latter possibility was obviously not on the table since BP did not want PGS to know anything about their efforts to sell the company. This is clearly a lack of good faith and cooperation under French law.

2. **Did PGS breach the S6 and S7 Agreement or act in bad faith in performing the S6 and S7 Agreement?**

   a) **Was PGS' failure to provide BP's revised delivery schedule to broadcasters an act of bad faith?** This issue raises an interesting question because PGS had contracts with the broadcasters which also required good faith and open communication. Under those contracts, PGS probably had an obligation to provide to the broadcasters all the information they had about distribution including the back-and-forth revisions to the delivery schedule. This could be done with their doubts about it conveyed at the same time. In any event, PGS' failure to provide broadcasters with the delivery updates that BP provided, was bad faith by PGS although understandable given their doubts.

   Like the defendants who refused to pay for shoddy work in the construction cases referenced below, PGS reacted in self-serving ways by changing their behavior vis-à-vis the broadcasters and withholding information. While this reactive behavior is understandable, it nevertheless qualifies as an act of bad faith under French law. PGS's reaction is as understandable as the French parties in the cases cited below who were found to be in bad faith.

   b) **Was PGS' disclosure of the ongoing litigation proceedings an act of bad faith?** At the time of the disclosure of the arbitration to broadcasters and others, PGS did not believe there was a confidentiality aspect to these proceedings. Given that fact, I am declining bad faith and in fact, as hinted at above, may well be described as good faith by PGS vis-à-vis the broadcasters.

3. **Is termination of the S6 and S7 Agreement available?**

Under French law, an agreement between two parties may be terminated based on the shared fault or wrongs of the parties. The Arbitrator requested that the parties provide additional information regarding this facet of the law. PGS presented no cases with fact patterns where termination was sought by one side or the other but denied by the trial court. The cases provided by BP fall into a few different categories, which are of varying degrees of help in resolving the case at hand:

(1) cases relating to construction where the contract was terminated;

a. **Mr. P.I.J.Y.X. and Ms. T.R.L.X. v. S.A.S. Pro Elite +, et al.** Homeowners hired a contractor to renovate their home. Later, the owners refused to pay because they believed that they had already paid beyond the rate of progress of the work. The contractor ceased work. The court terminated the agreement based on shared wrongs due to the homeowner's refusal to pay and the contractor's failure to complete the work.

b. **Association ECOLE v. S.A.S. SMS.** A company hired a contractor to construct a building, but construction was hindered due to weather conditions. The company eventually withheld payment under their agreement after defects were found in the contractor's work. The court terminated the agreement based on shared wrongs because the company refused to pay for work completed and the contractor failed to properly perform the work.

c. **S.A.S. WOOD ELEMENT v. SCCV L'OREE DU PARC**. SSVC hired SAS to perform certain construction work related to a new real estate complex. SAS performed the work poorly and SSVC refused to pay SAS' invoices. SAS blocked SSVC from accessing the worksite. The court terminated the agreement based on shared fault because SSVC refused to pay SAS money owed and SAS blocked the site and then abandoned it, leaving its work incomplete.

d. **Architecture SUMMUM, S.A.R.L. v. Mr. G.T.** Two landowners hired an architect to construct a detached home on the land. After performing preliminary work, the architect sent the owners an invoice. The owners did not pay the invoice because they did not secure the loan necessary to finance the work and claimed that the the projected cost of the project had ballooned. The court terminated the contract based on shared fault because the architect severely underestimated the final cost of the work, and the owners continued to sign off on increased costs and failed to timely secure the necessary loan.

e. **Ms. M.G. v. Mr. P.N. and Ms. F.N.** Two homeowners hired a painter to paint their home as part of a renovation project. Completion of the work was delayed, and the homeowners refused to pay. The court terminated the agreement for shared wrongs because the painter had not performed the services properly and the homeowners had poorly managed the renovation and then attempted to unilaterally terminate the agreement without formal notice.

f. A real estate company hired a project manager to manage the renovation of a farm to a hotel. The lower court terminated the contract at the reciprocal fault of both parties because the project manager poorly executed the project and the real estate company had varied his requests, made it impossible to comply with the schedules and budget of the project, and has delayed important decisions necessary to the project.

(2) cases other than construction cases where the contract was terminated;

a. **SA Axxxx002 v. International ALCL Company, et al.** A laboratory company entered into an agreement with a software company to replace its computer systems. The software company was unable to provide the promised system within the specified timeframe. The court terminated the contract based on the shared fault of both parties because the software company was unable to provide the services promised within the specified timeframe and the laboratory equipment company unilaterally terminated the project.

b. **Educaffix v. CNRS, et al.** A company founded at a research university entered into an assignment of rights with the university for software developed while at the university. The company was later unable to exploit the software because it necessarily incorporated another software that was owned by a third party. The court terminated the assignment based on the shared wrongs of both parties because both parties were aware that they did not have the rights to the third-party software.

c. **PRODIS SAS v. BIOTECH SARL**. BIOTECH, a manufacturer, and PRODIS, an implant company entered into an agreement by which BIOTECH supplied PRODIS with lenses. BIOTECH lost the certification necessary to produce the lenses but did not inform PRODIS because PRODIS had previously failed to comply with the terms of the agreement. The court terminated the agreement based on shared wrongs because PRODIS was not in compliance with the agreement and BIOTECH did not hold the necessary certification to produce the lenses.

d. **NHG Development SARL, et al. v. SARL F.** A franchisor signed a ten-year master franchise agreement with a franchisee. Although the agreement stated that three restaurants were to be opened, the franchisor refused to open the second and third restaurants because it claimed that the franchisee was not in compliance with the standards in the agreement. The court terminated the agreement for shared wrongs based on the franchisee's failure to comply with the franchisor's standards and the franchisor's failure to perform under the agreement.

e. **A.H. v. Sociodore SCA.** Sociodore agreed to provide agricultural services at a fixed price to be set by mutual agreement each year. In 2016, the parties disagreed upon the price and Sociodore attempted to unilaterally reduce the price. The court terminated the agreement based on the shared wrongs of both parties because both parties failed to come to an agreement on the yearly price and failed to act based on the principles of good faith, fairness, and use.

f. Smartpush agreed to provide technological and IT services to Amarris. After the commission of the services was delayed, Amarris attempted to terminate their agreement. The lower court terminated the contract based on thes hared wrongs of the parties.

g. Babcock Enterprise entered into an agreement with Software AG France by which Software AG was to upgrade Babcock's computer system and provide technical support. Babcock withheld payment and claimed that Software AG did not provide acceptable products under the agreement. The lower court terminated the contract for the shared wrongs of both parties because Software AG failed to provide software that met the agreed upon specifications and Babcock attempted to terminate the contract without resolving the issue.

(3) appellate cases that were not of much help because the court accepted the factual findings of mutual wrong without setting forth the facts in the appellate opinion.

a. **SAS LA BOX A VIGNES v. SARL S2V.** This opinion acknowledges that the Commercial Court of Dijon had previously terminated the agreement based upon the shared wrongs of both parties but does not discuss or interrogate the details of the circumstances surrounding the termination.

Because PGS did not address this issue in their briefing, no cases were presented in which a request to terminate a contract was denied.

As noted above, there was mutual bad faith under French law regarding the S6 and S7 Agreement. Therefore, the S6 and S7 Agreement may be terminated at the Arbitrator's sole discretion. Given the palpable ill will between the parties, the S6 and S7 Agreement is terminated. The parties are, of course, free to enter a new contract in the future.

However, numerous contracts exist between PGS and various broadcasters that are not affected by this ruling. PGS has certain rights under those contracts which rights are not adversely impacted by the termination of S6 and S7 Agreements. The contracts can be extended by renewal. PGS also has certain duties under those contracts which must be complied with such as collecting payments from broadcasters, and accounting for such payments to BP and distributing BP's share to BP in a timely fashion. BP, for its part must approve any extensions in the same manner as past extensions have been approved. BP is not allowed to mark up a contract with new complaints not previously made when the relationship was copasetic. BP is

not allowed and must not allow any new agent they hire to make any sort of end run around PGS to discourage renewals of the agreement between broadcaster and PGS. Neither party is allowed to make derogatory comments about the other.

**4. Did PGS suffer any damages because of the course of conduct by BP?**

PGS projected extensive potential damages. BP attacked those projections with some valid arguments. However, the real problem with the projected possible damages is that 24 months passed between the date when the damages period commenced, May 27, 2022, and the last day of the second Evidentiary Hearing on which they presented evidence June 5, 2024.

There was no evidence presented by PGS that any actual reputational damages occurred in spite of the fact that PGS was representing other children's programs in the marketplace. Their projections were sales that would be lost because of BP behavior, but the fact that there is no evidence of that happening for 24 months while they were busy selling other shows casts a very long shadow on their damages claim.

There was, however, damage claims presented in connection with the broadcast contracts presented which I have ruled to have been turned down in bad faith. As to those contracts, PGS is due its projected revenues: 27.5% of each proposed license fee.

For the Disney deal described in 5.b.1, the potential amount of the final deal is not mentioned, therefore, the proposed license fee shall be considered the amount of the Disney Turkey deal that failed to materialize: $450,000 USD. Therefore, PGS' projected revenue shall be $123,750 USD.

For the Discovery deal described in 5.b.3, the proposed license fee was $715,000 USD. Therefore, PGS' projected revenue shall be $196,625 USD.

For the Tele-Quebec deal described in 5.b.4, the parties disagreed as to the exact amount of the proposed license. For purposes of this calculation, I have relied on the amount provided by PGS: $487,500 CAN. Therefore, the proposed license fee shall be $348,241.65 USD and PGS' projected revenue shall be $95,766.45 USD.

Given that the Nickelodeon proposal described in 5.b.2 was never formalized, there is no proposed licensee fee on which to base our calculations. Therefore, I have averaged the proposed license fees of the three other deals found to be in bad faith, which resulted in a proposed licensee fee of $504,413.88 USD. Therefore, PGS' projected revenue shall be $138,713.81 USD.

The total damages on account of the four deals held to be refused in bad faith by BP equals $554,855.26 USD.

PGS correctly pointed out that French law allows an arbitrator to declare damages in the case of bad faith. Any amount of damages can be awarded for bad faith without regard for what, if any, damage evidence was presented. I am happy to exercise that discretion, however my thought process is seriously affected by the desire to have some rational basis for such an award. It seems the value of the labor expended to sell *Alvinnn!!!* during this period would be a good measure, but no evidence was ever presented about those costs.. Certainly, damages were not in the millions and probably not in six figures given that typical sales calls benefit across all PGS products and needs to be allocated accordingly. For this reason, only a total award of $75,000 is made. PGS will undoubtedly find that ridiculously low. BP will probably feel gouged. For what it is worth, the Arbitrator is frustrated for the lack of guidance provided in the transcript for making this decision.

**5. Did BP suffer any damages because of the course of conduct by PGS?**

Like PGS, BP projected great losses on future contracts. However, the deals upon which they projected losses were films not yet conceived, let alone written or prepared in any way — and the television projects were likewise based on the Chipmunks, but otherwise without concept or any elemental preparation. Actual damages cannot be based on aspirations and hope and dreams. There has to be some real-world

foundation for them.

Like PGS, BP also claimed damages due to the damage to their reputation on account of revealing the troubles the parties were having between themselves and especially by revealing the fact that an arbitration was in force. However, BP also presented evidence that within the year after a lawsuit with FOX, they were approached by FOX and a deal was made without any evidence presented that the deal was in any way lessened by the fact of the litigation. Such evidence persuaded the Arbitrator that the mere fact of an arbitration between a creator and its sales agent (or distributor, for that matter) could not possibly have any deleterious effect on the reputation of the producer. Therefore, no damages are awarded for reputational harm.

**6. Is either party entitled to attorneys' fees and costs?**

Both parties have requested an award of attorneys' fees and costs. Neither side will receive such an award with regard to the initial arbitration brought by PGS against BP. Both parties were found to have not fully complied with the requirement under French law to perform under the S6 and S7 Agreement in good faith and open communication according to relevant French case law. However, PGS is entitled to attorney fees and costs starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022.

The second arbitration brought by BP against PGS was triggered by testimony of Xavi Mas. No formal attention had been paid to Mr. Mas' testimony until the second arbitration.

This inaction might be due in part to the decision of BP to change its legal representation midstream, but that was their decision for which PGS will not be asked to be financially burdened. While substantial, the costs incurred by PGS for travel and food and lodging from France to Los Angeles and while in Los Angeles for hearings are not recoverable costs.

**VI. Award**

For the reasons stated above, I award as follows:

1. Within thirty (30) days from the date of transmittal of this Final Award to the parties, Bagdasarian Productions, LLC, hereinafter referred to as BP, shall pay to PGS Entertainment, hereinafter referred to as PGS, the sum of $629,855.26 USD in damages and the attorney's fees and costs as specified in the Award.

2. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$54,127.58 and the compensation of the arbitrator totaling US$154,767.07 shall be borne equally by the parties. Therefore, Bagdasarian Productions, LLC shall reimburse PGS Entertainment the sum of US$8,088.79, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by PGS Entertainment

3. This award is in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Los Angeles, California, USA.

Nov 21, 2024
Date

[signature]
Michael C. Donaldson, Arbitrator

State of California )
) SS:
County of Los Angeles )

I, Michael Donaldson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Nov 21, 2024
Date

Michael D Donaldson
__________, Arbitrator

State of California )
) SS:
County of Los Angeles )

On this _____ day of __________, 20__, before me personally came and appeared __________, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

______________________________
Notary Public

# CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Los Angeles )

On Nov 21, 2024 before me, Aaron Anshin, Notary Public, personally appeared MICHAEL C DONALDSON who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the state of California that the foregoing paragraph is true and correct.

AARON ANSHIN
COMM. 2349565
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Mar. 1, 2025

**WITNESS** my hand and official seal.

Signature of Notary
Aaron Anshin, Notary Public

**OPTIONAL**

Though the information below is not required by law, it may prove valuable to persons relying on the document and prevent fraudulent reattachment of this form to another document.

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: Final award – ICDR case # 01-22-005-2712

Date of Document: Nov 21, 2024 Number of Pages in words: 13 including this page (including this page)

Signer(s) Other Than Named Above: None

# EXHIBIT A

PGS

# AGENCY REPRESENTATION AGREEMENT

November 31st 2019

**BETWEEN**

| | |
|---|---|
| **AGENT:** PGS Entertainment<br>**Address:** 26 rue Jacques Dulud,<br>92200 Neuilly-sur-Seine, France<br>**VAT NUMBER:** FR 45 507 934 594<br>**email:** psoutter@pgsentertainment.com<br><br>Hereafter referred to as **"Agent"**<br>or **"PGS Entertainment"** | **LICENSOR:** Bagdasarian Productions, LLC<br>**Address:** 1192 E. Mountain Drive Montecito, CA 93108, United States<br>Represented by Ross Bagdasarian, CEO<br><br>Hereafter referred to as **"Licensor"** or **"Bagdasarian Productions"** |
| | Technicolor Animation Productions<br>(formerly known as Technicolor)<br>**Address:** 1-5 rue Jeanne d'Arc 92130 Issy-Les-Moulineaux, France<br>Represented by Boris Hertzog, CEO<br><br>Hereafter referred to as **"Technicolor"** |

**Recitals:**

PGS Entertainment, Bagdasarian Productions and Technicolor have executed successive agreements whereby PGS Entertainment has been granted certain distribution rights to the first five seasons, with an option on subsequent seasons, of the animated series "ALVINNN!!! and The Chipmunks" (the "Series").

PGS Entertainment and Bagdasarian Productions have agreed to enter into the present agreement in order to set forth the terms and conditions upon which PGS Entertainment is granted the representation of the sixth and seventh seasons of the Series. By its signature below, Technicolor, as coproducer, acknowledges the terms of this agreement, and agrees that the terms of this agreement between Agent and Licensor are in full compliance with the terms of the agreements between Licensor and Technicolor

**Program:** Sixth and seventh seasons of "ALVINNN!!! and The Chipmunks" – Animated Series (**"Program"**), which are being co-produced by Bagdasarian Productions and Technicolor.

**Format:** 104x11' being 52x11' for Season 6 and 52x11' for Season 7

**Territory:** Worldwide excluding France and the United States (including its territories, possessions and commonwealths) (**"Licensed Territory"**)

**Term:** Shall start upon signature of this agreement and the term for each season shall end seven (7) years from the initial broadcast of the first episode of the season or in the event that delivery of the entire season to PGS Entertainment is not completed within three (3) months of the



BH GS

initial broadcast of the first episode of that season, then the term shall end seven (7) years from the date delivery of the season to PGS Entertainment is complete (the **"Initial Period"**).

The Initial Period shall be automatically extended for an additional seven-year (7) period provided that PGS Entertainment has paid Licensor a minimum total amount of US$16,000,000 (sixteen million US dollars) net of any tax from the exploitation of the Media Rights to the Program as defined hereunder (**"Safeguard Amount"**). The Safeguard Amount is composed of a US$ 8,000,000 for Season 6 and an US$ 8,000,000 for Season 7. For the avoidance of any doubt, the Safeguard Amount shall include the amount of the Minimum Guarantee paid to Technicolor and Bagdasarian Productions as defined hereunder.

In the event PGS Entertainment is close to paying Licensor the Safeguard Amount within the Initial Period but has not received all monies due to PGS Entertainment by third parties under executed agreements with respect to the exploitation of the Media Rights to the Program, then PGS Entertainment may advance to Licensor up to US$2,000,000 (two million US dollars) – allocated 50/50 to Seasons 6 and 7 - of such earned but unpaid monies in order to reach the Safeguard Amount if PGS Entertainment provides Licensor with a schedule of all earned but unpaid monies due under executed agreements, including the approved payment schedule relating to earned but unpaid monies.

For the avoidance of any doubt, Agent shall be entitled to execute license agreements concerning the exploitation of the Media Rights to the Program with terms that extend up to five (5) years after the expiration of the Term. Notwithstanding the foregoing, any deal, as well as any extension, renewal, or revision thereof, shall be subject to the Deal Approval process as set forth in the present agreement.

The Initial Period and any applicable extension are referred to herein as the **"Term."**

Pursuant to and consistent with the agency representation agreement dated as of March 7th, 2013 executed by PGS Entertainment, Bagdasarian Productions and Technicolor with respect to the first season of the Series, all Media Rights acquired by PGS Entertainment to Season 1 and subsequent seasons of the Series (including Seasons 2, 3, 4, 5, 6, and 7) shall end co-terminus with PGS Entertainment Media Rights to the last represented season if PGS Entertainment has paid Licensor the Safeguard Amount of US$ 8 million (eight million US dollars) in accordance for each season of "ALVINNN !!!".

**Minimum Guarantee:** Agent shall pay as an advance on the revenues to be paid to Licensor from the exploitation of the Media Rights to the Program, the amount of €9,123,840 (nine million one hundred twenty three thousand and eight hundred forty EUROS) (**"Minimum Guarantee"**), payable as follows:

(i) A minimum guarantee of € 4,147,200 (four million one hundred forty seven thousand and two hundred EUROS) for Season 6, payable as follows:

- 10% upon Agent's receipt of written confirmation that Technicolor has obtained full financing for the Program and written confirmation of a schedule of when each episode of Season 6 shall be delivered to PGS Entertainment;
- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards



BH GS

to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 1 to 26 of Season 6; and

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 27 to 52 of Season 6.

Licensor has requested PGS Entertainment and PGS Entertainment has agreed to pay the Minimum Guarantee due to Licensor for Season 6 under the present paragraph as follows:

- € 3,421,760 (three million four hundred twenty-one thousand and seven hundred sixty Euros) shall be paid directly to Technicolor; and
- € 725,440 (eight hundred and thirteen thousand Euros) shall be paid directly to Bagdasarian Productions.

(ii) A minimum guarantee of € 4,976,640 (four million nine hundred seventy six thousand and six hundred forty EUROS) for Season 7, payable as follows:

- 10% upon Agent's receipt of written confirmation that Technicolor has obtained full financing for the Program and written confirmation of a schedule of when each episode of Season 7 shall be delivered to PGS Entertainment;

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 1 to 26 of Season 7; and

- 45% upon delivery and acceptance, which acceptance shall be based upon objective technical standards as set forth in this agreement without regards to questions of commercial or artistic merit and shall not be unreasonably withheld, of episodes 27 to 52 of Season 7.

Licensor has requested PGS Entertainment and PGS Entertainment has agreed to pay the Minimum Guarantee due to Licensor for Season 7 under the present paragraph as follows:

- € 3,434,139 (three million four hundred thirty fort thousand and one hundred thirty nine Euros) shall be paid directly to Technicolor; and
- € 1,542,501 (one million five hundred forty two thousand and five hundred one Euros) shall be paid directly to Bagdasarian Productions.

When the event triggering payment of any portion of the Minimum Guarantee occurs, Agent shall be invoiced for the amount due, and Agent shall pay Technicolor the amount due no later than the end of the next month following receipt of the invoice. The Minimum Guarantee is non-returnable.

**Represented Rights:** PGS Entertainment shall be the exclusive agent regarding the representation, distribution and exploitation of all the following media rights to the Program in the Licensed Territory, as defined in the IFTA International Schedule of Definitions, dated October 20, 2010:



BH GS

(i) Ancillary Rights;

(ii) Pay TV Rights and Free TV Rights;

(iii) Video Rights (excluding "Commercial Video Rights");

(iv) Internet Rights provided however that the licensing of such rights does not interfere with Licensor's rights outside the Licensed Territory;

(v) PayPerView Rights; and

(vi) ClosedNet Rights

which rights are collectively referred to herein as "**Media Rights.**"

To the extent the IFTA Schedule of Definitions is revised to incorporate any technology hereafter devised that is analogous to the Media Rights granted to PGS Entertainment, the Media Rights shall incorporate such revised definitions.

"Cinematic Rights" and "Commercial Video Rights," or rights similar thereto, are expressly excluded from Media Rights. Licensor agrees not to use, exploit or grant to any third party any "Cinematic Rights" or "Commercial Video Rights," or rights similar thereto, to the Program in the Licensed Territory during the Term.

For the avoidance of any doubt, all Media Rights to the Program shall only be exploited by Agent in the Licensed Territory during the Term, except Licensor may use and license excerpts of the Program of up to three (3) minutes in length per episode in the Licensed Territory.

All rights not expressly licensed to Agent are "**Reserved Rights**" which Licensor may exploit without restriction except as provided for in this agreement. However, Licensor may allow Agent to exploit some of the Reserved Rights on a case by case basis. For the avoidance of doubt, if Licensor approves a deal which includes some Reserved Rights under the Deal Approval process as set forth below, the Agent shall be deemed authorized by Licensor to exploit such Reserved Rights for such specific approved deal.

**Deal Approval:** PGS Entertainment shall provide Licensor with a written summary of the basic terms, including estimated distribution costs (e.g. material and dubbing costs but excluding withholding tax), of any potential third-party deal. Licensor shall have sole approval over the basic terms of any potential third-party deal, as well as sole approval over any decision to extend, renew, or revise any third-party deal, which approval shall not be unreasonably withheld by Licensor. Licensor shall notify Agent of Licensor's written approval (or disapproval) within three (3) business days following Licensor's receipt of the basic terms of any potential third-party deal proposed by Agent. If Licensor does not send notice to Agent of Licensor's written response by email or overnight delivery service (e.g. UPS, FedEx, DHL, etc.) within this three (3) business day period, the basic terms of the potential third-party deal shall be deemed approved by Licensor.

**Marketing Approval:** All marketing and promotional materials of the Program (including but not limited to press materials, ads, characterization of the characters, costs, etc.) shall be subject to Licensor's prior approval. For the avoidance of any doubt, Licensor may reject any marketing and promotional material in whole or in part, if, in Licensor's sole discretion, Licensor considers



BH GS

the material, or any part of the material, not to be in the best interest of the Program or the "Alvin and The Chipmunks" property.

Licensor shall notify Agent of Licensor's written approval (or disapproval) of any marketing and promotional materials within three (3) business days following Licensor's receipt of Agent's proposed marketing and promotional materials. If Licensor does not send notice to Agent of Licensor's written response by email or overnight delivery service (e.g. UPS, FedEx, DHL, etc.) within this three (3) business day period, Agent's proposed marketing and promotional material shall be deemed approved by Licensor.

PGS Entertainment agrees to manage the marketing and promotion of the Program in at least as favorable a manner as it manages the marketing and promotion of any other property.

PGS Entertainment may not couple or co-promote the Program with any other third-party brands in any kind of advertising or promotion.

**Options:** All provisions related to PGS Entertainment's options for subsequent seasons and any new television series derived from "ALVINNN!!! and The Chipmunks" contained in the First Season Agreement shall remain in full force and effect.

**Agency Commission:** PGS Entertainment shall receive a 27.5% GROSS commission on all monies/revenues actually received by PGS Entertainment resulting from the exploitation of the Media Rights. In case of a sub-agent, the GROSS commission for PGS Entertainment and its subagent may not exceed 35% in total.

**Remuneration:** Agent shall have the right, after deducting its Agency Commission, to deduct the Minimum Guarantee, its actual marketing costs ("**Marketing Costs**") and its actual distribution costs ("**Distribution Costs**") before paying any amount due to Licensor from Agent's exploitation of Agent's Media Rights.

Money collected or received from third parties by Agent in connection with the exercise of Agent's Media Rights shall be held and accounted for separately from the funds related to Agent's other business activities.

**Marketing Costs:** Marketing Costs shall be capped at 5% of gross receipts, according to standard industry practice. Marketing Costs include but are not limited to B to B advertising, specific events, etc. Notwithstanding the foregoing, any Marketing Costs in excess of US$5,000 (five thousand US dollars) if paid by Agent in US dollars or €4,000 (four thousand EUROS) if paid by Agent in Euros must be approved by Licensor in advance and in writing.

**Distribution Costs:** Distribution Costs shall include (but are not limited to): Withholding Tax (if applicable); all actual dubbing or subtitling costs if not borne directly by broadcasters or advanced by Agent; all actual costs associated with accessing such dubbed or subtitled versions or the existing dubbed or subtitled versions; all reversioning in connection with the delivery of the Program and at broadcaster discretion. Distribution Costs shall be based upon standard industry practices, and shipment and bank fees shall be no higher than €500 (five hundred EUROS) per deal.

Licensor shall have ninety (90) days from receipt of each royalty statement to object to Distribution Costs, but Licensor may only object on the grounds that the Distribution Costs are not based upon standard industry practice or are higher than market costs. After this ninety (90) day delay, the Distribution Costs shall be deemed approved by Licensor.



BH GS

Notwithstanding the foregoing, if actual Distribution Costs are similar to – i.e. within no more than 3% of – the estimated Distribution Costs approved by Licensor, Licensor may not exercise any of its rights to reject Distribution Costs.

**Licensor's approval of dubbing versions:**

Approval of International Version Cast

Licensor shall have approval rights on lead cast and recorded dialogue test excerpts, including the cast and dialogue test excerpts for David Seville, the Chipmunks and the Chipettes, for all languages Worldwide.

Licensor shall notify its written approval (or disapproval) within three (3) business days following Licensor's receipt of a recorded dialogue test excerpt from the Program for the lead cast of a particular language. If Licensor does not respond within this three (3) business day period, the lead cast shall be deemed approved by Licensor for that particular language.

The recorded dialogue test excerpt approved by Licensor shall set the minimum quality standard and be representative of how the dialogue should sound for the Program in that particular language.

PGS Entertainment shall use its best efforts to match as closely as possible Licensor's approved English dubs and ancillary voices in recording dialogue for any other language. Licensor acknowledges that broadcasters in certain territories may choose to record ancillary voices that significantly differ from the English dubs for the best interest of their particular market. For the avoidance of any doubt, the lead cast and recorded dialogue test excerpts for David Seville, the Chipmunks and the Chipettes shall always be subject to Licensor's prior approval.

Approval of Neutral Spanish Version

Licensor shall have approval rights on the ancillary cast of the Spanish dubbing for exploitation in Latin America.

**Licensor's ownership of dubbing versions:**

Licensor shall own all foreign language dubs to the extent of the rights cleared in the dubbing contract (with respect to the rights granted, the duration of the rights and the territories covered) for each territory in which PGS Entertainment is responsible for such dubbing. To the extent Agent elects to acquire anything less than 100% of the rights in perpetuity to any foreign language dub (where such rights are possible to be cleared), Agent shall offer Licensor the opportunity to obtain such rights to the extent of the rights available at Licensor's own expense. In the event a third party is responsible for foreign language dubs (including all corresponding costs), PGS Entertainment shall use its best efforts to allow Licensor to acquire the foreign language dub upon the most favorable terms possible and such rights shall be to the extent of the rights cleared in the dubbing contract. In no event shall Licensor be required to pay the broadcaster more than 50% of the actual dubbing costs in order to acquire ownership of the foreign language dubs.

Notwithstanding the foregoing, at Licensor's sole expense, which shall not exceed US$1,000 (one thousand US dollars) per language dub for each Season of the Program – i.e. 26 half-hours – Licensor shall be entitled to a master dub, in the form of digital delivery, of each new language version created per territory once such recordings are approved by Licensor. In



BH GS

order to keep material costs down, Licensor shall accept digital delivery of such foreign language dubs.

**Material Delivery:**

HD Version in English and French according to the following technical specifications:
**DIGITAL FORMAT**
Apple ProRes HQ 422 / 1920*1080p 16:9 25fps (& 23.98psf) 160Mbps
A1/2 = Original Version LtRt & Stereo
A3-8 = 5.1 Original Version
A9/10 = M&E LtRt & Stereo
A11/16 = 5.1 M&E

**TAPES**
HDCAMSR 1920x1080, 4 :4 :4, 24PsF with the following audio configuration:
A1/2 = Original Version LtRt or Stereo
A3/4 = M&E LtRt or Stereo
A5/10 = 5.1 Original Version

**PROSPECTION FORMAT**
MPEG4
A1/2 = Original Version

Legal ownership of all delivery materials will remain with Licensor subject to Agent's right to use such materials under this agreement.

**Delivery Schedule:**

**Delivery of the English Version:**
**Season 6**
Episodes 1-13: August 1st 2022
Episodes 14-26: December 18th 2022
Episodes 27-39: May 7th 2023
Episodes 40-52: September 25th 2023

**Season 7**
Episodes 1-13: April 8th 2024
Episodes 14-26: August 19th 2024
Episodes 27-39: January 15th 2025
Episodes 40-52: May 18th 2025

**Delivery of the French Version:**
**Season 6**
Episodes 1-13: September 5th 2022
Episodes 14-26: January 31st 2023
Episodes 27-39: June 12th 2023
Episodes 40-52: October 29th 2023

**Season 7**
Episodes 1-13: May 12th 2024
Episodes 14-26: September 30th 2024
Episodes 27-39: February 22nd 2025
Episodes 40-52: June 23rd 2025



BH GS

Agent acknowledges that these dates are tentative. The Program is currently in production, but delays may occur. Licensor will inform Agent of any such delays within a reasonable amount of time, which in no event shall be less than two (2) months before the expected delivery date for each set of episodes as set forth above or as revised.

**Statements/Payments:** Timely payment is of the essence. Agent shall provide Licensor with the first royalty statement(s) in English and initial payment(s) no later than the end of the month immediately following receipt and approval by Agent of the broadcast quality of the first episode of the Program. Agent's approval of the broadcast quality of the first episode, and all subsequent episodes, shall be based upon standard industry practices, and Agent's approval shall not be unreasonably withheld or delayed.

Thereafter, Agent shall provide royalty statements in English and payments to Licensor no later than forty-five (45) days from the end of each quarter, provided the amount due Licensor for the exploitation period exceeds US$500 (five hundred US dollars). Licensor shall send an invoice for the corresponding amount no less than 30 days from receipt of payment.

**Enforcement:** Enforcement of the terms of the present agreement is subject to the execution of French broadcaster deal and compliance with Euro Quotas. In case of non-compliance with Euro Quotas, Agent shall have the right to terminate this agreement if, after Agent provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Licensor of Agent's intention to terminate due to failure to comply with Euro Quotas, Licensor does not cure the non-compliance with Euro Quotas within thirty (30) calendar days from receipt of Agent's notice.

**PGS Entertainment Approval:** None with the exception of territory specific broadcast regulations or as otherwise specified in this agreement.

**Additional Terms:** Key Man:

For the first three (3) years after this agreement is executed, Philippe Soutter, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by him, except in the event of his death, will personally supervise all business aspects of the distribution of Agent's Media Rights to the Program, and such supervision shall be "of the essence" to this agreement and a material inducement for Licensor to enter into this agreement.

After the initial three-year (3) period after this agreement is executed, Philippe Soutter, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by Philippe Soutter or Guillaume Soutter, shall oversee and manage all key business aspects of the distribution of Agent's Media Rights to the Program.

All services and rights as outlined in this agreement are subject to Philippe Soutter being willing and available to serve as Agent's representative, whether as a manager of PGS Entertainment or as a manager of another company owned in majority, directly or indirectly, by him, in connection with the Program.

Notwithstanding the above, Licensor shall have the right to terminate this agreement if Philippe Soutter is no longer a direct or indirect shareholder of the company PGS Entertainment.



BH GS

The provisions of the present "Key Man" clause shall be unenforceable if Ross Bagdasarian is no longer an owner of Bagdasarian Productions, LLC or Bagdasarian Productions, LLC no longer controls the rights to the Program.

For the sake of clarity, the present "Key Man" clause is construed in order to maintain Philippe Soutter's involvement in the distribution of Agent's Media Rights to the Program and shall not be interpreted as granting to Licensor the right to terminate this agreement at any given time at its sole discretion.

Assignment

PGS Entertainment shall not be entitled to assign any rights under this agreement to any third party without Licensor's prior written consent. If Agent seeks to assign any rights under this Agreement to any entity owned in majority by Philippe Soutter, Licensor's consent shall not be unreasonably withheld.

Termination

Each party shall have the right at any time, after giving written notice to the other, to terminate this agreement if (a) either party is adjudged bankrupt or (b) either party ceases to carry on its business.

For the avoidance of any doubt, neither party shall be considered to cease to do business due to a corporate restructuring or reorganization, unless that restructuring or reorganization is incident or related to that party's insolvency, receivership, or bankruptcy.

In the event of a breach by Agent of its financial obligations under this agreement, including Agent's failure to make timely payments due to Licensor, Licensor shall have the right to terminate this agreement, if, after Licensor provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Agent of such breach, Agent fails to cure such breach within thirty (30) calendar days from receipt of such notice.

In the event of such termination by Licensor, any and all ongoing contracts approved by Licensor and entered into by Agent prior to Licensor's termination shall survive such termination and remain in effect for the benefit of Licensor provided that all monies due Agent under such agreements under this agreement shall be paid by Licensor to Agent upon the following terms:

(i) Agent shall immediately assign to Licensor all contracts and all payments due under any contract concerning Agent's exploitation of any right under this agreement; and

(ii) The rate of any commission due to Agent under this agreement as of the date Licensor provides notice to Agent of Agent's breach and thereafter shall be reduced to 10% of the monies/revenue actually generated and received from Agent's exploitation of its Media Rights (**"Agent's Revised Commission"**) and shall be payable to Agent only after (a) Licensor recoups from Agent all unpaid amounts owed to Licensor by Agent, (b) Licensor recoups from Agent all costs associated with addressing Agent's breach, and (c) an account penalty is assessed against Agent of US$500,000 (five hundred thousand US dollars). For the avoidance of any doubt, the US$500,000 account penalty shall be deducted from the gross monies/revenues actually generated and received from Agent's exploitation of its Media Rights before the calculation of Agent's Revised Commission (e.g. if gross monies/revenues



BH GS

actually generated and received are US$3,000,000, Agent's Revised Commission shall be based upon US$2,500,000).

In the event Licensor fails to deliver the Program to Agent according to the Delivery Schedule or any amendments thereto as identified by Licensor, Agent shall have the right to terminate this agreement, if, after Agent provides written notice by email and overnight delivery service (e.g. UPS, FedEx, DHL, etc.) to Licensor of such breach, Licensor fails to cure such breach by delivering the specific Episodes at issue within one hundred eighty (180) calendar days from receipt of such notice. In the event of such termination by Agent, Licensor shall be directly liable for all penalties and fees triggered by or resulting from the non-delivery of the ordered Program in all third-party agreements approved by Licensor and signed by Agent.

Moreover, in the event of such termination, any and all ongoing contracts entered into by Agent prior to Agent's termination shall survive such termination and remain in effect for the benefit of Licensor provided that all monies due to Agent under such agreements shall be paid by Licensor to Agent under the same conditions of payment as set forth in this agreement.

**Arbitration:** Any dispute under, relating to, or arising out of this agreement shall be resolved by binding, final, exclusive and non-appealable international arbitration in Los Angeles County, California, under the International Arbitration Rules of Independent Film and Television Alliance (the **"Rules"**) in effect as of the date of the request for arbitration, before a sole arbitrator which rules and procedures are incorporated into and made part of this agreement. The parties shall abide by any decision rendered in such arbitration and each party agrees that a final judgment in any such arbitration action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. The parties shall submit to the exclusive jurisdiction of the courts in the forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award. The parties shall accept service of process for all arbitral proceedings in accordance with such Rules and to accept service of process for any judicial or other proceedings by registered mail. The parties shall abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such award may be enforced in any court of law with jurisdiction over any of the entire agreement.

**Applicable Law:** The validity, construction and performance of this agreement shall be governed in accordance with French law.

IN WITNESS WHEREOF, the parties hereto have affixed their signature,

**AGENT: PGS ENTERTAINMENT**

Guy Soutter

**By: Guy Soutter**
**Title: C.E.O**

**LICENSOR: BAGDASARIAN PRODUCTIONS, LLC**

**By: Ross Bagdasarian**
**Title: C.E.O.**

**TECHNICOLOR ANIMATION PRODUCTIONS**
**(formerly known as OuiDo Productions)**

Boris Hertzog

**By: Boris Hertzog**
**Title: C.E.O.**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF** Central District of California

**Form 1. Notice of Appeal from a Judgment or Order of a United States District Court**

U.S. District Court case number: 2-25-cv-03240-CV (Ex)

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 04/11/2025

Date of judgment or order you are appealing: 03/31/2026

Docket entry number of judgment or order you are appealing: 39

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

(●) Yes ( ) No ( ) IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Bagdasarian Productions, LLC

Is this a cross-appeal? ( ) Yes (●) No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ( ) Yes (●) No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City: State: Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ David M. Gossett **Date** Apr 16, 2026

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 6. Representation Statement**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Bagdasarian Productions, LLC

Name(s) of counsel (if any):

See attached

Address: See attached

Telephone number(s): See attached

Email(s): See attached

Is counsel registered for Electronic Filing in the 9th Circuit? ◉ Yes ○ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

PGS Entertainment

Name(s) of counsel (if any):

Daniel Lifschitz

Address: 1901 Avenue of the Stars Suite 1100 Los Angeles, CA 90067

Telephone number(s): 310-557-8820

Email(s): dlifschitz@ghplaw.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit? ○ Yes ○ No

**Appellees**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

***Bagdasarian Productions, LLC v. PGS Entertainment***

**Counsel for Petitioner-Appellant Bagdasarian Productions, LLC**

David M. Gossett
davidgossett@dwt.com
Davis Wright Tremaine LLP
1301 K Street NW
Washington, D.C. 20005
Telephone: (202) 973-4200

MaryAnn Almeida
maryannalmeida@dwt.com
Davis Wright Tremaine LLP
920 5th Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 622-3150

Haley B. Zoffer
haleyzoffer@dwt.com
Davis Wright Tremaine LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

Name David M. Gossett
Address 1301 K Street NW, Suite 500 East
City, State, Zip Washington, D.C. 20005
Phone (202) 973-4200
Fax
E-Mail davidgossett@dwt.com

☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☒ Retained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bagdasarian Productions, LLC<br>PLAINTIFF(S),<br>v.<br>PGS Entertainment<br>DEFENDANT(S). | CASE NUMBER:<br>2-25-cv-03240-CV (Ex)<br><br>**NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that Bagdasarian Productions, LLC (*Name of Appellant*) hereby appeals to the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
39 - Denying motion to vacate and granting in part motion to confirm arbitration award

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on 3/31/2026. Entered on the docket in this action on 3/31/2026.

A copy of said judgment or order is attached hereto.

4/16/2026
Date

/s/ David M. Gossett
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BAGDASARIAN PRODUCTIONS, LLC,

Petitioner,

v.

PGS ENTERTAINMENT,

Respondent.

Case No. 2-25-cv-03240-CV (Ex)

**ORDER DENYING PETITIONER BAGDASARIAN PRODUCTIONS, LLC'S MOTION TO VACATE AND GRANTING IN PART, DENYING IN PART PGS ENTERTAINMENT'S MOTION TO CONFIRM ARBITRATION AWARD**

**[DOC. ## 20, 28]**

This case involves a challenge to an arbitration award regarding the international distribution of an Alvin and the Chipmunks animated television series. Petitioner Bagdasarian Productions, LLC ("BP"), the owner of the franchise, had contracted with Respondent PGS Entertainment ("PGS"), a French animation distributor, to serve as BP's international sales agent for seven seasons of the series. When production of the sixth season was suspended in 2022, PGS commenced arbitration, alleging that BP had acted in bad faith to undermine the parties' agreement so it could sell the franchise to a third party. BP filed its own arbitration demand, asserting that PGS had failed to communicate

valuable broadcasting offers to BP and did not communicate scheduling changes required by the COVID-19 pandemic.

The parties' claims and counterclaims were consolidated into a single arbitration proceeding and resolved largely in PGS's favor. In the arbitrator's November 21, 2024 award, while BP prevailed on certain issues, the arbitrator declined to grant BP damages and instead determined that BP had rejected three proposed contracts and one potential deal for the television series in bad faith, awarding monetary damages and attorney fees to PGS. Both sides sought clarification under the arbitration rules. On January 24, 2025, the arbitrator issued an amendment that increased the damages awarded to PGS. BP then initiated this action.

Before the Court are the parties' competing motions regarding the arbitration award: BP's April 30, 2025 Motion to Vacate and Remand Arbitration Award ("Motion to Vacate"), Doc. # 20, and PGS's June 23, 2025 Motion to Confirm Arbitration Award Doc. # 28 ("Motion to Confirm," and with the Motion to Vacate, the "Motions"). Both Motions are fully briefed. Doc. ## 20, 28–30, 33, 35. Having reviewed the parties' submissions, the Court finds the Motions appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15; *Willis v. Pac. Mar. Ass'n*, 244 F.3d 675, 684 n.2 (9th Cir. 2001). For the following reasons, the Court **DENIES** BP's Motion to Vacate and **GRANTS IN PART** and **DENIES IN PART** PGS's Motion to Confirm.

## I. **INTRODUCTION**

On April 11, 2025, BP filed its Petition to Vacate and Remand Arbitration Award. Doc. # 1 ("Petition to Vacate"). BP seeks an order vacating the arbitration award, or, in the alternative, remand to the arbitrator for further proceedings consistent with the Court's opinion, and such other relief that the Court deems proper. *Id.* at Prayer for Relief ¶¶ 1–3.

On June 23, 2025, PGS filed its Petition to Confirm Arbitration Award. Doc. # 27 ("Petition to Confirm"). PGS asks the Court to (1) confirm the arbitration award; (2)

grant PGS all relief provided for in the Final Award; (3) award PGS pre-award, post-award/pre-judgment, and post-judgment interest as against BP; (4) award PGS costs accrued in bringing this action for confirmation and opposing BP's Petition to Vacate; (5) maintain jurisdiction over this matter until BP has fully complied with the arbitration award; and (6) to award any further relief to PGS as the Court deems proper and necessary in conformity with the arbitration award. Doc. # 27 at Prayer for Relief ¶¶ 1–6.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332. Doc. # 1 ¶¶ 6–7; Doc. # 27 ¶¶ 3–4.[1]

## II. FACTUAL BACKGROUND

### A. The Parties

BP is a limited liability company formed under the laws of California. Petition to Vacate ¶ 4. BP is a family-run business that has three members: Ross Bagdasarian, Jr.; Janice Karman; and Karman Ross Productions, Inc., a corporation incorporated in and with its principal place of business in California. *Id.* ¶¶ 4, 12. BP owns the rights to the Alvin and the Chipmunks franchise—an iconic name in children's entertainment that includes successful albums, television series, merchandise, and films. *Id.* ¶ 12. BP relies on distributors, sales agents, and other third parties to deliver its content to viewers around the world. *Id.* ¶ 13.

PGS Entertainment is a French S.A.S.[2] entity with its principal place of business in Paris, France. Petition to Confirm ¶ 1. PGS was founded by brothers Philippe and Guillaume Soutter to develop and distribute children's animation. *Id.* ¶ 9.

In or about 2011, after finding success in producing certain motion pictures, BP was introduced to PGS as a potential international sales agent. Petition to Vacate at ¶ 14; Petition to Confirm at ¶¶ 12–15. In 2013, PGS and BP contracted for PGS to fund and

---

[1] The parties agreed to forgo filing answers to the Petitions. *See* Doc. ## 23, 24.

[2] "'S.A.S.' is an acronym for 'société par actions simplifiée,' a type of French business entity. *See* *Siswanto v. Airbus Americas, Inc.*, No. 15-CV-5486, 2016 WL 7178459, at *1 (N.D. Ill. Dec. 9, 2016).

distribute the first five seasons of BP's new animated children's television show entitled *Alvinnn!!! And the Chipmunks* (the "Series"). *Id.*; Doc. # 30-1 at 2.[3]

**B. The International Distribution Agreement**

On or around November 31, 2019, BP and PGS entered into an agreement governing the international distribution of Seasons 6 and 7 of the Series (the "Agreement"). Doc. # 30-1 at 1. The Agreement requires disputes to be resolved by "binding, final, exclusive and non-appealable international arbitration" in Los Angeles under the International Arbitration Rules of Independent Film and Television Alliance ("IFTA") in effect as of the date of the request for arbitration before a sole arbitrator. *Id.* at 11.

After entering into the Agreement, the parties' relationship began to deteriorate. This culminated in April 2022, when BP suspended production on Seasons 6 and 7 of the Series. Petition to Vacate ¶ 18; Petition to Confirm ¶ 39. BP asserts that this was due to the COVID-19 pandemic and a changing entertainment landscape (Petition to Vacate ¶¶ 15–18), while PGS claims the suspension was the latest iteration of BP's efforts to renege on the Agreement so it could sell an unencumbered Alvin and the Chipmunks franchise to a third party (Petition to Confirm ¶¶ 22–39).

**C. The Arbitrations**

PGS initiated arbitration on May 27, 2022, asserting breach of the Agreement and bad faith (the "First Arbitration"). Doc. # 30-2. In the First Arbitration, PGS alleged that BP breached the Agreement by failing to perform its obligations in good faith, including by rejecting licensing proposals involving Disney, Nickelodeon, Amazon, Discovery and Tele-Quebec. *Id.* at 4–5. PGS sought approximately $33.8 million in lost profits from BP's refusal to commit to the production of Seasons 6 and 7, $6.7 million for harm to PGS's business relationships with existing distribution partners, $12.15 million for frustrating PGS's ability to produce additional properties in the future with affected

[3] Unless otherwise noted, citations to the record use CM/ECF pagination.

distributors working on the Series; and for the costs and attorney fees from the arbitration. *Id*. at 10. BP responded, seeking dismissal of PGS' claims. Doc. # 30-3.

The International Center for Dispute Resolution ("ICDR") appointed Michael C. Donaldson to oversee the arbitration. Petition to Vacate ¶¶ 1, 20.

On December 16, 2022, BP initiated a separate arbitration, asserting that PGS breached the Agreement and its good-faith obligations to BP under French law (the "Second Arbitration"). Doc. # 30-4 at 5. BP claimed that after BP revised the delivery schedule for the Series to account for COVD-19 related delays, PGS failed to provide BP's new delivery schedules to broadcasters and concealed this failure until broadcasters complained. *Id*. 2–5. BP characterized this as a deliberate effort by PGS to position itself for litigation against BP and sought monetary damages from the alleged economic and reputational harm of PGS's actions. *Id*. at 2, 6.

On February 1, 2023, PGS asserted a counterclaim against BP in the Second Arbitration for improperly disclosing PGS's confidential business information to PGS's business partners and direct competitors and sought monetary damages and costs as relief. Doc. # 30-5 at 7, 9.

On April 18, 2023, the ICDR granted PGS's request to consolidate the First Arbitration and the Second Arbitration before the arbitrator. Doc. # 30-6.

On February 2, 2024, BP amended its arbitration demand to include additional claims against PGS for breach of contract and for violation of PGS's duties under French law to perform its obligations in good faith and to perform its agency obligations. Doc. # 30-7 at 7. BP alleged that PGS disclosed confidential litigation information to broadcasters damaging BP's reputation and failed to inform BP of third-party broadcast proposals. *Id*. On February 14, 2026, PGS asserted its own counterclaim, alleging that BP had disclosed PGS's confidential information to business partners and direct competitors. Doc. # 30-8 at 11.

//

//

**D. The November 21, 2024 Award**

On November 21, 2024, the arbitrator issued a final award "in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding" (the "November 21, 2024 Award"). Doc. # 30-10 at 12. In sum, the arbitrator required BP to pay PGS $629,855.26 in damages and attorney fees and costs; BP was not awarded any monetary damages or attorney fees. *Id*. at 12.[4]

The arbitrator found that BP acted in bad faith under French law by rejecting four licensing opportunities involving Disney, Discovery, Tele-Quebec, and Nickelodeon.[5] *Id*. at 7. The arbitrator also found that BP acted in bad faith by (1) withholding from PGS BP's intention to sell their company and its intellectual property (*id*. at 6); (2) sharing various PGS contacts with third parties when exploring efforts to sell its company (*id*. at 8). The arbitrator also rejected BP's claim that PGS improperly disclosed the ongoing litigation proceedings to broadcasters and others. *Id*.

The arbitrator did not uniformly find in favor of PGS, however. For example, the arbitrator found that PGS acted in bad faith by failing to provide revised delivery schedules to broadcasters. *Id*. at 8. The arbitrator also found insufficient evidence that BP threatened to cancel seasons 6 and 7 of the Series to hinder PGS's ability to secure deals for these seasons. *Id*. at 7. And the arbitrator also found "there was mutual bad faith under French Law" and "[g]iven the palpable ill will between the parties" terminated the Agreement with specific requirements for certain continuing obligations under the Agreement. *Id*. at 10–11.

---

[4] The arbitrator also found that the arbitration costs totaling $154,127.58 should be borne equally by the parties and required BP to reimburse PGS $8,088.79 for the arbitration fees incurred by PGS in excess of the apportioned costs. Doc. # 30-10 at 12.

[5] The arbitrator did not find that BP rejected an earlier, 2020 Nickelodeon offer in bad faith. Although he did not state the reason for not considering that offer in his bad faith analysis, the arbitrator's failure to do so is understandable because both BP and PGS rejected the 2020 offer. *See* Petition to Confirm ¶ 37 ("Nickelodeon made a $6.5 million offer *that the parties initially passed on in 2020*, then PGS returned to in 2021 with the expectation to improve it through subsequent negotiations.") (emphasis added).

As noted above, the arbitrator awarded damages to PGS for "the course of conduct of BP." *Id.* at 11. For the rejected Disney, Discovery, and Tele-Quebec deals, the arbitrator awarded PGS 27.5% of the proposed license fee for each rejected contract: $123,750 for the Disney deal; $196,625 for the Discovery deal; and $95,766.45 for the Tele-Quebec deal. *Id.* at 11. As for the rejected Nickelodeon proposal, the arbitrator concluded that there was "no proposed licensee fee on which to base [the] calculations" because the proposal was never formalized. *Id.* He therefore averaged the proposed licensing fees from the three other rejected deals and awarded $138,713.81 for the rejected Nickelodeon opportunity. *Id.* The total damages awarded for the four lost opportunities were $554,855.26. *Id.* The arbitrator also awarded PGS $75,000 in separate damages for BP acting in bad faith under French law. *Id.*

The arbitrator did not award BP damages for "the course of conduct by PGS," finding that BP had failed to provide sufficient evidence supporting its damages claim. *Id.* at 11–12.

As for the parties' requests for attorney fees, the arbitrator found that since both parties had not fully complied with the French requirement to perform the Agreement in good faith and open communication, he would not award attorney fees and costs with regard to the First Arbitration brought by PGS against BP. *Id.* at 12. But he also found that PGS was entitled to attorney fees and costs "starting with the point in time when a separate arbitration was filed by BP against PGS on December 16, 2022" (the Second Arbitration) because BP's arbitration demand was triggered by testimony previously ignored by BP. *Id.* at 12.

**E. Requests for Correction**

Article 37 of the ICDR International Arbitration Rules ("Article 37") allowed the arbitrator to "correct any clerical, typographical, or computation errors" or "make an additional award as to claims, counterclaims, or setoffs presented by omitted from the award" upon the request of a party within 30 days or the final arbitration award. Doc. # 30-14 at 2–3.

On December 10, 2024 BP submitted a request for correction pursuant to Article 37 (the "BP Correction Request"). Doc. # 30-11. BP explicitly stated that it did "not challenge the substance" of the arbitrator's merits decisions. *Id.* at 1–2. Instead, BP sought correction of the arbitrator's assessment of what triggered the Second Arbitration—pointing out that the testimony identified by the arbitrator was given *after* the initiation of the Second Arbitration. *Id.* at 3. BP also requested that the arbitrator award BP its own fees and costs for the portions of the arbitration award for which BP had been successful and proposed a post-award process requiring PGS to produce invoices and proof of payment and allowing BP to lodge targeted objections on a mutually agreed schedule. *Id.*

On December 11, 2024 PGS submitted an objection to the BP Correction Request and its own request for correction pursuant to Article 37 (the "PGS Correction Request"). Doc. # 30-12. PGS objected to the BP Correction Request as exceeding the scope for corrections contemplated by Article 37. *Id.* at 2–4. PGS asked the arbitrator (1) to reduce the attorney fees and cost award to a sum certain and (2) to modify the Nickelodeon damages calculation to use a $6.24 million licensing valuation in the record rather than the average of the Disney, Discovery, and Tele-Quebec deals. *Id.* at 5

**F. January 24, 2025 Amendment**

On January 24, 2025, the arbitrator issued a written disposition granting in part and denying in part the parties' Article 37 requests (the "January 24, 2025 Amendment"). Doc. # 30-14 at 3, 5.

As to the BP Correction Request, the arbitrator modified certain language regarding circumstances that led to the Second Arbitration. *Id.* at 3. The arbitrator found that while BP was correct that the testimony cited in the November 21, 2024 Award as the impetus for the Second Arbitration was misdated, the Second Arbitration was still "premised upon information that either was or should have been known by BP at the time of the [First Arbitration]." *Id.*

As to the PGS Correction Request, the arbitrator concluded he had "inadvertently overlooked" a licensing valuation for the rejected Nickelodeon deal that was in the record[6] and replaced the averaged value used for the Nickelodeon opportunity ($138,713.81) with a number calculated based on the purportedly overlooked exhibit ($1,716,000). *Id*. As a result, the damages attributable to PGS's four lost opportunities increased from $554,855.26 to $2,132,141.45. *Id*.

With respect to attorney fees and costs, the arbitrator also declined BP's requests to either withdraw the attorney fees awarded to PGS or to award BP attorney fees. *Id*. The arbitrator found these requests did not fall within the ambit of Article 37, noting that his attorney fee decision was "thoughtfully made after weighing PGS's relatively minor bad faith against BP's much more costly and serious bad faith." *Id*.

The arbitrator also declined PGS's request to fix a sum certain and instead ordered the parties to meet and confer to determine the amount, directing that invoices and proof of payment be exchanged and that BP's objections to invoices be reasonable. *Id*.

## III. DISCUSSION

### A. BP's Motion to Vacate is Denied

The Federal Arbitration Act ("FAA") "gives federal courts only limited authority to review arbitration decisions." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.,* 363 F.3d 1010, 1012 (9th Cir. 2004) (citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.,* 341 F.3d 987, 998 (9th Cir. 2003) (en banc)). Under 9 U.S.C. § 9, a court "must grant" an order confirming an award, "unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10 or 11]."

The FAA limits the Court's power to vacate an arbitration award to certain circumstances, including where "the arbitrator[] exceeded [his or her] powers." 9 U.S.C.

---

[6] The arbitrator pointed to "Nickelodeon's licensing offer contained in Exhibit 62" as the licensing offer that was overlooked. Doc. # 30-14 at 3. Exhibit 62 concerns a Viacom/Nickelodeon 2020 offer, which both BP and PGS rejected. *See* Doc. # 30-15; Doc. # 1 at 49; Doc. # 27 at 64–65, 74.

§ 10(a)(4). The burden of establishing grounds for vacatur rests on the party seeking to vacate the award. *U.S. Life Ins. v. Super. Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010); *Emp'rs Ins. of Wausau v. Nat. Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1485 (9th Cir. 1991). The Court has "extremely limited authority to review arbitration awards." *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1239 (9th Cir. 2022). A district court will set aside an arbitrator's decision "only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). Courts resolve ambiguities in favor of the award's validity, even where its factual findings or legal conclusions are erroneous. *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1209 (9th Cir. 1989).

1. The Court Declines to Vacate the Arbitrator's Decision to Amend His Damages Calculation Regarding the Nickelodeon Deal

BP argues that the arbitrator exceeded his powers by increasing damages for BP's rejection of the potential Nickelodeon deal in the January 24, 2025 Amendment. Doc. # 20 at 16–21. BP invokes both the doctrine of *functus officio*[7] and Article 37 of the ICDR-IFTA Rules to challenge this amendment. *Id.* While BP's argument regarding the *functus officio* doctrine is persuasive, the Court finds that the arbitrator did not exceed his authority under Article 37.

//

//

//

//

//

[7] "*Functus officio*" is the Latin for "having performed his or her office." *See* FUNCTUS OFFICIO, Black's Law Dictionary (12th ed. 2024)

### *a. Functus Officio*[8]

The doctrine of *functus officio* provides that "once an arbitrator has made and published a final award his authority is exhausted and he can do nothing more in regard to the subject matter of the arbitration." *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir. 1982) (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967)). The doctrine serves an important but limited function: preserving finality and reducing the risk that, after an award issues, an arbitrator will be drawn back into the merits by renewed advocacy, outside influence, or second thoughts. *Id.*

The doctrine is subject to limitations. *Id.* at 734 n.1. An arbitrator may revisit a final award to (1) "correct a mistake which is apparent on the face of his award"; (2) "complete an arbitration if the award is not complete"; and (3) "clarify an ambiguity in the award." *Id.* Those exceptions do not permit a party to introduce new evidence to persuade the arbitrator that the original decision was wrong. *Id.* And the exception for mistakes apparent on the face of the award generally covers "clerical mistakes or obvious errors in arithmetic computation." *Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 332 (3d Cir. 1991); *see Local P-9, United Food & Com. Workers v. George A. Hormel & Co.*, 776 F.2d 1393, 1394 (8th Cir. 1985).

The parties have not identified, and the Court has not found, binding authority drawing a precise line between a permissible correction of a computational mistake and

---

[8] The Court rejects PGS's argument that the November 21, 2024 Award was nonfinal for purposes of analyzing the *functus officio* doctrine. Doc. # 29 at 14. The arbitrator stated that the award was "in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding." Doc. # 30-10 at 12. Similar language has been found sufficiently final for purposes of the *functus officio* doctrine, and the Court finds the same here. *See, e.g., BridgeLux, Inc. v. Ensure Enter., Inc.*, No. C 08-04218 JF, 2009 WL 10709801, at *4 (N.D. Cal. Mar. 31, 2009); *Aerojet Rocketdyne, Inc. v. Int'l Union, UAW*, No. 2:16-cv-1061, 2017 WL 9500948, at *4–5 (E.D. Cal. Apr. 19, 2017).

an impermissible reconsideration of a final arbitral award. The non-binding authorities suggest that the common-law exception is narrow.

In *Colonial Penn*, for example, the arbitrators' correction was found to fall outside this exception. The arbitrators first awarded $10 million and a release of claims to certain reserves, then later replaced that release with an additional cash payment after concluding they had misunderstood the parties' rights in those reserves. 943 F.2d at 329–33. The Third Circuit held that the second award could not stand because the asserted error was not apparent on the face of the award and became visible only by resort to facts outside the award itself. *Id.* at 332–33. *San Diego AFL-CIO* reached a similar result when an arbitration board later inserted the word "not" into one provision and added an effective date to another. *San Diego AFL-CIO Bus Drivers Local Div. 1309 v. San Diego Transit Corp.*, 972 F.2d 1342, 1992 WL 180221, at *2 (9th Cir. 1992). Those decisions reflect concern with post-award changes that alter the basis or effect of the award after the arbitrator returns to the matter.

Other cases show the narrow circumstances in which a later correction is allowed. For example, in *Laurin Tankers*, the court approved a remand to address a fuel-consumption miscalculation that was evident to "anyone familiar with the industry," because the fuel consumption number used by the arbitrators would have been physically impossible for the specific tanker vessel at issue. *See Laurin Tankers Am., Inc. v. Stolt Tankers, Inc.*, 36 F. Supp. 2d 645, 650–53 (S.D.N.Y. 1999). Accordingly, the permissible re-computation in *Laurin Tankers* involved a simple arithmetic correction to an obvious error, not a change to the methodology used to determine the remedy based on a reinterpretation of the evidence as in *Colonial Penn*.

In *BridgeLux*, the district court upheld a correction because it found the face of the original award revealed the problem: the arbitrator had expressly valued common stock based on "unrebutted testimony" concerning preferred stock. *BridgeLux, Inc. v. Ensure*

*Enter., Inc.*, No. C 08-04218 JF, 2009 WL 10709801, at *5–6 (N.D. Cal. Mar. 31, 2009).[9] The arbitrator then used a different valuation of the common stock by averaging the values of common stock previously provided by the parties. *Id.* at *5. To the extent *BridgeLux* reflects a broader application of the *functus officio* exception than *Colonial Penn*, the decisions remain reconcilable for two reasons: (1) the recalculation in *BridgeLux* resulted in only a *de minimis* change to the remedy (*id.*) while the recalculation in *Colonial Penn* resulted in an almost $9 million increase in award (*see Colonial Penn Ins. Co.*, 943 F.2d at 329–30); and (2) the district court in *BridgeLux* also relied on the arbitrator's authority under Article 30 of the ICDR rules—authority substantially similar to the Article 37 power invoked by the arbitrator here—while *Colonial Penn* did not address the arbitrator's authority under the arbitral rules. *See BridgeLux, Inc.*, 2009 WL 10709801, at *4–6.

The recalculation performed by the arbitrator here appears outside the bounds of what is typically permitted under the common law *functus officio* doctrine. In the November 21, 2024 Award, the arbitrator stated that there was "no proposed licensee fee on which to base" a calculation for the Nickelodeon opportunity because the proposal had never been formalized. Doc. # 30-10 at 11. He then used a different valuation method: averaging the proposed licensing fees from the Disney, Discovery, and Tele-Quebec deals, which yielded $138,713.81 for the rejected Nickelodeon opportunity. *Id.*

Then, in the January 24, 2025 Amendment, the arbitrator abandoned the averaging approach he previously used, referenced an exhibit in the record to approximate the value of the Nickelodeon opportunity, and replaced his earlier figure for damages for the Nickelodeon deal with $1,716,000. Doc. # 30-14 at 5. This increased the damages awarded to PGS. Doc. # 30-14 at 5. It also changed the methodology used to measure

[9] Relevant to the Court's analysis below, the affirmance of the arbitrator's correction was also based on the arbitrator's power under a substantially similar arbitral rule as Article 37 in this case. *BridgeLux, Inc.*, 2009 WL 10709801 at *4–6.

damages for the Nickelodeon deal, not just an input used in the calculation. Moreover, the asserted "mistake" was not apparent from the face of the award itself—it only became visible after the arbitrator returned to the record and decided that an exhibit should have been used when the November 21, 2024 award suggested the record did not supply sufficient evidentiary basis for such a calculation. Unlike *Laurin Tankers*, the corrected portion of the November 21, 2024 did not involve a physical impossibility evident from the face of the award, and unlike *BridgeLux*, the modification involved a significant change to the magnitude of the remedy. Accordingly, the arbitrator's amendment likely went beyond the narrow exceptions to the *functus officio* doctrine.

***b. Article 37***

The Court's *functus officio* analysis is not the end of the matter, however, because the parties did not proceed under the default common-law framework alone. They agreed to arbitrate under rules that expressly authorize a limited form of post-award correction. Article 37 permitted the arbitrator to "correct any clerical, typographical, or computation errors" and to "make an additional award as to claims, counterclaims, or setoffs presented by omitted from the award." Doc. # 30-14 at 2–3. "It is clear . . . that the parties and the arbitrator have full authority to establish the procedural rules of arbitration." *See Loc. P-9, United Food & Com. Workers Int'l Union, AFL-CIO*, 776 F.2d at 1394. The question, then, is how much deference the Court owes the arbitrator's understanding of Article 37 in these circumstances.

*T.Co Metals* provides guidance. There, the Second Circuit considered ICDR Article 30 (which uses similar language to Article 37) and held that the arbitrator did not exceed his powers by issuing an amended award under that rule. *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 336, 342–47 (2d Cir. 2010). The correction in *T.Co Metals* went beyond fixing a transposed number or recalculating an obvious arithmetic error. Indeed, the arbitrator explained that his corrections were "not a mere computational issue," and required renewed "appreciation of the evidence." *Id.* at 337.

Nonetheless, he concluded that Article 30 authorized him to "change conclusions based upon clerical errors in the body of an award, even where such correction process entails an exercise of judgment beyond rote computation." *Id.* He therefore modified his original calculation and reduced the damages from $420,537 to $340,587. *Id.*

The Second Circuit upheld the amendment and concluded that the district court had framed the issue too narrowly by looking only to the common-law *functus officio* doctrine rather than to the arbitrator's authority under Article 30 and the parties' adopted arbitral rules. *Id.* at 342–47. The court emphasized that the ICDR rules gave the arbitrator authority to interpret provisions relating to his powers and duties, and it therefore deferred to his understanding of Article 30's scope. *Id.* at 344–47. In that respect, *T.Co* recognized that an amendment may fall outside the narrow common-law category of "clerical mistakes or obvious errors in arithmetic computation," yet still be permissible under the parties' chosen arbitral rule containing the same language. *Id.* at 342–43, 345–47.

This reasoning applies here. The parties agreed to be bound by the decision of a single arbitrator acting under IFTA rules, which included Article 37. *See* Doc. # 30-1 at 11. The Second Circuit in *T.Co. Metals* found this kind of agreement provided a "clear and unmistakable" expression of intent to allocate to the arbitrator the task of interpreting the scope of his powers and duties under these rules. *See T.Co Metals, LLC*, 592 F.3d at 344–45. And here it is evident that the arbitrator grappled with the scope of his authority under Article 37 when the parties both submitted requests for correction pursuant to this rule. For example, he denied BP's request to alter the attorney fees ruling because that request challenged a decision he had "thoughtfully made after weighing" the parties' conduct and therefore fell outside his Article 37 authority. Doc. # 30-14 at 5. He treated the Nickelodeon issue differently because, in his view, the relevant licensing valuation had been "inadvertently overlooked." *Id.* The Court does not read that explanation lightly. To be sure, the Nickelodeon revision may have been more substantive than the

sort of correction ordinarily allowed under the common-law *functus officio* doctrine. But *T.Co Metals* shows that this does not end the analysis when the parties have adopted arbitral rules that give the arbitrator continuing corrective authority and the arbitrator has interpreted the authority conferred by that rule. 592 F.3d at 344–47; *see also*, *Veliz v. Cintas Corp.*, 273 F. App'x 608, 609 (9th Cir. 2008) (finding the district court erred by applying the doctrine of *functus officio* to find the arbitrator reconsidered his award without deferring to the arbitrator's interpretation of his authority); *BridgeLux, Inc.* 2009 WL 10709801 at *5–6.

This approach also aligns with the Ninth Circuit's directive that an "arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits." *See Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006).

On this record, the Court cannot say that the arbitrator exceeded the authority Article 37 conferred when he determined that the Nickelodeon issue involved an overlooked computational input that Article 37 empowered him to correct, rather than an improper request to revisit a "thoughtfully made" substantive decision. Accordingly, the Court finds that the arbitrator acted appropriately in revising the damages calculation regarding the Nickelodeon deal with the January 24, 2025 Amendment. On this issue, BP's Motion is DENIED and PGS's Motion is GRANTED.

2. <u>BP Waived Its Concealment Claim and the Arbitrator Addressed the Claim By Declining Damages Based on Insufficient Evidence</u>

BP argues that the arbitrator failed to rule on its claim that PGS failed to inform BP of third-party broadcast proposal deals (BP's "concealment claim") and therefore did not issue a "mutual, final, and definite award," rendering the November 21, 2024 Award subject to vacatur under § 10(a)(4). Mot. to Vacate at 21–23. The Court disagrees.

A party cannot assert challenges to confirmation of an arbitration award that were not raised during the arbitration. *Marino v. Writers Guild of America, East, Inc.,* 992 F.2d

1480, 1484 (9th Cir.1993); *Wellman v. Writers Guild of America, West., Inc.,* 146 F.3d 666, 673–74 (9th Cir.1998).

Here, BP waived its argument about the purportedly unaddressed concealment claim because it did not raise this alleged omission in the BP Request for Correction. *See* Doc. # 30-11 at 1–2. Article 37 expressly permits a party to seek "an additional award as to claims, counterclaims, or setoffs presented but omitted from the award." Doc. # 30-14 at 1. BP did not invoke that mechanism to seek a ruling on any missing claims. *See* Doc. # 30-11 at 1–2. Instead, BP affirmatively represented that it "does not challenge the substance of the arbitrator's decisions regarding the parties' claims and defenses." *Id*. Having failed to raise the alleged omission when expressly permitted to do so—and having disclaimed any challenge to the arbitrator's merits determinations—BP cannot now seek vacatur on the theory that the award was incomplete.

Even absent waiver, BP's argument fails on the merits. The arbitrator expressly stated that the November 21, 2024 Award was "in full settlement of all claims and counterclaims submitted by the parties in this consolidated Arbitration proceeding." Doc. # 30-10 at 12. And, as BP concedes, the arbitrator addressed the supposedly missing claim earlier in the November 21, 2024 Award. *Id*. at 10–11; Mot. to Vacate at 21–22. Accordingly, the Court finds that the arbitrator adjudicated each of BP's claims and denied relief. *Id*. at 11. The November 21, 2024 Award thus resolved this issue.

3. <u>BP Waived Its Argument that the Arbitrator Exceeded His Authority by Failing to Fix Costs</u>

BP also argues that the arbitrator exceeded his powers by failing to reduce the fee-and-cost award to a sum certain. Mot. to Vacate at 23–24. BP's argument is forfeited, however, and BP cannot complain of a procedure similar to the one it urged the arbitrator to adopt. In its request for correction, BP did not argue that the fee award was defective because it did not state a sum certain. Doc. # 30-11 at 2–3. Instead, BP proposed a post-award process under which PGS would produce invoices and proof of payment and BP could make targeted objections on an agreed schedule. *Id.* The arbitrator adopted a

similar invoice-based process in the January 24, 2025 Amended Award. Doc. # 30-14 at 4–5.

That sequence forecloses vacatur on the theory BP now advances. Courts reviewing arbitral awards have held that procedural objections are forfeited when they are not timely presented to the arbitrator. *See Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 692–93 (7th Cir. 2004) (holding that objections to the panel's compliance with arbitral timing rules were waived where "no one objected at the crucial time" and emphasizing that "the prejudiced party must make its objection known"). And the Ninth Circuit has long applied the related principle that a party "may not complain on review of errors below for which he is responsible." *Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1336 (9th Cir. 1985) (quoting *Hudson v. Wylie*, 242 F.2d 435, 448 (9th Cir. 1957)). Having asked the arbitrator to quantify fees through invoice production and party objections—rather than by fixing a sum certain in the award itself—BP cannot now seek vacatur because the arbitrator failed to reduce the attorney fees to a specific number. On this record, that objection supplies no basis for relief under 9 U.S.C. § 10(a)(4). *See Schoenduve Corp.*, 442 F.3d at 732–33.

4. <u>The Arbitrator Did Not Exceed His Authority By Awarding PGS Attorney Fees</u>

BP argues that the arbitrator exceeded his authority by awarding PGS Attorney Fees on the Second Arbitration. Mot. to Vacate at 24–27.

As BP concedes, the arbitral rules permitted the arbitrator to award "the reasonable legal and other costs incurred by the parties." *Id.* at 27. Indeed, both BP and PGS requested attorney fees as part of the proceedings. *See* Doc. # 30-10 at 12 ("Both parties have requested an award of attorneys' fees and costs."). The arbitrator fashioned a fee award for the consolidated proceedings pegged to attorney fees and costs stemming primarily from BP's Second Arbitration. *Id.* In the January 24, 2025 Amendment, the arbitrator rejected BP's request to revoke any attorney fees awarded to PGS, noting that he had made this decision "[t]houghtfully . . . after weighing PGS' relatively minor bad

faith against BP's must more costly and serious bad faith." Doc. # 30-14 at 3. The Court will not second guess this decision and finds that BP has not carried its burden to show that the award should be vacated on this basis. *See Stead Motors of Walnut Creek*, 886 F.2d at 1209.

***

Accordingly, BP's Motion to Vacate the Arbitration Award is DENIED**.**

**B. PGS's Request to Confirm the Arbitration Award is Granted**

Under the FAA, the Court must confirm an arbitration award unless a statutory ground for vacatur is established. 9 U.S.C. § 9. Accordingly, for the reasons discussed above, the Court GRANTS PGS's Motion to Confirm to the extent it seeks confirmation of the November 21, 2024 Award as it was amended by the January 24, 2025 Amendment.

**C. PGS's Request for Interest and Additional Attorney Fees is Granted in part, Denied in Part**

In addition to seeking confirmation of the arbitration award, PGS asks the Court to award it different categories of interest as well as attorney fees in connection with this action. Doc. # 28 at 23–26. As a threshold matter, the arbitrator's silence on awarding interest does not foreclose the Court from awarding interest upon confirmation of the arbitration award. *Lagstein v. Certain Underwriters at Lloyd's of London*, 725 F.3d 1050, 1055 (9th Cir. 2013) ("Courts do not lack authority to award interest where an arbitration award is silent."); *accord*, *Northrop Corp. v. Triad Int'l Mktg. S.A.,* 842 F.2d 1154, 1155 (9th Cir. 1988) (per curiam).

//

//

//

//

//

//

In diversity cases, state law governs the availability and rate of prejudgment interest. *Id*. Federal law governs requests for post-judgment interest. *Id*. at 1155–56.[10]

As detailed below, the Court GRANTS PGS's request for post-award, prejudgment interest and post-judgment interest and DENIES PGS's request for pre-award interest and additional attorney fees in connection with this action.

1. Pre-Award Interest is Denied

PGS seeks pre-award, prejudgment interest for the period before issuance of the November 21, 2024 Award pursuant to California Civil Code section 3287(a). Doc. # 28 at 24–25.

Under California Civil Code § 3287(a), prejudgment interest is mandatory only when damages are "certain, or capable of being made certain by calculation." Cal. Civ. Code § 3287(a); *Leff v. Gunter*, 33 Cal. 3d 508, 519–20 (1983). That standard is not met where the amount of damages depends on the trier of fact's resolution of disputed evidence or valuation issues. *Fireman's Fund Ins. Co. v. Allstate Ins. Co.*, 234 Cal. App. 3d 1154, 1173–74 (1991) ("The statute does not authorize prejudgment interest where the amount of damage . . . depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor.") (citation modified); *accord.*, *Duale v. Mercedes-Benz USA, LLC*, 148 Cal. App. 4th 718, 729 (2007); *Wisper Corp. v. Cal. Com. Bank*, 49 Cal. App. 4th 948, 962–63 (1996).

Here, the November 21, 2024 Award turned on the arbitrator's factual findings and valuation methodology regarding alleged lost licensing opportunities, including projected revenues and other disputed inputs. Because the amount owed was not fixed or

[10] Although the Agreement provides that French law should govern "the validity, construction and performance" of the Agreement, the question of the availability of pre- and post-judgment interest and attorney fees are a distinct remedial issue. *See Arno v. Club Med Boutique Inc.*, 134 F.3d 1424, 1426 (9th Cir. 1998) (finding that California law applied to an attorney fee request, despite French law applying to the underlying tort claim).

ascertainable before the arbitrator issued that award, PGS has not shown entitlement to mandatory prejudgment interest under § 3287(a). *See Warren v. Kia Motors Am., Inc.*, 30 Cal. App. 5th 24, 43–44 (2018).[11]

2. Post-Award, Prejudgment Interest is Granted

PGS also seeks post-award, prejudgment interest in the amount of 10% per annum for all liabilities first fixed by the January 24, 2025 amendment. Doc. # 28 at 25–26. The Court grants this request.

Under California Civil Code section 3289(a), post-award, prejudgment interest is mandatory from the date the arbitration panel renders its award, because the award itself fixes the amount owed and creates a new, certain liability. *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004); *Pierotti v. Torian*, 81 Cal. App. 4th 17, 27–28 (2000).

Here, the amount owed to PGS became certain and fixed with the January 24, 2025 amendment. The Court therefore awards PGS post-award, prejudgment interest at 10% per annum from January 24, 2025, through the day before entry of judgment.

3. Post-judgment Interest is Granted

PGS also requests post-judgment interest. Doc. # 28 at 26. The Court grants this request.

Post-judgment interest on a federal judgment is mandatory. 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *see Perkins v. Standard Oil Co.*, 487 F.2d 672, 674 (9th Cir. 1973). Post-judgment interest accrues on the entire amount of the judgment, including any

---

[11] To the extent PGS also seeks discretionary pre-award, pre-judgment interest on an unliquidated contract claim under section 3287(b), the Court declines to award it. The Court has "broad discretion" under that provision. *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1376–77 (9th Cir. 1987). In exercising that discretion, the Court notes that PGS has already obtained a substantial recovery. The Court also notes that PGS has not explained why it could not have sought pre-award interest from the arbitrator. Under these circumstances, the Court declines to award prejudgment interest under section 3287(b).

prejudgment interest awarded. *Air Separation, Inc. v. Underwriters at Lloyd's of London,* 45 F.3d 288, 291 (9th Cir. 1995). Accordingly, the Court finds that PGS is entitled to post-judgment interest at the rate provided by 28 U.S.C. § 1961 from the date judgment is entered until the date of payment.

4. Additional Attorney Fees for this Action are Denied

PGS also seeks attorney fees in addition to those awarded by the arbitrator for being forced to litigate the present action because of BP's bad faith actions. Doc. # 28 at 26–27. The Court denies this request.

Federal courts may award attorney fees under their inherent authority where the losing party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983). In the arbitration-confirmation context, an "unjustified refusal to abide by an arbitrator's award" may support a bad-faith fee award. *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.*, 84 F.3d 1186, 1192 (9th Cir. 1996).

Based on its review of the record, the Court finds that PGS has not carried its burden to show that BP's pursuit of vacatur amounted to bad faith or an unjustified refusal to comply with the award. Accordingly, the Court DENIES PGS's request for attorney fees.

## IV. **CONCLUSION**

For the foregoing reasons:

1. BP's Motion to Vacate is **DENIED**.
2. PGS's Motion to Confirm is **GRANTED IN PART and DENIED in PART.**
    a. The Court **CONFIRMS** the November 21, 2024 Award as it was amended by the January 24, 2025 Amendment.
    b. PGS is awarded post-award, prejudgment interest on the final arbitration award at a rate of 10% per annum from January 24, 2025, through the day before entry of judgment.

c. Post-judgment interest shall accrue pursuant to 28 U.S.C. § 1961 from the date judgment is entered until the date of payment.

d. PGS's request for attorney fees incurred in this confirmation and vacatur proceeding is **DENIED**.

3. All other pending matters are hereby **TERMINATED**.

**IT IS SO ORDERED**.

Dated: 3/31/26

Cynthia Valenzuela

HON. CYNTHIA VALENZUELA
UNITED STATES DISTRICT JUDGE

# 2:25cv3240, Bagdasarian Productions, Llc V. Pgs Entertainment

US District Court Docket

United States District Court, California Central

(Western Division - Los Angeles)

**This case was retrieved on 07/13/2026**

## Header

**Case Number:** 2:25cv3240
**Date Filed:** 04/11/2025
**Assigned To:** Judge Cynthia Valenzuela
**Referred To:** Magistrate Judge Charles F. Eick
**Nature of Suit:** Other Statutes - Arbitration (896)
**Cause:** Petition to Vacate Arbitration Award
**Lead Docket:** None
**Other Docket:** 9th CCA, 26-02568
**Jurisdiction:** Federal Question

**Class Code:** Closed
**Closed:** 03/31/2026
**Statute:** 09:0010
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Arbitration

## Participants

| Litigants | Attorneys |
| --- | --- |
| Bagdasarian Productions, LLC<br>**Petitioner** | Haley B. Zoffer<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Davis Wright Tremaine LLP<br>350 South Grand Avenue, Ste 27th Floor<br>Los Angeles, CA 90071<br>USA<br>213-633-8601 Email:Haleyzoffer@dwt.Com<br><br>David Gossett<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>DAVIS WRIGHT TREMAINE LLP<br>1301 K Street Nw Suite 500 East<br>Washington, DC 20005<br>USA<br>202-262-4156 Email:Davidgossett@dwt.Com<br><br>MaryAnn T. Almeida<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Davis Wright Tremaine LLP<br>920 Fifth Avenue Suite 3300<br>Seattle, WA 98104-1610<br>USA<br>206-757-8187 Fax: 206-757-7700<br>Email:Maryannalmeida@dwt.Com |
| PGS Entertainment<br>**Respondent** | Daniel Boris Lifschitz<br>ATTORNEY TO BE NOTICED<br>Gipson Hoffman and Pancione APC<br>1901 Avenue Of The Stars, Suite 1100<br>Los Angeles, CA 90067-6002<br>USA<br>310-556-4660 Fax: 310-556-8945 |

## Litigants

## Attorneys

Email:Dlifschitz@ghplaw.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 04/11/2025 | PETITION to Vacate and Remand Arbitration Award with filing fee previously paid ($405 paid on 04/11/2025, receipt number 39494874), filed by Petitioner Bagdasarian Productions, LLC. (Attorney Haley B. Zoffer added to party Bagdasarian Productions, LLC(pty:pet))(Zoffer, Haley) (Entered: 04/11/2025) | |
| 2 | 04/11/2025 | CIVIL COVER SHEET filed by Petitioner Bagdasarian Productions, LLC. (Zoffer, Haley) (Entered: 04/11/2025) | |
| 3 | 04/11/2025 | Request for Clerk to Issue Summons on Petition (Attorney Civil Case Opening), 1 filed by Petitioner Bagdasarian Productions, LLC. (Zoffer, Haley) (Entered: 04/11/2025) | |
| 4 | 04/11/2025 | NOTICE of Interested Parties filed by Petitioner Bagdasarian Productions, LLC, (Zoffer, Haley) (Entered: 04/11/2025) | |
| 5 | 04/16/2025 | NOTICE OF ASSIGNMENT to District Judge Cynthia Valenzuela and Magistrate Judge Charles F. Eick. (mza) (Entered: 04/16/2025) | |
| 6 | 04/16/2025 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (mza) (Entered: 04/16/2025) | |
| 7 | 04/16/2025 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (mza) (Entered: 04/16/2025) | |
| 8 | 04/16/2025 | 21 DAY Summons Issued re Petition (Attorney Civil Case Opening) 1 as to Respondent PGS Entertainment. (mza) (Entered: 04/16/2025) | |
| 9 | 04/16/2025 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney David Gossett. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (mza) (Entered: 04/16/2025) | |
| 10 | 04/16/2025 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney MaryAnn T. Almeida. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (mza) (Entered: 04/16/2025) | |
| 11 | 04/16/2025 | APPLICATION of Non-Resident Attorney David M. Gossett to Appear Pro Hac Vice on behalf of Petitioner Bagdasarian | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Productions, LLC (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-39519174) filed by Petitioner Bagdasarian Productions, LLC. (Attachments: # 1 Proposed Order) (Zoffer, Haley) (Entered: 04/16/2025) | |
| 12 | 04/16/2025 | APPLICATION of Non-Resident Attorney MaryAnn T. Almeida to Appear Pro Hac Vice on behalf of Petitioner Bagdasarian Productions, LLC (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-39519363) filed by Petitioner Bagdasarian Productions, LLC. (Attachments: # 1 Proposed Order) (Zoffer, Haley) (Entered: 04/16/2025) | |
| 13 | 04/17/2025 | ORDER by Judge Cynthia Valenzuela: granting 11 Non-Resident Attorney David M. Gossett APPLICATION to Appear Pro Hac Vice on behalf of Petitioner Bagdasarian Productions, LLC, designating Zoffer, Haley as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY (aus) (Entered: 04/17/2025) | |
| 14 | 04/17/2025 | ORDER by Judge Cynthia Valenzuela: granting 12 Non-Resident Attorney MaryAnn T. Almeida APPLICATION to Appear Pro Hac Vice on behalf of Petitioner Bagdasarian Productions, LLC, designating Zoffer, Haley as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY (aus) (Entered: 04/17/2025) | |
| 15 | 04/24/2025 | [STRICKEN PURSUANT TO DOCKET # 19] NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award filed by Petitioner Bagdasarian Productions, LLC. (Attachments: # 1 H. Zoffer Declaration, # 2 Exhibit A to H. Zoffer Declaration - Agreement Between BP and PGS, # 3 Exhibit B to H. Zoffer Declaration - Initial Arbitration Award, # 4 Exhibit C to H. Zoffer Declaration - Amended Arbitration Award, # 5 Exhibit D to H. Zoffer Declaration - BP's Request for Correction, # 6 Exhibit E to H. Zoffer Declaration - PGS's Objection to and Request for Correction, # 7 Proposed Order) (Zoffer, Haley) Modified on 4/30/2025 (jec). (Entered: 04/24/2025) | |
| 16 | 04/24/2025 | CERTIFICATE OF SERVICE filed by Petitioner Bagdasarian Productions, LLC, re Certificate/Notice of Interested Parties 4 , Notice to Counsel Re: Consent to Proceed before a US Magistrate Judge - optional html form 7 , Civil Cover Sheet (CV-71) 2 , Petition (Attorney Civil Case Opening), 1 , Summons Issued (Attorney Civil Case Opening) 8 , NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award 15 , Notice of Assignment to United States Judges(CV-18) - optional html form 5 served on April 24, 2025. (Zoffer, Haley) (Entered: 04/24/2025) | |
| 17 | 04/25/2025 | NOTICE OF ERRATA filed by Petitioner Bagdasarian Productions, LLC. correcting NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award 15 (Attachments: # 1 Exhibit A to Notice of Errata - Corrected Notice of Motion and Memorandum of Law in Support of Petition to Vacate and Remand Arbitration Award)(Harper, Jacob) (Entered: 04/25/2025) | |
| 18 | 04/25/2025 | WAIVER OF SERVICE Returned Executed filed by Plaintiff Bagdasarian Productions, LLC. upon PGS Entertainment waiver sent by Plaintiff on 4/23/2025, answer due 6/23/2025. Waiver of Service signed by Defendant PGS Entertainment's Counsel, Daniel B. Lifschitz. (Zoffer, Haley) (Entered: 04/25/2025) | |
| 19 | 04/30/2025 | (IN CHAMBERS) ORDER Petitioner Bagdasarian Productions, LLCs April 24, 2025, Motion to Vacate and Remand Arbitration Award (Doc. # 15) does not include the date and time of the motion hearing and thus does not comply with Local Rule 7-4. Accordingly, Petitioners Motion (Doc. # 15) is STRICKEN. IT IS SO ORDERED.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jec) TEXT ONLY ENTRY (Entered: 04/30/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 20 | 04/30/2025 | Corrected NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award filed by Petitioner Bagdasarian Productions, LLC. Motion set for hearing on 6/6/2025 at 01:30 PM before Judge Cynthia Valenzuela. (Attachments: # 1 Declaration of H. Zoffer in Support, # 2 Exhibit A to Declaration of H. Zoffer - Agreement Between BP and PGS, # 3 Exhibit B to Declaration of H. Zoffer - Initial Arbitration Award, # 4 Exhibit C to Declaration of H. Zoffer - Amended Arbitration Award, # 5 Exhibit D to Declaration of H. Zoffer - BP's Request for Correction, # 6 Exhibit E to Declaration of H. Zoffer - PGS's Objection to and Request for Correction, # 7 Proposed Order, # 8 Certificate of Service) (Zoffer, Haley) (Entered: 04/30/2025) | |
| 21 | 04/30/2025 | STANDING ORDER FOR CIVIL CASES ASSIGNED TO JUDGE VALENZUELA by Judge Cynthia Valenzuela: PLEASE READ THIS ORDER CAREFULLY. IT GOVERNS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES. WHEN CONSULTING THE COURT'S CIVIL STANDING ORDER, PLEASE BE SURE TO USE THE MOST UPDATED VERSION LOCATED ON JUDGE VALENZUELA'S WEBPAGE. See document for further details. (gk) (Entered: 05/04/2025) | |
| 22 | 04/30/2025 | ORDER RE MOTIONS FOR SUMMARY JUDGMENT by Judge Cynthia Valenzuela: READ THIS ORDER CAREFULLY BECAUSE IT CONTROLS THIS CASE AND DIFFERS IN PART FROM THE LOCAL RULES. See document for further details. (gk) (Entered: 05/04/2025) | |
| 23 | 05/09/2025 | STIPULATION to Continue Parties' briefing schedules on motions and hearing date from June 6, 2025 to September 5, 2025 filed by Petitioner Bagdasarian Productions, LLC. (Attachments: # 1 Declaration, # 2 Proposed Order)(Almeida, MaryAnn) (Entered: 05/09/2025) | |
| 24 | 05/14/2025 | ORDER GRANTING STIPULATION TO CONTINUE DEADLINES AND HEARING [DOC. # 23 ] by Judge Cynthia Valenzuela. The Court, having considered the Parties' Stipulation and good cause having been found, hereby GRANTS the Stipulation and ORDERS as follows: (1) PGS's opposition to BP's motion to vacate and remand the arbitration award, and PGS's petition and cross-motion to confirm the arbitration award shall be filed no later than June 23, 2025; (2) BP's reply in support of its motion to vacate and remand the arbitration award, and BP's opposition to PGS's cross-motion to confirm the arbitration award shall be filed no later than July 23, 2025; (3) PGS's reply in support of its cross-motion to confirm the arbitration award shall be filed no later than August 22, 2025; (4) No answers need be filed; and (5) A hearing on both motions will be held on September 5, 2025. (es) (Entered: 05/14/2025) | |
| 25 | 06/16/2025 | ORDER RE MOTIONS FOR SUMMARY JUDGMENT by Judge Cynthia Valenzuela. (cbr) (Entered: 06/16/2025) | |
| 26 | 06/23/2025 | TEXT ONLY ENTRY: NOTICE TO PARTIES by District Judge Cynthia Valenzuela. Effective June 24, 2025, Judge Cynthia Valenzuela will be relocating to Courtroom 10B in the First Street Courthouse, 350 W. 1st Street, Los Angeles, California 90012. All Court appearances shall be made in Courtroom 10B unless otherwise ordered by the Court. For additional information, please refer to Judge Valenzuela's Procedures and Schedules Page on the Court's website. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cbr) (Entered: 06/23/2025) | |
| 27 | 06/23/2025 | PETITION to Confirm Arbitration Award Receipt No: ACACDC-39956533 - Fee: $405, filed by Respondent and Counter-Petitioner PGS Entertainment. (Attorney Daniel Boris Lifschitz added to party PGS Entertainment(pty:res))(Lifschitz, Daniel) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (Entered: 06/23/2025) | |
| 28 | 06/23/2025 | NOTICE OF MOTION AND MOTION for Order for Confirmation of Arbitration Award filed by Respondent and Counter-Petitioner PGS Entertainment. Motion set for hearing on 9/5/2025 at 01:30 PM before Judge Cynthia Valenzuela. (Attachments: # 1 Proposed Order) (Lifschitz, Daniel) (Entered: 06/23/2025) | |
| 29 | 06/23/2025 | OPPOSITION in opposition to re: Corrected NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award 20 filed by Respondent PGS Entertainment. (Lifschitz, Daniel) (Entered: 06/23/2025) | |
| 30 | 06/23/2025 | DECLARATION of Daniel B. Lifschitz In Support Of NOTICE OF MOTION AND MOTION for Order for Confirmation of Arbitration Award 28 and in Opposition to Corrected NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award 20 filed by Respondent PGS Entertainment. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O)(Lifschitz, Daniel) (Entered: 06/23/2025) | |
| 31 | 06/23/2025 | Request for Clerk to Issue Summons on Petition (Attorney Civil Case Opening) 27 filed by Respondent and Counter-Petitioner PGS Entertainment. (Lifschitz, Daniel) (Entered: 06/23/2025) | |
| 32 | 06/23/2025 | NOTICE of Interested Parties filed by Respondent and Counter-Petitioner PGS Entertainment, (Lifschitz, Daniel) (Entered: 06/23/2025) | |
| 33 | 07/23/2025 | REPLY in Support of Corrected NOTICE OF MOTION AND MOTION to Vacate and Remand Arbitration Award 20 and Response to Motion to Confirm 28 filed by Petitioner Bagdasarian Productions, LLC. (Attachments: # 1 Proposed Order)(Zoffer, Haley) (Entered: 07/23/2025) | |
| 34 | 08/21/2025 | (IN CHAMBERS) ORDER by Judge Cynthia Valenzuela. The Court finds that Bagdasarian Productions, LLC Motion to Vacate and Remand Arbitration Award 20 and PGS Entertainments Motion for Order for Confirmation of Arbitration Award 28 , both set for hearing on September 5, 2025, are appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the motions are taken UNDER SUBMISSION and the hearing is vacated. No appearances are necessary on this date. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jec) TEXT ONLY ENTRY (Entered: 08/21/2025) | |
| 35 | 08/21/2025 | REPLY in support of NOTICE OF MOTION AND MOTION for Order for Confirmation of Arbitration Award 28 filed by Respondent PGS Entertainment. (Lifschitz, Daniel) (Entered: 08/21/2025) | |
| 36 | 12/23/2025 | Joint REQUEST for Ruling Petitioner's Petition to Confirm Arbitration Award and Respondent's Motion to Vacate and Remand Arbitration Award filed by Petitioner and Counter-Respondent Bagdasarian Productions, LLC. (Gossett, David) (Entered: 12/23/2025) | |
| 37 | 02/23/2026 | Joint Request Pursuant to Local Rule 83-9.4 filed by Petitioner Bagdasarian Productions, LLC (Gossett, David) (Entered: 02/23/2026) | |
| 38 | 02/24/2026 | MINUTES (IN CHAMBERS) ORDER RE JOINT REQUESTS FOR DECISION 36 37 by Judge Cynthia Valenzuela: Pursuant to Local Rule 83-9.3, the parties are advised that the Court expects to issue its decision on the pending motions no later than March 31, 2026.Court Reporter: Not Reported. (jec) TEXT ONLY ENTRY (Entered: 02/24/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 39 | 03/31/2026 | ORDER DENYING PETITIONER BAGDASARIAN PRODUCTIONS, LLC'S MOTION TO VACATE AND GRANTING IN PART, DENYING IN PART PGS ENTERTAINMENT'S MOTION TO CONFIRM ARBITRATION AWARD by Judge Cynthia Valenzuela: Petitioner Bagdasarian Productions, LLC's ("BP") Motion to Vacate 20 is DENIED. Respondent PGS Entertainment's ("PGS") Motion to Confirm 28 is GRANTED IN PART and DENIED in PART. (a) The Court CONFIRMS the 11/21/2024 Award as it was amended by the 1/24/2025 Amendment. (b) PGS is awarded post-award, prejudgment interest on the final arbitration award at a rate of 10% per annum from 1/24/2025, through the day before entry of judgment. (c) Post-judgment interest shall accrue pursuant to 28 U.S.C. section 1961 from the date judgment is entered until the date of payment. (d) PGS's request for attorney fees incurred in this confirmation and vacatur proceeding is DENIED. All other pending matters are hereby TERMINATED. (gk) (Entered: 03/31/2026) | |
| 40 | 04/16/2026 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiff Bagdasarian Productions, LLC. Appeal of Order on Motion to Vacate,,,, Order on Motion for Order,,, 39 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-42024978.) (Attachments: # 1 CACD Notice of Appeal and Order to Appeal)(Gossett, David) (Entered: 04/16/2026) | |
| 41 | 04/24/2026 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 26-2568 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 40 as to petitioner Bagdasarian Productions, LLC. (mat) (Entered: 04/29/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document